**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re JP Morgan Chase Cash Sweep Program* | Case No. 1:24-cv-06404-LGS |
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| | JURY TRIAL DEMANDED |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................... 1

II.     PARTIES .............................................................................................................. 4

        A.      Plaintiffs ................................................................................................... 4

        B.      Defendants ................................................................................................ 4

        C.      Relevant Non-Parties ............................................................................... 5

III.    JURISDICTION AND VENUE ........................................................................... 5

IV.     JPMORGAN'S CASH SWEEP ACCOUNT MISCONDUCT ........................... 6

        A.      The Agreements Between JPMorgan and Its Clients................................ 6

                1.      Full-Service and Self-Directed Brokerage Accounts................................. 9

                2.      Self-Directed Brokerage Accounts ...........................................11

                3.      Traditional IRA and Roth IRA Accounts ................................... 12

                4.      Additional JPMorgan Promises ................................................. 14

        B.      JPMorgan's Cash Sweep Programs ....................................................... 14

        C.      JPMorgan Offered Financial Recommendations on
                Swept Cash and Exercised De Facto Control Over Client
                Accounts With Respect to the Cash Sweep Programs ........................... 15

        D.      JPMorgan Used Its Affiliated Bank, JPMCB, to Siphon Billions of
                Dollars in Net Interest Income from Its Clients' Cash Sweep Deposits ............... 17

        E.      JPMorgan Established Unreasonably Low Interest Rates
                on the Billions of Dollars Its Clients Held in Cash Sweep
                Accounts and Unjustly Enriched Itself ................................................... 19

        F.      JPMorgan Owes Several Independent Duties and Obligations
                to Its Clients in Connection with the Cash Sweep Programs................. 22

                1.      JPMorgan Owes Fiduciary and Other Duties to Its Clients...................... 23

                2.      JPMorgan Has Contractual Obligations to Its Clients,
                        Including to Base Its Sweep Account Interest Rates on
                        Business and Economic Conditions........................................... 26

3.      JPMorgan Has Additional Obligations to Treat Its
        Clients Fairly and in Good Faith.................................................................. 28

4.      JPMorgan Has Contractual and Legal Obligations to Pay
        Reasonable Interest Rates for Retirement Account Clients ...................... 29

5.      JPMorgan Breached the Implied Covenant of Good
        Faith and Fair Dealing to Provide Its Clients with a
        Reasonable Rate of Interest ........................................................................ 31

G.    JPMorgan Breached Its Duties, Contracts, and the Implied
      Covenant, and Profited Thereby ............................................................................ 31

H.    JPMorgan Paid Unreasonably Low Interest Rates on Its
      Clients' Cash Sweep Deposits ................................................................................ 33

      1.      Sweep Account Rates Paid by Other Institutions ..................................... 34

      2.      The Federal Funds Rate Benchmark........................................................... 37

      3.      The Interest Rates on Sovereign Short-Term Debt Benchmark................ 38

      4.      The Interest Rate Applicable to Short-Term Instruments Such as
              Repurchase Agreements.............................................................................. 39

CLASS ACTION ALLEGATIONS ...................................................................................... 40

FIRST CLAIM FOR RELIEF
      Breach of Contract Brought on Behalf
      of Plaintiffs and the Class Against All Defendants........................................................ 44

SECOND CLAIM FOR RELIEF
      Breach of Contract Brought on Behalf
      of the IRA Subclass Against All Defendants ................................................................. 46

THIRD CLAIM FOR RELIEF
      Breach of the Implied Covenant of
      Good Faith and Fair Dealing Brought on Behalf of Plaintiffs
      and the Class Against All Defendants............................................................................. 47

FOURTH CLAIM FOR RELIEF
      Breach of Fiduciary Duty Brought on
      Behalf of Plaintiffs and the Class Against All Defendants ............................................ 48

FIFTH CLAIM FOR RELIEF
      Unjust Enrichment Brought on Behalf
      of Plaintiffs and the Class Against All Defendants........................................................ 49

ii

DEMAND FOR RELIEF ................................................................................................. 49

JURY TRIAL DEMAND ................................................................................................. 50

## I.  **INTRODUCTION**

1.      This class action arises out of JPMorgan Chase & Co. and J.P. Morgan Securities LLC's (together, "JPMorgan" or "Defendants") drastic under-payment of interest on its clients' cash balances in the JPMorgan Cash Sweep Programs.[1]  While acting as its clients' agent vis-à-vis its Cash Sweep Programs, JPMorgan underpaid its clients in violation of its fiduciary and contractual duties in order to enrich itself and its affiliates, including JPMorgan Chase Bank N.A. ("JPMCB"), at its clients' expense.  Rather than pay its clients a fair and "reasonable rate of interest" and put its clients' interests above its own, including by properly or reasonably taking into account prevailing "business and economic conditions" as it was required to do in connection with its Cash Sweep Programs, JPMorgan instead paid *de minimis* rates to its clients in order to improperly reap billions of dollars on that cash in periods of rising interest rates.

2.      Three types of JPMorgan client relationships employ the Cash Sweep Programs— full-service brokerage accounts, self-directed brokerage accounts, and IRA or Roth IRA accounts. For each type, JPMorgan clients often have uninvested cash from various sources—such as when a brokerage client receives dividends, interest payments, or securities sale proceeds.  Rather than allowing that cash to sit idle, JPMorgan's Cash Sweep Programs ostensibly allow clients to earn interest on that uninvested cash by "sweeping" (i.e., automatically transferring) such cash into a bank deposit account. At JPMorgan, each client relationship shared the same fundamental characteristics in which JPMorgan sweeps its clients' uninvested cash into its Cash Sweep Programs and pays interest to those clients on the swept cash.  In so doing, in each example, JPMorgan acts as its client's agent by establishing and maintaining the account on its client's

---

[1] "Cash Sweep Program(s)" or the "Program(s)" refers collectively to what are currently referred to as the Chase Deposit Sweep – IRA (Sweep Symbol: QDERQ), JPMorgan Deposit Sweep – IRA (Sweep Symbol: QCERQ), Chase Deposit Sweep (Sweep Symbol: QACDS), and JPMorgan Deposit Sweep (Sweep Symbol: QAJDS).

behalf, automatically transferring cash from the client's brokerage account into an interest-bearing bank account, and determining and remitting interest that is earned on that cash to clients.

3.     As an agent of its clients with respect to its Cash Sweep Programs, JPMorgan is required to act as a fiduciary in the best interests of its clients in connection with the Programs. That includes a duty to put its clients' interests ahead of its own when recommending and/or conducting transactions for them within the scope of its Cash Sweep Programs.  In addition, the agreements between JPMorgan and its clients carry with them an implied covenant of good faith and fair dealing.

4.     Rather than act as a fiduciary in the best interests of its clients with respect to its Cash Sweep Programs, or fulfill its contractual and implied covenant obligations to its clients, JPMorgan used its clients' funds to enrich itself and its affiliates at its clients' expense. Specifically, JPMorgan failed to uphold its obligation to provide a "reasonable rate of interest" and to "[c]harge no more than what is reasonable for our services."  Instead, JPMorgan was focused on maximizing profits for itself under the Cash Sweep Programs, thus breaking its "special rule that requires us to act in your best interest and not put our interest ahead of yours" that JPMorgan was obligated to follow.

5.     JPMorgan underpaid interest to sweep account clients by controlling and increasing the profits to itself and its affiliates by channeling its clients' cash sweep deposits to its affiliated bank, JPMCB—rather than to any independent third-party banks.  Indeed, JPMCB is the *only option* for the Cash Sweep Programs. In other words, JPMorgan had a tremendous incentive and ability to profit off of its clients' swept cash.  That is exactly what JPMorgan did by using JPMCB to funnel cash from its clients' accounts to JPMCB through its Cash Sweep Programs to capture the profits that could be made off of the substantial amount of swept cash in the Programs.

6. That is particularly true of the last several years, as rising interest rates presented an opportunity for JPMorgan clients to earn significant interest on their cash sweep account balances. In this environment—in which the Federal Funds Rate (the interest rate at which banks lend to one another) skyrocketed from a low of 0.08% in early 2022 to a high of 5.33% in 2024—JPMorgan kept the interest rates paid on the swept cash at its Cash Sweep Programs stagnant at 0.01%. By improperly keeping the interest rates paid on the Cash Sweep Programs artificially low, JPMorgan usurped the opportunity of rising market interest rates for itself, leveraging its clients' cash for its own benefit and earning massive profits for itself and its affiliates. In doing so, JPMorgan thereby meaningfully increased and substantially contributed to its affiliated bank's net interest income (the difference between the interest earned on the cash and the interest amounts paid to clients), which was approximately $90 billion annually over the past couple years.

7. Contrary to its contractual obligations, in setting JPMorgan's cash sweep interest rates, JPMorgan ignored business and economic conditions. For example, the yield on short-term U.S. Treasury bills increased dramatically in recent years, and it was above 5.25% for most of 2024. The Federal Funds Rate increased consistently from a low of .08% in 2022 to a high of 5.33% in 2024. By contrast, for the past several years, JPMorgan clients enrolled in the Cash Sweep Programs have only been paid an interest rate of 0.01%. That is ***more than 500 times less*** than the prevailing short-term Treasury bill rate and Federal Funds Rate.

8. In stark contrast, for clients in JPMorgan's managed cash sweep programs, JPMorgan increased the interest rates paid on those cash sweep deposits during the periods of rising interest rates to be closely in line with U.S. Treasury bills and the Federal Funds Rate.

9. Nor does JPMorgan set its sweep interest rates based on competitive interest rates; as set forth below, brokerages that do ***not*** sweep their cash to affiliated banks (as JPMorgan does) typically pay far higher interest rates than JPMorgan.

3

10.     There is nothing reasonable or fair about the rates JPMorgan paid to its clients with cash sweep accounts or about JPMorgan and its affiliates using its clients' cash balances to reap windfall profits. Indeed, JPMorgan's behavior was particularly harmful to its clients who have suffered through record inflation over the past few years.

11.     JPMorgan's misconduct constituted, and continues to constitute, an ongoing series of breaches of its fiduciary duties, of its contracts with accountholders, and of the implied covenant of good faith and fair dealing.  Plaintiffs, individually and on behalf of the proposed Class and IRA Subclass defined herein, bring this class action to remedy the significant financial harm caused by JPMorgan's misuse of its cash sweep programs to enrich itself at the expense of its clients.

## II.     PARTIES

### A.     Plaintiffs

12.     Plaintiff Dan G. Bodea is a citizen of Illinois.  He sues both individually and as Trustee for the Dan G. Bodea Living Trust. Mr. Bodea had both brokerage accounts and an individual retirement account ("IRA") with JPMorgan during the relevant period. The cash balances held in Mr. Bodea's accounts are automatically "swept" into a low interest-bearing bank account at JPMCB pursuant to the Cash Sweep Programs.

13.     Plaintiff Richard W. Quigley Jr. is a citizen of Ohio. Mr. Quigley has several IRA accounts with JPMorgan, including a traditional IRA and a Roth IRA. Mr. Quigley opened his IRA accounts in 2023. The cash balances in Mr. Quigley's IRA accounts are automatically "swept" into a low interest-bearing bank account at JPMCB pursuant to the Cash Sweep Programs.

### B.     Defendants

14.     Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is a financial services firm based in the U.S. with operations worldwide. JPMorgan Chase is a holding company that conducts business through its subsidiaries including Defendant J.P. Morgan Securities LLC, and non-party

JPMorgan Chase Bank N.A. JPMorgan Chase is a Delaware corporation with its principal place of business in this District at 383 Madison Avenue, New York, NY.

15.     Defendant J.P. Morgan Securities LLC ("JPMS") is a Delaware limited liability company with its principal place of business in this District in New York, NY. JPMS is a broker-dealer and investment advisor registered with the SEC, and member of FINRA and SIPC. It is the wholly owned and principal non-bank subsidiary of JPMorgan Chase, through which JPMorgan Chase conducts securities, underwriting, and brokerage activities in the U.S.

16.     As used in this Complaint, the term "JPMorgan" collectively refers to JPMorgan Chase and JPMS.

### C.     Relevant Non-Parties

17.     Non-Party JPMorgan Chase Bank N.A. ("JPMCB") is a wholly owned subsidiary of JPMorgan Chase and its principal bank subsidiary. JPMCB has branches in 48 states and Washington, D.C.

18.     As made clear in the account agreements that Plaintiffs and the other members of the Class entered into with JPMorgan (further defined below), JPMS and JPMCB "are affiliated companies under the common control of JPMorgan Chase & Co."

### III.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Plaintiffs and other class members are citizens of States different from Defendants.

20.     The Court has personal jurisdiction over Defendants because Defendants conduct substantial business in this District and maintain their principal places of business in this District.

21.    Venue is proper under 28 U.S.C. § 1391 because, among other things, Defendants maintain their principal place of business in this District and a substantial part of the events and/or relevant conduct by Defendants and their subsidiaries giving rise to Plaintiffs' claims occurred in this District.

## IV.    JPMORGAN'S CASH SWEEP ACCOUNT MISCONDUCT

### A.    The Agreements Between JPMorgan and Its Clients

22.    The relationships among JPMorgan and all its brokerage and retirement account clients, including Plaintiffs, along with the fiduciary, contractual, and other duties and obligations that JPMorgan owes to each, are set forth in multiple agreements.

23.    To start, the *Investment Account Agreement and Disclosures Booklet* ("Booklet")[2] has general terms and conditions, account agreements, and disclosures that apply to brokerage accounts, managed accounts, and individual retirement accounts.

24.    JPMS's client account applications ("Client Application") incorporate the terms of the Booklet. According to the Application, the Booklet "[p]rovides the important disclosures, general terms and conditions and account agreements that will apply to the brokerage account(s), managed account(s) and/or individual retirement account(s) (IRA) you have with us now and in the future. . . .Your continued use of any of your accounts, regardless of when they were opened, will mean you've agreed to the new Booklet."

25.    JPMS's Client Application provides detail about JPMorgan's Cash Sweep Programs and further establishes that JPMS acts as an agent for its clients with respect to the Cash Sweep Programs.  That agency relationship gives rise to a fiduciary relationship between itself and

---

[2] References to the "Booklet" are to the Booklet along with its contents, which includes the Brokerage Agreement, Traditional IRA Agreement, Roth IRA Agreement, and the Deposit Account Agreement. The Booklet is available at chase.com/JPMorganAgreement (revised as of March 2025; last visited March 15, 2025).

a JPMorgan client with respect to the Cash Sweep Programs.  Specifically, the Client Application provides that, "By signing this Application, you agree to let us use your J.P. Morgan Chase Deposit Account (Deposit Sweep) unless you pick one of the other available options below for the type of accounts you're opening."

26.     Notably, for non-managed IRA accounts, there are no alternative cash sweep options. For non-retirement brokerage accounts, there is only one alternative option to handle uninvested cash called "Bank Link," which is not a sweep program. Bank Link connects the brokerage account to a JPMCB account and transfers cash from JPMS into the JPMCB account. Therefore, not only were the Cash Sweep Programs the default sweep option, they were also the only option for non-managed accounts.

27.     The Client Application further states:

> By selecting the J.P. Morgan Chase Deposit Account, you authorize us to sweep funds from your JPMS account into an FDIC insured account with JPMorgan Chase Bank, N.A. opened on your behalf by JPMS. Please note that you can only access these funds through your JPMS account and not by going to your Chase branch. ***A full description of the J.P. Morgan Chase Deposit Account is in the Disclosure Section of the Booklet.***[3]

28.     According to the Booklet, "By signing the Application, you're agreeing to the Agreements and acknowledging receipt of the disclosures contained in the Booklet, which will apply to any investment account and services referenced in the Application and to any like-titled account you open or services you receive in the future. . . . The most current version of the Booklet will be posted in the agreements and disclosures section of the website you use to access your JPMS accounts or is available from your [Private Client Advisor] or [Financial Advisor]."  In other

---

[3] All emphasis in both bold and italics is added; emphasis in only bold or italics is not added.

words, the Client Application incorporates by reference all disclosures and agreements contained in the Booklet set forth below.

29.     Those agreements make clear that JPMorgan and its affiliates, including JPMorgan Chase, owe duties and obligations to its clients in connection with the Cash Sweep Programs and are under common control of JPMorgan Chase.  As the Booklet explains: "'JPMS' means J.P. Morgan Securities LLC, which is the broker-dealer and registered investment advisor for your J.P. Morgan Wealth Management accounts. JPMS is also the non-bank custodian for your traditional and IRAs."  The Booklet further notes that JPMS and JPMCB "are affiliated companies under the **_common control_** of JPMorgan Chase & Co."  Similar statements are made throughout Defendants' agreements with its clients.

30.     The *JPMorgan Chase Deposit Account* document ("Deposit Account Agreement"), which is located in the Booklet and on JPMorgan's website, provides that the "[s]election of the Deposit Account for the sweep of available cash in your account will be deemed your acknowledgement and consent to the features and terms of the Deposit Account."[4]

31.     Plaintiffs and all members of the Class were owed fiduciary duties by JPMorgan under the Deposit Account Agreement, which further establishes that JPMS acts as an agent for its clients with respect to the Cash Sweep Programs. In that agreement, JPMorgan undertook and memorialized its fiduciary duty by stating that "**_JPMS acts as exclusive custodian and agent_** with respect to all transactions relating to the Deposit Account feature of customers' JPMS accounts." The Deposit Account Agreement further states that "When you select the Deposit Account for the automatic investment or 'sweep' of available cash held in your JPMS account, such balances are

---

[4] https://www.jpmorgan.com/content/dam/jpm/securities/documents/jpms-deposit-account-agreement.pdf.

*remitted for deposit by JPMS, acting as your agent, into a Demand Deposit Account* maintained at JPMCB."

32.     JPMorgan has an additional contractual obligation to base its sweep account interest rates on "business and economic conditions." According to the Deposit Account Agreement, "[t]he interest rate paid on Deposit Account balances *will vary based on business and economic conditions*. . . . The rate is reset periodically at the discretion of JPMCB."

### 1.     Full-Service and Self-Directed Brokerage Accounts

33.     According to JPMS's Client Relationship Summary ("CRS"), JPMorgan offers two types of brokerage accounts: (1) full-service and (2) self-directed. The CRS explains that for full-service brokerage accounts, "You'll receive investment recommendations, made in your best interest and based on information you share about your investing goals, needs and preferences." The full-service brokerage accounts "provide access to a financial professional" but are not part of JPMorgan's investment advisory services. The self-directed brokerage accounts "allow you to make your own investment decisions and trades . . .You'll have access to our online tools and research to help you make informed decisions, and you can place trades online or by phone."

34.     Both the full-service and self-directed brokerage accounts use the Cash Sweep Programs.

35.     Under the terms of the relevant agreements, including the CRS and those agreements noted below, JPMorgan agreed to act as an agent with respect to the Cash Sweep Programs, and therefore undertook a fiduciary duty, on behalf of its brokerage account clients.

36.     Specifically, with respect to brokerage accounts, the Booklet includes a section titled the *Brokerage Account Agreement* ("Brokerage Agreement"). The Brokerage Agreement "governs JPMS brokerage account(s)" and "[i]n providing services under this Agreement, JPMS is acting as a broker-dealer and custodian."  The Brokerage Agreement further notes, "Unless you

select an available alternative, you authorize JPMS to use the JPMorgan Chase Deposit Account for your sweep option."

37.    The Brokerage Agreement references and incorporates the Deposit Account Agreement discussed above, stating "Details concerning the Deposit Account are in the 'JPMorgan Chase Deposit Account Disclosure' contained in the Disclosure section of the Booklet."  In other words, as set forth in the Deposit Account Agreement, "***JPMS acts as exclusive custodian and agent with respect to all transactions relating to the Deposit Account feature*** of customers' JPMS accounts," including with respect to brokerage account clients.  In addition, as set forth in the Deposit Account Agreement, JPMorgan contractually promised that "[t]he interest rate paid on Deposit Account balances ***will vary based on business and economic conditions***."

38.    In addition, JPMorgan owes an obligation to its brokerage account clients to act in their best interest.  Specifically, the CRS states, "When we provide you with a recommendation as your broker-dealer or act as your investment adviser, ***we must act in your best interest and not put our interest ahead of yours***." In addition, JPMorgan's Brokerage Agreement states that "[i]n providing services under this Agreement, JPMS is acting as a broker-dealer and custodian . . . When acting in a brokerage capacity for certain clients, ***JPMS will make investment recommendations that are in your best interest***, based on the information you have shared with JPMS about you and your preferences."

39.    Similar to the CRS, the Guide to Investment Services and Brokerage Products (the "Guide") explains that a JPMorgan client can choose between full-service and self-directed brokerage accounts. With a full-service brokerage account, a JPMorgan client is able to "work with an advisor who can provide goals-based advice, guidance and help with specific investment needs." With respect to full-service brokerage retirement accounts, JPMorgan further promises that

10

"we generally trade in an *agency capacity* where applicable" and is obligated to "*act in your best interest* at the time we make a securities recommendation to you."

### 2. Self-Directed Brokerage Accounts

40. With respect to self-directed brokerage accounts—i.e., accounts where the client makes the investment decisions and where JPMorgan is not acting as an investment advisor—JPMorgan's obligations were set out in the *J.P Morgan Self-Directed Investing Disclosures and Brokerage Account Agreement* ("Self-Directed Agreement").

41. The Self-Directed Agreement provided that JPMorgan's duties in operating the Cash Sweep Programs were identical to those for other brokerage clients. Specifically, the Self-Directed Agreement Self-Directed Agreement states: "You authorize JPMS to invest or 'sweep' available credit balances in your Account(s) into your Settlement Account *subject to JPMS' then-applicable policies, procedures, disclosures, offering documents and prospectuses, including, but not limited to, the Deposit Account disclosure*, contained in *Disclosures and Brokerage Account Agreement* and in the disclosure you will receive in connection with your first deposit in the Deposit Account, which may be amended from time to time." Therefore, the Self-Directed Agreement incorporates and references the Deposit Account Agreement discussed above and other JPMorgan disclosures.

42. Like the full-service brokerage accounts mentioned above, the Self-Directed Accounts automatically enrolled clients into the Cash Sweep Programs. Specifically, the Self-Directed Agreement provided that, *"*Unless you were offered and selected a different option when opening your Account, uninvested cash in your JPMS Account is automatically 'swept' to a bank deposit account with JPMorgan Chase Bank, N.A."

43. Further, with respect to self-directed brokerage accounts, JPMorgan owed a contractual duty to pay interest on self-directed brokerage account cash balances that "*will vary*

*based on business and economic conditions* and is reset periodically at the discretion of Chase Bank."

### 3.        Traditional IRA and Roth IRA Accounts

44.       For traditional and Roth IRA Accounts—i.e., accounts involving retirement funds—JPMorgan's contracts spell out the duties that JPMorgan undertakes as a fiduciary. Specifically, with respect to traditional and Roth IRA accounts, the Booklet also includes sections titled *J.P. Morgan Securities LLC Traditional IRA Custodial Agreement* ("Traditional IRA Agreement") and *J.P. Morgan Securities LLC Roth IRA Custodial Agreement* ("Roth IRA Agreement") (together, "IRA Agreements"). The IRA Agreements lay out agreements between JPMorgan and its retirement account clients, and specifically provide that "The Depositor and J.P. Morgan Securities LLC (the **Custodian**) make the following agreement (the **Agreement**)."

45.       The Traditional IRA Agreement includes the following agreement between the client and JPMS related to uninvested cash (with a nearly identical agreement in the Roth IRA Agreement):

> [T]he Custodian [JPMS] may invest any uninvested cash held in the IRA in bank savings instruments or bank deposits ***bearing a reasonable rate of interest*** in JPMCB's banks so long as (to the extent necessary) such investment is in compliance with section 4975(d)(4) of the Code, Treasury regulations section 54.4975-6(b)(1), the class exemption of PTCE 81-8, dated January 23, 1981 or other applicable law.

46.       The Brokerage Agreement further explains the "special rule" requiring JPMorgan to act in their retirement clients' "best interest," specifically describing the following:

> As further described below, we make investment recommendations to you regarding your retirement plan account or individual retirement account as a fiduciary within the meaning of Title I of the Employee Retirement Income Security Act (ERISA) and/or the Internal Revenue Code (the Code), as applicable, which are laws governing retirement accounts. The way we make money or otherwise are compensated creates some conflicts with your financial interests, ***so we operate under a special rule that requires us to act in your best interest and not put our interest ahead of yours***.

Under this special rule's provisions, we must:

• Meet a professional standard of care when making investment recommendations (give prudent advice) to you;
• ***Never put our financial interests ahead of yours when making investment recommendations*** (give loyal advice) to you;
• Avoid misleading statements about conflicts of interest, fees, and investments;
• Follow policies and procedures designed to ensure that we give advice that is in your best interest;
• ***Charge no more than what is reasonable for our services***; and
• Give you basic information about our conflicts of interest.

47.  Under the Brokerage Agreement, JPMorgan further agreed to "***act as a fiduciary*** within the meaning of ERISA and/or the Code, as applicable, when a specific recommendation is provided to you based on your particular needs or circumstances, such as when we recommend you enter into (or 'solicit') a brokerage transaction in your qualified retirement account or that you roll over or transfer qualified retirement account assets to us and our communication to you regarding such transaction, rollover or transfer could reasonably be viewed as a 'call to action.'"

48.  Similarly, the Guide lays out JPMorgan's brokerage services, products, and duties. According to the Guide, "When acting as a broker-dealer" for retirement accounts, "we make investment recommendations to you regarding your retirement plan account or individual retirement account as a fiduciary within the meaning of Title I of the Employee Retirement Income Security Act ("ERISA") and/or the Internal Revenue Code (the "Code"), as applicable, which are laws governing retirement accounts."  The Guide then provides the "special rule" noted above, including the provisions to: "Never put our financial interests ahead of yours when making investment recommendations" and "Charge no more than what is reasonable for our services."

49.  Under the Guide, JPMorgan further agreed to "***act as a fiduciary*** within the meaning of ERISA and/or the Code, as applicable, when a specific recommendation is provided to you based on your particular needs or circumstances, such as when we recommend you enter

13

into (or 'solicit') a brokerage transaction in your qualified retirement account or that you roll over or transfer qualified retirement account assets to us and our communication to you regarding such transaction, rollover or transfer could reasonably be viewed as a 'call to action.'"

### 4.   Additional JPMorgan Promises

50.     A JPMorgan client also receives a welcome package that provides additional information about their accounts. For example, on August 29, 2023, Mr. Quigley received a welcome package for his non-managed, full-service accounts that included a letter from the CEO of Chase Wealth Management, Eric Tepper. Mr. Tepper's welcome letter explained, "[w]e included an overview of your new account and the financial information you provided to your advisor . . . [t]his information helps us make personalized recommendations for your account." Mr. Tepper's letter also included the name of Mr. Quigley's JPMorgan advisor and states, "[w]e're here for you to provide personalized guidance and expertise." Mr. Tepper's letter noted that for retirement accounts, "this letter also confirms that J.P. Morgan Securities LLC will serve as custodian." The Deposit Account Agreement was included in the materials mailed to Mr. Quigley.

51.     JPMS's Client Applications define "Important Account Documents" to include the Booklet, account application, welcome package, CRS, and Guide, the provisions of which are detailed above.

### B.   JPMorgan's Cash Sweep Programs

52.     The Cash Sweep Programs at issue in this case are currently referred to by JPMorgan as the following: Chase Deposit Sweep – IRA (Sweep Symbol: QDERQ); JPMorgan Deposit Sweep – IRA (Sweep Symbol: QCERQ); Chase Deposit Sweep (Sweep Symbol: QACDS); and JPMorgan Deposit Sweep (Sweep Symbol: QAJDS). These Programs all sweep JPMorgan clients' cash using the JPMorgan Chase Deposit Account feature—and all these

14

Programs have paid the same interest rate, 0.01%, from June 2020 to the present and 0.03% prior to that during the relevant period.

53. JPMCB—JPMS's affiliated bank—is the ***only option*** for the Cash Sweep Programs. As detailed below, JPMorgan used its affiliated bank, JPMCB, to siphon net interest income from its clients' cash sweep deposits by exercising control over the setting of the interest rates that JPMCB paid on clients' cash balances.

54. According to the Deposit Account Agreement, as noted above, "[t]he interest rate paid on Deposit Account balances ***will vary based on business and economic conditions***." The Deposit Account Agreement also states, "[t]he rate is reset periodically at the discretion of JPMCB." Similarly, the Self-Directed Agreement states, "The interest rate paid on Deposit Account balances ***will vary based on business and economic conditions*** and is reset periodically at the discretion of Chase Bank. As the interest rate paid on Deposit Account balances ***may be higher or lower than the rate available to direct depositors of Chase Bank*** for comparable accounts (and the return on any other vehicles available to you as a sweep option)." The Guide provides the same disclosures, including that the interest rate "will vary based on business and economic conditions."

### C. JPMorgan Offered Financial Recommendations on Swept Cash and Exercised De Facto Control Over Client Accounts With Respect to the Cash Sweep Programs

55. JPMorgan's provision of financial recommendations to clients with respect to the Cash Sweep Programs, including recommendations on swept cash, and its complete control over the creation, operation, recommendation, and use of the Cash Sweep Programs, reinforced the existence of a fiduciary relationship with respect to all client accounts.

56.     JPMorgan had de facto control over its clients' accounts with regards to the Cash Sweep Programs because its clients specifically entrusted to JPMorgan the management of the Cash Sweep Programs pursuant to the parties' agreements.

57.     As detailed above, JPMorgan exercised this de facto control by (i) automatically selecting and placing client funds into the Cash Sweep Programs of JPMorgan's choice, (ii) by setting the interest rates clients received, (iii) only using its affiliated bank JPMCB as the bank that its client cash was swept to, and (iv) determining client eligibility for the Cash Sweep Programs.

58.     JPMS's Client Application states, "[b]y selecting the J.P. Morgan Chase Deposit Account, you authorize us to sweep funds from your JPMS account into an FDIC insured account with JPMorgan Chase Bank, N.A. opened on your behalf by JPMS. Please note that you can only access these funds through your JPMS account and not by going to your Chase branch."

59.     The Deposit Account Agreement describes the relationship between JPMS and JPMCB regarding its clients' deposit accounts. As noted above, this includes the representation that "***JPMS acts as exclusive custodian and agent*** with respect to all transactions relating to the Deposit Account feature of customers' JPMS accounts." The Deposit Account Agreement also states that "JPMCB will not accept any instructions concerning these bank deposits unless the instructions are transmitted by JPMS."

60.     The Deposit Account Agreement further states, "JPMCB or JPMS, in its discretion, may modify the terms, conditions and procedures relating to the Deposit Account"; "JPMS may amend the features of the Deposit Account by adding or removing depository institutions"; and "JPMS may, in its sole discretion and without notice, terminate your use of the Deposit Account."

61.     JPMorgan also offered its clients recommendations on swept cash.  Under the Brokerage Agreement, JPMorgan agreed to "***act as a fiduciary*** within the meaning of ERISA and/or the Code, as applicable, ***when a specific recommendation is provided to you based on your***

16

*particular needs or circumstances*, such as when we recommend you enter into (or 'solicit') a brokerage transaction in your qualified retirement account or that you roll over or transfer qualified retirement account assets to us and our communication to you regarding such transaction, rollover or transfer could reasonably be viewed as a 'call to action.'" Similarly, under the Guide, JPMorgan agreed to "*act as a fiduciary* within the meaning of ERISA and/or the Code, as applicable, *when a specific recommendation is provided to you based on your particular needs or circumstances*, such as when we recommend you enter into (or 'solicit') a brokerage transaction in your qualified retirement account or that you roll over or transfer qualified retirement account assets to us and our communication to you regarding such transaction, rollover or transfer could reasonably be viewed as a 'call to action.'"

62.     In addition, with respect to full-service brokerage accounts, a JPMorgan client is able to "work with an advisor who can provide goals-based advice, guidance and help with specific investment needs." With respect to a self-directed brokerage account, in at least October through December 2020, J.P. Morgan Investment Management, Inc. was "retained" by JPMS "*to have investment discretion* over the construction of the model portfolios (including fund selection and replacements)," and JPMS further "*retains trading authority* to implement the model portfolios and place orders consistent with each client's Selected Portfolio."

63.     Through each of these activities, JPMorgan was acting in a fiduciary capacity and undertaking such obligations with respect to the management of the Cash Sweep Programs.

**D.      JPMorgan Used Its Affiliated Bank, JPMCB, to Siphon Billions of Dollars in Net Interest Income from Its Clients' Cash Sweep Deposits**

64.     Rather than act as a fiduciary or pay interest rates commensurate with prevailing "economic and business conditions," JPMorgan used JPMCB—its affiliate bank and the only bank

17

JPMorgan uses for its Cash Sweep Programs—to siphon billions of dollars in net interest income from its clients' cash sweep accounts.

65.     In creating and operating its Cash Sweep Programs, JPMorgan exercises control over interest rates in two ways.  First, by controlling its subsidiary, JPMCB, JPMorgan Chase controls what interest rates JPMCB pays to Cash Sweep Program clients.  Second, because JPMS has control over what sweep vehicles it makes available to its clients, JPMS effectively controls the interest rates its clients receive.  JPMCB failed to pay a fair and reasonable rate of interest, but JPMS could choose to make a different vehicle available—one that would pay fair and reasonable rates.

66.     Throughout the Class Period, the only bank JPMorgan used for its Cash Sweep Programs was and continues to be JPMCB.  This allowed JPMCB to derive the primary benefit of the spread between income generated and interest amounts paid on the JPMorgan clients' deposits in the Cash Sweep Programs. And the ultimate beneficiary of this arrangement was and is the common parent of JPMS and JPMCB, Defendant JPMorgan Chase.

67.     In addition, JPMS agreed to serve as its clients' agent and custodian with respect to all transactions regarding the clients' deposit accounts at JPMCB. As such, it had a duty to act in the best interests of its clients, not the best interests of its affiliates.

68.     A section of the Deposit Account Agreement titled "Other Benefits to J.P. Morgan Chase" explains how JPMCB profits from the Cash Sweep Programs:

> Through the Deposit Account, JPMCB will receive a stable, cost-effective source of funding. JPMCB intends to use deposits made by customers who select the Deposit Account to fund current and new businesses, including lending activities and investments. The profitability on such lending activities and investments is generally measured by the difference, or "spread," between the interest rate paid on the deposits and other costs associated with the Deposit Account, and the interest rate and other income earned by JPMCB on the loans and investments made with the deposits.

18

69.     The Guide further states, "J.P. Morgan Securities LLC and JPMCB have a financial incentive in the use of the Deposit Sweep as the primary sweep option."

**E.      JPMorgan Established Unreasonably Low Interest Rates on the Billions of Dollars Its Clients Held in Cash Sweep Accounts and Unjustly Enriched Itself**

70.     As described above, the interest rates to be paid to clients pursuant to the Cash Sweep Programs are established by JPMorgan through its affiliated bank JPMCB. Contrary to the terms of JPMorgan's agreements with its clients, JPMorgan has not paid to its clients a fair or reasonable rate of interest on their swept cash, and JPMorgan has in fact ignored or failed to properly take into account prevailing economic and business conditions in setting rates. The interest rates on the Cash Sweep Programs are significantly below market rates and are not reasonably tied to any business or economic condition.

71.     For example, and without limitation, since 2022, the Federal Funds Rate—the interest rate at which banks lend to one another—increased significantly from a low of 0.08% to a high of 5.33% in 2024.  However, JPMorgan failed to pay increasing interest rates on its clients' swept cash.  In fact, JPMorgan maintained flat Cash Sweep Program rates of 0.01% from June 2020 to the present.  Prior to that, JPMorgan paid 0.03% during the relevant period.

72.     During times when the Federal Funds rate was elevated, JPMorgan kept high interest returns for itself on swept cash but paid far less than a fair and reasonable rate for its clients.  In other words, JPMorgan singularly benefited from the sharply increased interest rates by keeping almost the entire spread for itself at the expense of its clients.  This is reflected in the graph below, which compares the Federal Funds Rate to JPMorgan's Cash Sweep Programs interest rate:



73.     As the above graph illustrates, JPMorgan derives significant profits from having its clients' funds invested in its Cash Sweep Programs because JPMorgan establishes rates to be paid to its clients that are neither fair, nor reasonable, nor reflective of current economic and business conditions—contrary to JPMorgan's legal, contractual, and implied duties.

74.     The interest rates paid on the deposit account sweep programs that are only available for JPMorgan's managed or advisory accounts ("Deposit Account Sweep Managed") further establishes that JPMorgan's clients in the Cash Sweep Programs received unfair and unreasonable interest rates.[5] JPMorgan's Deposit Account Sweep Managed paid more than 4% interest at all times from December 2022 through the present, with a high of 5.35% for most of the

---

[5] The Deposit Account Sweep Managed refers to the following:  Chase Deposit Sweep - IRA - Managed (Sweep Symbol: QVERQ); JPMorgan Deposit Sweep - IRA - Managed (Sweep Symbol: QBERQ); Chase Deposit Sweep - Managed (Sweep Symbol: QCDSM); and JPMorgan Deposit Sweep - Managed (Sweep Symbol: QCPCM). The Deposit Account Sweep Managed are comparable in all respects to the Cash Sweep Programs, except for the interest rate paid and that it was only offered to JPMorgan's managed or advisory clients. The Deposit Account Sweep Managed are not money market accounts. The Deposit Account Sweep Managed are governed by the same Deposit Account Agreement as the Cash Sweep Programs.

second half of 2023 and into 2024. In comparison, JPMorgan's Cash Sweep Programs paid 0.01%. This means that the Cash Sweep Programs paid an interest rate that was 400 to 535 times less than the interest rate that JPMorgan paid on the Deposit Account Sweep Managed since December 2022.

75.    The below graph compares the Federal Funds Rate to the interest rates on the Deposit Account Sweep Managed and the Cash Sweep Programs.



76.    As demonstrated by the above graph, JPMorgan's Deposit Account Sweep Managed varied based on business and economic conditions, while the Cash Sweep Programs interest rate did not.

77.    The stark contrast between the rates JPMorgan paid on its managed accounts and those paid on its other, non-managed accounts is further proof that JPMorgan paid unreasonable rates to its brokerage and retirement account clients—who were also owed fiduciary and

contractual duties just as JPMorgan's managed account clients. As a result, JPMorgan received a windfall in net interest income directly from its clients' cash in the Cash Sweep Programs.

78. JPMorgan has derived significant financial benefits for itself from the payment of unreasonably low interest rates on its clients' cash sweep deposits. JPMCB functions as a highly profitable arbitrage operation of JPMorgan, making it possible for JPMorgan to take advantage of the nearly-cost-free and substantial flows of cash entrusted to it by its clients pursuant to the Cash Sweep Programs, and retaining for itself, through JPMCB, the vast majority of the profits generated by its clients' cash deposits.

**F. JPMorgan Owes Several Independent Duties and Obligations to Its Clients in Connection with the Cash Sweep Programs**

79. JPMorgan has repeatedly acknowledged numerous fiduciary, contractual, and implied duties to its clients with respect to its Cash Sweep Programs, including to put its clients' best interests ahead of its own, to properly and reasonably take into account "business and economic conditions" when setting interest rates for its clients' cash in the Cash Sweep Programs, and to provide IRA accountholders with a "reasonable rate of interest." However, as detailed below, JPMorgan has acted directly contrary to such duties by appropriating for itself the profits that belong to its own clients.

80. As a broker-dealer acting as an agent for its clients with respect to the Cash Sweep Programs, JPMorgan owes fiduciary duties to its clients as well as obligations implied as a matter of law.

81. Duties are also imposed on JPMS under principles of broker-dealer law and JPMorgan recognizes many of these duties in its client agreements.

82. For accounts in the Cash Sweep Programs, JPMorgan agreed to act as "agent" for its clients and exercised de facto control and discretion with respect to the Cash Sweep Programs,

22

and, as a result, JPMorgan was required to act as a fiduciary for its clients as its principal with respect to the Cash Sweep Programs.

83.    For retirement accounts, including traditional and Roth IRAs, JPMorgan was contractually obligated to pay to its clients a "reasonable rate of interest" on the clients' cash balances.

84.    JPMorgan also contracted with its clients that the interest rate on its Cash Sweep Program deposits would "vary based on business and economic conditions."

85.    In addition, JPMorgan is bound by the implied covenant of good faith and fair dealing to pay to its clients with sweep accounts a fair and reasonable rate of interest.

86.    JPMorgan breached its express and implied contractual duties and fiduciary duties to its clients vis-à-vis the Cash Sweep Programs by, among other things: (i) structuring the Cash Sweep Programs to place client assets in the Programs and securing for, and paying to, clients artificially low interest rates so as to benefit JPMorgan and its affiliates to its clients' detriment; (ii) failing to adjust the interest rates paid on sweep account balances to reflect market, industry, or prevailing business and economic conditions as marked by increased interest rates in the industry, including as paid by brokerages with sweep accounts that swept cash to non-affiliated banks; and (iii) failing to properly take into account competitive interest rates when setting sweep account interest rates.

### 1.    JPMorgan Owes Fiduciary and Other Duties to Its Clients

87.    The conflicts of interest inherent in the operation of JPMorgan's Cash Sweep Programs that motivated JPMorgan's breaches of its contractual and fiduciary duties alleged in this case have long been the focus of consumer advocates and regulators, including the SEC, since cash sweep programs were first implemented by major banks over 20 years ago.

23

88.     Over the past several years, the SEC has repeatedly highlighted the conflicts of interest financial institutions must appropriately manage under Regulation Best Interest—the SEC rule requiring that broker-dealers' recommendations are always in the best interests of their retail clients. *See* Regulation Best Interest:  The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318 (July 12, 2019), 17 C.F.R. ¶ 240.151-1. Among other things, under Regulation Best Interest, broker-dealers like JPMorgan are obligated to "consider reasonable alternatives, if any, offered by the broker-dealer in determining whether it has a reasonable basis for making the recommendation," 84 Fed. Reg. 33318, 33321—including with respect to whether a particular cash sweep program aligns with the best interests of the client.

89.     That JPMorgan's obligations under Regulation Best Interest applies to the misconduct alleged here is underscored by an August 2023 SEC Staff Bulletin—*Standards of Conduct for Broker-Dealer and Investment Advisers Account Recommendations for Retail Investors*—which made clear that broker-dealers are making recommendations when placing clients into a particular cash sweep program.  In the Staff Bulletin, the SEC specifically called out the operation of cash sweep programs in two separate instances as an example of a conflict of interest in the industry, alongside practices such as commissions, markups, revenue sharing and payment for order flow, that is governed by Regulation Best Interest. As the SEC highlighted, broker-dealers are obligated to act in a "retail investor's best interest and not to place their own interests ahead of the investor's interest"; can "recommend an account to a retail investor only when you have a reasonable basis to believe that the account is in the retail investor's best interest"; "cannot recommend an account that is not in a retail investor's best interest solely based on your firm's limited product menu"; "[a]ny limitations on account types considered . . . are material facts that should be disclosed"; and must disclose any compensation they receive on the basis of their cash sweep programs.

24

90.     In the account agreements, JPMorgan acknowledges its duties as a broker-dealer, and thus its obligations under Regulation Best Interest.  For example, in JPMorgan's Brokerage Agreement, JPMorgan states that "[i]n providing services under this Agreement, JPMS is acting as a broker-dealer and custodian . . . When acting in a brokerage capacity for certain clients, JPMS will make investment recommendations that are in your best interest, based on the information you have shared with JPMS about you and your preferences."

91.     Similarly, in the Guide, JPMorgan acknowledges its obligations when acting as a broker-dealer for retirement accountholders by noting, "we operate under a special rule that requires us to act in your best interest and not put our interest ahead of yours."

92.     In addition, in creating and operating its Cash Sweep Programs, JPMorgan also agreed to act as an agent (and therefore a fiduciary) on behalf of all clients in establishing, maintaining, and operating their cash sweep accounts.  For example, JPMorgan acted as its clients' agent and exercised complete control over the establishment and operation of the Cash Sweep Programs, including the establishment of rates to be paid to all clients.  This included JPMorgan's contractual agreements with clients in the Deposit Account Agreement that:

- "***JPMS acts as exclusive custodian and agent with respect to all transactions relating to the Deposit Account*** feature of customers' JPMS accounts."

- "When you select the Deposit Account for the automatic investment or 'sweep' of available cash held in your JPMS account, such balances are ***remitted for deposit by JPMS, acting as your agent, into a Demand Deposit Account*** maintained at JPMCB."

93.     Moreover, JPMorgan had discretion over the Cash Sweep Programs according to the Deposit Account Agreement, including:

- "The rate is reset periodically at the discretion of JPMCB."

- "JPMS may, in its sole discretion and without notice, terminate your use of the Deposit Account."

- "JPMCB or JPMS, in its discretion, may modify the terms, conditions and procedures relating to the Deposit Account."

94.    The Self-Directed Agreement made further representations regarding JPMS's discretion with respect to self-directed brokerage accounts, including:

- "At the discretion of JPMS, you may be given additional cash sweep options, and you acknowledge that JPMS may change the available sweep option(s) or offer different options for different customers."

- "JPMS may change the products available as cash sweep options for J.P. Morgan Self-Directed Investing accounts."

95.    In other words, JPMorgan's clients specifically entrusted these duties to JPMorgan, and in its capacity as their broker and agent in exercising complete control in creating, offering, enrolling, and maintaining cash sweep accounts under the Cash Sweep Programs and the rates paid thereunder, JPMorgan assumed fiduciary and other duties of loyalty and care to its clients.

96.    Contrary to its duties to its clients, at the same time that JPMorgan was supposed to be acting as its clients' agent in connection with the Cash Sweep Programs, it was actually acting to advance its own interests, and those of its affiliates, at the expense of its clients.

### 2.    JPMorgan Has Contractual Obligations to Its Clients, Including to Base Its Sweep Account Interest Rates on Business and Economic Conditions

97.    The governing documents described above not only establish JPMorgan's fiduciary duties to its clients, but also provide contractual obligations that require JPMorgan to act in its clients' best interests and not put JPMorgan's interests ahead of its clients.

98.    According to the Brokerage Agreement, "[w]hen acting in a brokerage capacity for certain clients, JPMS will make investment recommendations that are in your best interest." Similarly, in the Guide, JPMorgan has a clear contractual duty when acting as a broker-dealer for retirement accountholders "to act in your best interest and not put our interest ahead of yours."

26

99.    In addition, JPMorgan has a specific contractual obligation to base its sweep account interest rates on "business and economic conditions." According to the Deposit Account Agreement, "[t]he interest rate paid on Deposit Account balances *will vary based on business and economic conditions*. . . . The rate is reset periodically at the discretion of JPMCB." Similarly, with respect to self-directed brokerage accounts, the Self-Directed Agreement states, "[t]he interest rate paid on Deposit Account balances *will vary based on business and economic conditions* and is reset periodically at the discretion of Chase Bank."

100.    JPMorgan provides further assurances to its clients that interest rates will vary and could even be higher than other comparable accounts.  The Deposit Account Agreement states that "the interest rate" offered to clients "may be higher or lower than the rate available to direct depositors of JPMCB for comparable accounts." Similarly, the Self-Directed Agreement states that "the interest rate paid on Deposit Account balances may be higher or lower than the rate available to direct depositors of Chase Bank for comparable accounts (and the return on any other vehicles available to you as a sweep option)."

101.    Accordingly, pursuant to JPMorgan's agreements with its clients, the interest rates paid to all clients in JPMorgan cash sweep accounts throughout the Class Period were required to reflect prevailing business and economic conditions, and vary with changed conditions. But in reality, the interest rates on the Cash Sweep Programs were significantly below market rates and not reasonably tied to any business or economic condition. Rather than fluctuate or vary "based on business and economic conditions," the interest rates on the Cash Sweep Programs have remained stagnant at 0.01% for nearly five years even as market rates skyrocketed.

27

### 3. JPMorgan Has Additional Obligations to Treat Its Clients Fairly and in Good Faith

102. In addition to the fiduciary, contractual, and other legal obligations JPMorgan owes to its clients set forth above, JPMorgan possesses an additional obligation to treat its clients fairly and in good faith. By way of background, JPMorgan Chase has a Code of Conduct that is applicable to "the employees and directors of JPMorgan Chase & Co. . . . and its direct and indirect subsidiaries."[6] The Code of Conduct, as stated by JPMorgan Chase Chief Executive Officer Jamie Dimon, "represents our shared obligation to operate with the highest level of integrity and ethical conduct."

103. Section 1.1 of the Code of Conduct, states that "JPMorganChase is committed to ensuring employees act with honesty and integrity, *treat customers fairly*, and exercise sound judgment."

104. The Code of Conduct further requires JPMorgan and its employees to, "[a]lways *deal fairly and in good faith with our customers*, suppliers, competitors, business partners, regulators, and other employees."

105. Similarly, the Code of Conduct counsels that "[o]ur policies are designed to build honest business relationships and *promote fairness* in the marketplace."

106. The Code of Conduct prescribes that JPMorgan avoid the conflict of interest presented by the Cash Sweep Programs, particularly in view of its fiduciary status vis-à-vis Plaintiffs and the proposed class as to the Cash Sweep Programs: "Our firm often has *fiduciary obligations to our clients to act in their best interest*, by which you should abide."

---

[6] References to the Code of Conduct are to the document entitled "Our Code of Conduct 2024," available on JPMorgan's website: https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/documents/code-of-conduct.pdf

107.   As alleged herein, JPMorgan repeatedly and systematically violated their own Code of Conduct by and through the Cash Sweep Programs, which enriched JPMorgan at the expense of its clients.

### 4.   JPMorgan Has Contractual and Legal Obligations to Pay Reasonable Interest Rates for Retirement Account Clients

108.   With respect to its retirement accounts, JPMorgan owes specific contractual and legal obligations to pay reasonable interest rates for retirement account clients.

109.   For client cash balances maintained in retirement accounts, JPMorgan may utilize those cash balances for investments or loans, but only if it pays to the client a "reasonable rate of interest" on those cash balances.

110.   In order to comply with Section 4975 of the Internal Revenue Code, JPMorgan must make "reasonable" arrangements with JPMCB regarding the Cash Sweep Programs.

111.   In the Traditional IRA Agreement, JPMorgan explicitly promises:

> The IRA will be charged brokerage commissions and other securities transaction-related charges for the transactions in the custodial account. The Depositor authorizes the use of savings instruments offered by JPMorgan Chase Bank, N.A. (**JPMCB**); and without limiting the generality of the foregoing, unless otherwise directed by the Depositor, and agreed upon by Custodian, ***the Custodian may invest any uninvested cash held in the IRA in bank savings instruments or bank deposits bearing a reasonable rate of interest*** in JPMCB's banks so long as (to the extent necessary) such investment is in compliance with section 4975(d)(4) of the Code, Treasury regulations section 54.4975-6(b)(1), the class exemption of PTCE 81-8, dated January 23, 1981 or other applicable law.

112.   In the Roth IRA Agreement, JPMorgan makes the same explicit agreement for Roth IRA accounts to invest any uninvested cash in accounts "bearing a reasonable rate of interest."

113.   Similarly, the IRA Agreements each state, "Notwithstanding any other provision of this Agreement, the Custodian, the Depositor and all other persons and institutions are prohibited from directly or indirectly engaging in any transaction prohibited by section 4975 of the Code."

29

114.    As expressly recognized in the Booklet, the agreement to pay a reasonable rate of interest is required in order to comply with Section 4975 of the Code. Internal Revenue Code Section 4975 taxes "prohibited transactions," including when a plan sponsor for an IRA engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account."  26 U.S.C. § 4975(c).

115.    A "disqualified person" includes companies or individuals "providing services to the plan."[7]   26 U.S.C. § 4975(e)(2)(B). This includes banks that receive deposits swept from JPMorgan client accounts; in this case, the affiliated bank JPMCB, and JPMS in its capacity as IRA custodian.

116.    The IRC provides several "exemptions" or safe harbors for these "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution." 26 U.S.C. § 4975(d)(4).

117.    Treasury regulations confirm that when JPMorgan "invests plan assets in deposits in itself or its affiliates" under an authorization "contained in a plan . . . such authorization must name" such bank or similar financial institution and "must state that such bank or similar financial institution may make investments in deposits which bear a ***reasonable rate of interest*** . . . ." 26 CFR § 54.4975-6(b)(3)(i).

118.    Additionally, FINRA Rule 2122 expressly provides that "[c]harges, if any, for services performed . . . shall be reasonable and not unfairly discriminatory among customers."

---

[7] "Plan" is defined as including "an individual retirement account described in Internal Revenue Code § 408(a)."  26 U.S.C. § 4975(e)(1)(B).

119.    JPMorgan thus has both legal and contractual duties to make reasonable arrangements with respect to its Cash Sweep Programs, including to pay to its clients fair and reasonable interest rates on its clients' cash balances.

### 5.    JPMorgan Breached the Implied Covenant of Good Faith and Fair Dealing to Provide Its Clients with a Reasonable Rate of Interest

120.    JPMorgan's client agreements all include an implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing requires JPMorgan to deal fairly with its clients, to fulfill its obligations under the contract in good faith, and to not deprive Class members of the fruits of their contract. In this case, for instance, that implied covenant included a duty for JPMorgan to consider prevailing business and economic conditions in good faith, such that its clients would obtain a fair and reasonable rate of interest on their cash sweep balances.

121.    Even if JPMorgan's clients' agreements authorized JPMorgan to pay its clients a rate of interest that was less than other alternatives available as sweep options, no language in any of the agreements would have permitted JPMorgan to evade the spirit of the bargain by paying a rate of interest that was so low as to be unreasonable in comparison to business, economic, or competitive conditions.

122.    In failing to remit to its clients a fair and reasonable rate of interest, JPMorgan breached the implied covenant of good faith and fair dealing.

### G.    JPMorgan Breached Its Duties, Contracts, and the Implied Covenant, and Profited Thereby

123.    JPMorgan has breached, and continues to breach, its contractual agreements that the interest rates would be based on business and economic conditions, and the corresponding implied covenant to pay its clients a fair and reasonable rate of interest.

124.    JPMorgan breached, and continues to breach, such obligations by creating and operating its Cash Sweep Programs for its own principal benefit, over which JPMorgan exercises

31

complete control, all while failing to pay fair and reasonable rates of interest on client cash balances.

125.    Through its legal and contractual duties, JPMorgan was obligated, but failed, to: (i) set or pay fair and reasonable interest rates on clients' cash balances deposited in the Cash Sweep Programs; (ii) properly take into account industry, market, or prevailing economic and business conditions in setting interest rates; and (iii) elevate its clients' interests above its own in creating, implementing, maintaining, recommending, and operating the Cash Sweep Programs.

126.    JPMorgan's conduct of failing to pay to its clients a fair or reasonable rate of interest on their cash balances that properly or reasonably took into account the market and industry, as well as prevailing business and economic conditions, unjustly enriches JPMorgan and its affiliates at the expense of its clients.

127.    JPMorgan and its affiliates reaped an extraordinary financial windfall from the cash balances swept into its Cash Sweep Programs through the spread that JPMCB earned on the Cash Sweep Program deposits.  Based on JPMorgan's SEC filings, JPMorgan's net interest income ("NII") for the JPMorgan Chase's Consumer & Community Bank segment—the segment that would ostensibly include cash sweep deposits—increased over the past several years as interest rates spiked and remained at elevated levels.  Between 2021 and 2023, JPMorgan Chase's Consumer & Community Bank segment's NII grew from $32.8 billion to $55 billion, or nearly *70%* in two years—due in part to the NII JPMorgan was able to siphon from its clients' cash sweep deposits. The total net interest income JPMorgan Chase reported was $92.6 billion in 2024, $89.3 billion in 2023, $66.7 billion in 2022, and $52.3 billion in 2021.  In fact, these results contributed to the most profitable period in JPMorgan's history—with JPMorgan reporting nearly $50 billion in annual profit in 2023, its highest ever, until that record was surpassed in 2024, when JPMorgan

reported $58.5 billion in annual profit, in part due to the enormous spreads JPMorgan was able to earn on cash sweep deposits.

128.    The relationships between JPMorgan and its clients, the imbalance of negotiating power between JPMorgan and its clients, and JPMorgan's exercise of control over the interest paid in the Cash Sweep Programs are circumstances that create an equitable obligation (in addition to any fiduciary, contractual or implied duty) running from JPMorgan to its clients.

129.    Further, JPMorgan's automatic enrollment of clients in its Cash Sweep Programs— which swept clients' cash to its affiliated bank JPMCB instead of an unaffiliated, third-party bank—constituted a recommendation that violated JPMorgan's fiduciary and other duties under Regulation Best Interest to act in its client's best interest and not put JPMorgan's interest ahead of the client's. By automatically enrolling its clients in the Cash Sweep Programs, sweeping its clients' cash only to its affiliated bank JPMCB, paying its clients unreasonably low interest rates, and reaping net interest income, JPMorgan took advantage of this inherent conflict and failed to act in its clients' best interests.

130.    JPMorgan's continual sweep of Plaintiffs' and the other Class members' cash into the Cash Sweep Programs, while paying them unreasonably low interest rates, constitutes a continuing wrong and was an ongoing and continuing series of breaches of JPMorgan's duties to, and contracts with, Plaintiffs and the other Class members.

**H.    JPMorgan Paid Unreasonably Low Interest Rates on Its Clients' Cash Sweep Deposits**

131.    JPMorgan established, implemented, and maintained the Cash Sweep Programs to maximize its profits through increased net interest income by securing for its clients unfair and unreasonably low interest rates from JPMCB, while appropriating almost all of the interest earned at significantly higher rates for itself.

132.    IRS regulations define an "arm's-length interest rate" as:

[A] rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 C.F.R. § 1.482-2(a)(2).

133.    In 2003, the Department of Labor issued an exemption to certain transactions and, in granting the exemption, gave the following definition of a "reasonable" rate of interest:

A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, 34648 (June 10, 2003).

134.    Under these terms, and any reasonable understanding of what a reasonable rate of interest is, JPMorgan did not pay to its clients, including Plaintiffs and Class members, a reasonable rate of interest on their cash sweep accounts.  Nor did JPMorgan base its sweep account interest rates on competitive rates, the market, industry, or prevailing economic and business conditions. Further, as described above (¶¶74-75), the Cash Sweep Programs' interest rates are significantly less than the rates that JPMorgan established on the cash swept from its Deposit Account Sweep Managed.

### 1.    Sweep Account Rates Paid by Other Institutions

135.    The interest rates paid by other brokerages that sweep cash demonstrate that the interest rates paid by JPMorgan to its cash sweep accountholders were not fair or reasonable, nor did JPMorgan properly take into account the market, industry, or prevailing economic and business conditions.  This includes brokerages that sweep cash to a bank that is not affiliated with the brokerage, such as Fidelity Investments.

34

136.    As shown in the graph below, an index of interest rates paid by five brokerages that did ***not*** sweep client cash balances to a bank affiliated with its own brokerage more closely tracks the movement of the Federal Funds Rate (set forth above) than JPMorgan's *de minimis* interest rates for the Cash Sweep Programs.  By contrast, the interest rate that JPMorgan paid its clients was much lower during much of the relevant time:



137.    As shown in the above graph, from late 2018 to 2024, JPMorgan's sweep rates had no movement and remained at 0.01%, even as the sweep rates paid by brokerages using unaffiliated banks increased during 2018 and 2019 and remained much higher than JPMorgan in the beginning of 2020.  In addition, JPMorgan's sweep rates stayed at 0.01% from mid-2022 to the present while the rates paid by brokerages that swept cash to unaffiliated banks increased significantly.

138.    Specific brokerage firms that swept cash to unaffiliated banks paid interest rates that more closely resembled arm's-length negotiations, and therefore at least partially reflected prevailing market conditions, compared to the rates paid by JPMorgan. For example:

- Currently, the interest rate offered by The Vanguard Group, Inc. on its sweep program is 3.65% regardless of asset tier.

35

- As of January 2024, Fidelity Investments paid 2.72% interest on cash balances regardless of asset tier.

- As of year-end 2022, Fidelity Investments paid 2.21% interest on cash balances regardless of asset tier.

139.    A comparison of JPMorgan's sweep account interest rates to an industry-wide analysis of 300 sweep programs also shows that JPMorgan's rates were unreasonably low, and that JPMorgan did not base its sweep interest rates on the market, industry, or "business and economic conditions."  This graph compares JPMorgan's interest rate that it pays (orange line) to the average rate that other sweep programs nationwide have paid on the lowest tier of deposits (blue line).



140.    The rates depicted by the blue line above are ***conservatively low*** comparators because: (i) they represent the averages across many brokerages, some paying reasonable rates, and some not; (ii) other comparators are more appropriate, including when one compares JPMorgan to brokerages that sweep to unaffiliated banks (as set forth above); (iii) JPMorgan promised to take into account economic conditions, which includes the Federal Funds Rate, and the Treasury yield, and which was much more favorable than JPMorgan's sweep rates offered; and

36

(iv) fact and expert discovery will examine and address the appropriate comparators, JPMorgan's interest rate methodology, and what experts opine was the reasonable rate.

141.   As this data shows, other brokerage and advisory financial institutions that have cash sweep programs pay significantly higher rates than JPMorgan did for its own clients.

### 2.   The Federal Funds Rate Benchmark

142.   A number of interest rate benchmarks increased significantly over the past several years, but JPMorgan's interest rates did not change and stayed at 0.01%.

143.   The Federal Funds Rate benchmark further demonstrates that the interest rate paid to JPMorgan Cash Sweep Program accountholders was not reasonable and did not properly take into account the market, industry, or prevailing economic and business conditions.  The federal funds market consists of domestic unsecured borrowings by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises.  In other words, it is the market of unsecured borrowing transactions, principally between banks.  The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions.

144.   The Federal Funds Rate increased significantly in recent years.  For example, the effective Federal Funds Rate on August 28, 2024 was 5.33% and the effective Federal Funds Rate on March 20, 2025 was 4.33%.  The graph below (the same as reproduced above) shows the Federal Funds Rate since 2018 and the rate paid on the Cash Sweep Programs.  As the comparison shows, the interest rates paid to JPMorgan cash sweep account holders have been drastically lower and have failed to reflect changes in the economy:



145.    The above graph demonstrates that the interest rates JPMorgan paid on its clients'
sweep accounts were unreasonably low, when considered in light of prevailing business and
economic conditions.

### 3.    The Interest Rates on Sovereign Short-Term Debt Benchmark

146.    The yield on short-term U.S. Treasury Bills also demonstrates that the interest rates
paid on JPMorgan cash sweep accounts were not reasonable and did not properly take into account
the market, industry, or prevailing business and economic conditions.  U.S. Treasury Bills are
short-term securities issued by the U.S. Department of the Treasury with maturities ranging from
four to 52 weeks.  They are sold at a discount to their face value, and when they mature, the investor
is paid the face value.  Treasury Bills are considered extremely safe investments, but they generally
do not produce high returns over time, especially in a low-interest-rate environment.

147.    The yield on a U.S. Treasury Bill is the interest rate that the U.S. government pays
to borrow money for a set period of time, expressed as a percentage.  As shown in the graph below,

over the past several years, the yield on the shortest term (one month) U.S. Treasury Bill: (i) increased through mid-2019; (ii) dropped to close to zero throughout the COVID pandemic; and (iii) steadily increased from close to zero in early 2022 to approximately 5.5% in mid-2023, and remained at approximately that level through August 2024:



148.    During the entire timeframe when the U.S. Treasury Bill yield was appreciably above zero, the interest rate JPMorgan paid to cash sweep account holders remained a tiny fraction of that benchmark.

### 4.    The Interest Rate Applicable to Short-Term Instruments Such as Repurchase Agreements

149.    The prevailing interest rates applicable to short-term instruments such as repurchase agreements from 2019 to the present were also significantly higher than JPMorgan's cash sweep account interest rates.  This further demonstrates that the interest rates paid on JPMorgan cash sweep accounts were not reasonable and did not properly take into account the prevailing business and economic conditions.

150.    A repurchase agreement (also known as a "repo") is a short-term lending instrument that involves the sale and repurchase of securities.  In a repo, a borrower sells a security to a lender, usually a bank or securities dealer, and agrees to buy it back at a specified date and price.  The price is typically higher than the original sale price, reflecting the interest charge for borrowing over the period.  The security serves as collateral for the lender.  A repo can be based on any security, but it usually involves government debt or other debt instruments with steady values.

151.    The overnight repo rate is the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs.  During the period from April 2023 through April 2024, for example, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to as high as 5.55% in December 2023.  These rates are significantly higher than the cash sweep interest rates offered by JPMorgan.

152.    In comparison, JPMorgan paid an interest rate of 0.01% to its clients in the Cash Sweep Programs from June 2020 through the present.

## **CLASS ACTION ALLEGATIONS**

153.    Plaintiffs re-allege and incorporate by reference the allegations set forth above.

154.    Plaintiffs seek certification of the following Class:

**Clients of JPMorgan who had cash deposits or balances in JPMorgan's Cash Sweep Programs from August 24, 2018 until the unlawful conduct alleged herein ceases.**

155.    Plaintiffs also seek certification of the following Subclass ("IRA Subclass"):

**Clients of JPMorgan who held an Individual Retirement Account with JPMorgan and had cash deposits or balances in JPMorgan's Cash Sweep Programs from August 24, 2018 until the unlawful conduct alleged herein ceases.**

156.    Plaintiffs reserve the right to amend the Class and IRA Subclass definition if further investigation and discovery indicates that such definition should be narrowed, expanded, or otherwise modified.

157.    Excluded from the Class are JPMorgan and any of its affiliates, legal representatives, employees, or officers; the judicial officer(s) and any judicial staff overseeing this litigation; and counsel for Plaintiffs and the proposed Class.

158.    This action has been brought and may be maintained as a class action under Federal Rule of Civil Procedure 23.

**Numerosity**
**Rule 23(a)(1)**

159.    Class members are so numerous that their individual joinder is impracticable. The precise number of Class members and their identities are unknown to Plaintiffs at this time. However, JPMorgan's asset and wealth management segment provides investment and wealth management services planning and advisory services to thousands of client accounts through the work of over 8,000 client advisors.  Accordingly, Plaintiffs and the Class satisfy the numerosity requirement of Rule 23.  Class members may be notified of the pendency of this action by mail, published notice, or other appropriate methods.

**Existence and Predominance of**
**Common Questions of Law and Fact**
**Rule 23(a)(2), 23(b)(3)**

160.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

   a.    whether JPMorgan's interest rates paid on its sweep accounts were fair and reasonable;

b.   whether in setting interest rates to be paid in its sweep accounts JPMorgan reasonably or properly accounted for industry, market, or prevailing economic and business conditions;

c.   whether JPMorgan owed fiduciary duties and other duties of care to the Class, and whether JPMorgan violated those duties;

d.   whether JPMorgan acted as its clients' agent in its management and complete control over the Cash Sweep Programs;

e.   whether JPMorgan breached the contractual terms of its account agreements and other written communications to Class members;

f.   whether JPMorgan breached the contractual terms with members of the IRA Subclass;

g.   whether JPMorgan breached the implied covenant of good faith and fair dealing;

h.   whether JPMorgan was unjustly enriched by its wrongful conduct;

i.   whether this case may be maintained as a class action under Fed. R. Civ. P. 23;

j.   whether and to what extent Class members are entitled to damages and other monetary relief; and

k.   whether and to what extent Class members are entitled to attorneys' fees and costs.

161.   JPMorgan client agreements contain a choice of law provision that provides, in relevant part, that they and their enforcement shall be governed by the laws of New York.

162.   JPMorgan client agreements also expressly incorporate the rules of applicable federal, state and self-regulatory organizations, including the SEC and FINRA. Specifically, the Booklet provides:

"Applicable Law" includes constitutions, rules, regulations, customs and usages of the exchange or market and its clearinghouse where securities transactions are settled by JPMS, and all applicable laws, rules and regulations of federal and state authorities and self-regulatory agencies including, but not limited to, the Securities and Exchange Commission, the Board of Governors of the Federal Reserve System, and the Financial Industry Regulatory Authority. This Booklet, other Important Account Documents and your Accounts shall be governed by Applicable Law; its enforcement shall be governed by, and construed in accordance with, the laws of

42

the State of New York (except those provisions that expressly state that another state's law shall govern).

## Typicality
## Rule 23(a)(3)

163.    Plaintiffs' claims are typical of the claims of the Class because they were accountholders with JPMorgan that were paid unreasonably low interest rates in their cash sweep accounts that did not take into account economic and business conditions, and were not competitive interest rates.  Thus, Plaintiffs' claims are typical of the claims of the Class members as they arise from the same course of conduct by Defendants, and the relief sought within the Class is common to the Class members.

## Adequacy of Representation
## Rule 23(a)(4)

164.    Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously.  Plaintiffs have no interests adverse or antagonistic to those of the Class.

## Superiority
## Rule 23(b)(3)

165.    A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

166.    Even if Class members could afford individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory

43

judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

167. Superiority is particularly satisfied here, where the law of a single state will apply. Under the uniform contract terms with JPMorgan, the law of New York will apply to each Class member's claims, allowing the Court to adjudicate the claims of all Class members under a single state analysis.

168. Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

    b. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

    c. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

**<u>FIRST CLAIM FOR RELIEF</u>**
**Breach of Contract**
**Brought on Behalf of Plaintiffs and the Class**
**Against All Defendants**

169. Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants.

170. Defendants' governing documents related to the Cash Sweep Programs constitute a binding agreement between Defendants and their accountholders. Specifically, the governing

44

documents include, among others, the Client Application, Booklet, IRA Agreements, and Deposit Account Agreement. The governing documents are binding agreements between the Class and Defendants.

171.    The governing documents provide that Defendants will pay to their clients a rate of interest on cash deposits or balances maintained in the Cash Sweep Programs that will vary based on business and economic conditions.

172.    Defendants promised that they would act as an "agent" and a broker-dealer, with a duty to "act in your best interest," and consistent with that duty, JPMorgan was obligated to "not put our interest ahead of yours."

173.    As set forth herein, Defendants failed to pay to Plaintiffs and Class members an interest rate on their Cash Sweep Programs holdings that accounted for business and economic conditions. Defendants failed to place their clients' interests before their own, by creating and operating the Cash Sweep Programs for Defendants' own benefit, and reaping exorbitant net interest income from clients' cash balances while underpaying interest to them. Therefore, Defendants breached the contracts.

174.    Defendants' past, continuous, and ongoing breaches damaged and continue to damage Plaintiffs and the Class.

175.    Defendant JPMorgan Chase knowingly encouraged, directed, and participated in JPMS's breaches of contracts and knowingly received the benefits thereof, and JPMorgan Chase and JPMS are therefore jointly and severally liable therefor.

176.    JPMorgan Chase is also liable for such breaches of contracts, including under the doctrine of respondeat superior, because JPMS is a wholly owned subsidiary and agent of JPMorgan Chase and committed breaches of contracts within the scope of its corporate principal-agent relationship.

**SECOND CLAIM FOR RELIEF**
**Breach of Contract**
**Brought on Behalf of the IRA Subclass**
**Against All Defendants**

177. Plaintiffs, on behalf of themselves and the IRA Subclass, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants.

178. Defendants' governing documents related to accounts held by members of the IRA Subclass constitute a binding agreement between Defendants and their accountholders. Specifically, the governing documents include, among others, the Client Application, Booklet, IRA Agreements, and Deposit Account Agreement. The governing documents are binding agreements between the Subclass and Defendants.

179. Defendants agreed to "invest any uninvested cash held in the IRA in bank savings instruments or bank deposits bearing a reasonable rate of interest."

180. Defendants also agreed that when acting as a broker-dealer for retirement accountholders they "operate under a special rule that requires us to act in your best interest and not put our interest ahead of yours."

181. As set forth herein, Defendants failed to pay to Plaintiffs and the IRA Subclass members a "reasonable rate of interest" on those deposits in the Cash Sweep Programs. Defendants also failed to act in the IRA Subclass's best interest and instead acted in their own interest. Therefore, Defendants breached their contracts with Plaintiffs and the IRA Subclass.

182. Defendants' past, continuous, and ongoing breaches damaged and continue to damage Plaintiffs and the Class.

183. Defendant JPMorgan Chase knowingly encouraged, directed, and participated in JPMS's breaches of contracts and knowingly received the benefits thereof, and JPMorgan Chase and JPMS are therefore jointly and severally liable therefor.

184.    JPMorgan Chase is also liable for such breaches of contracts, including under the doctrine of respondeat superior, because JPMS is a wholly owned subsidiary and agent of JPMorgan Chase and committed breaches of contracts within the scope of its corporate principal-agent relationship.

## THIRD CLAIM FOR RELIEF
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### Brought on Behalf of Plaintiffs and the Class
### Against All Defendants

185.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants.

186.    Defendants' governing documents related to their accounts constitute a binding agreement with those accountholders.

187.    Implicit in these contracts (all of which incorporated Defendants' Cash Sweep Programs disclosure documents), and under New York law which governs them, is a covenant of good faith and fair dealing, requiring Defendants to deal fairly with their clients, to fulfill their obligations under the contract in good faith, and to not deprive Class members of the fruits of their contract.

188.    Through the implied covenant of good faith and fair dealing, Defendants were obligated to pay to Class members a fair and reasonable rate of interest on their cash balances; including by reasonably or properly accounting for current or prevailing business and economic conditions and competitive interest rates when paying or securing interest rates on their clients' cash sweep balances.  By failing to do so, Defendants breached the implied covenant of good faith and fair dealing.

189.    Defendants' past, continuous, and ongoing breaches of the implied covenant damaged and continue to damage Plaintiffs and the Class.

47

## FOURTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### Brought on Behalf of Plaintiffs and the Class
### Against All Defendants

190. Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants.

191. Defendants owed fiduciary duties to Plaintiffs and Class members with respect to the Cash Sweep Programs.

192. These duties include, but are not limited to:

   a. a duty of care;

   b. a duty of loyalty;

   c. a duty to act in the best interests of their clients; and

   d. a duty not to place Defendants' interests above those of their clients.

193. Defendants breached the foregoing duties when they: (i) failed to pay to Plaintiffs and the Class a fair or reasonable rate of interest that properly took into account prevailing business and economic conditions; (ii) failed to act in the best interests of Plaintiffs and the Class with respect to the Cash Sweep Programs; and (iii) recommended to Plaintiffs and the Class that they utilize and continue to utilize the Cash Sweep Programs.

194. Defendants' past, continuous, and ongoing breaches of duties damaged Plaintiffs and the Class.

195. Defendant JPMorgan Chase knowingly encouraged, directed, and participated in the breaches of fiduciary duties by JPMS and knowingly received the benefits thereof, and JPMorgan Chase and JPMS are therefore jointly and severally liable therefor.

196. JPMorgan Chase is also liable for such breaches, including under the doctrine of respondeat superior, because JPMS is a wholly owned subsidiary and agent of JPMorgan Chase

48

and committed breaches of fiduciary duties within the scope of their corporate principal-agent relationship.

## FIFTH CLAIM FOR RELIEF
### Unjust Enrichment
### Brought on Behalf of Plaintiffs and the Class
### Against All Defendants

197.    Plaintiffs, on behalf of themselves and the Class, hereby re-allege the factual allegations above as if fully set forth herein, and bring this Claim against all Defendants in the alternative to the preceding Claims to the extent it is duplicative of any such claim.

198.    As a result of Defendants' wrongful conduct, Plaintiffs and the Class received unfair and unreasonably low interest payments on their cash sweep deposits.

199.    As a result of Defendants' wrongful conduct, Defendants were unjustly enriched because, among other benefits, they received significantly greater net interest income than they would have but for their wrongful conduct.

200.    Defendants appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the Class.

201.    It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

202.    Defendants' retention of these unjustly obtained benefits would violate the fundamental principles of justice, equity, and good conscience.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class (including the IRA Subclass), demand judgment and relief as follows:

a.  certifying the proposed Class and IRA Subclass, and appointing Plaintiffs and their counsel to represent the proposed Class and IRA Subclass;

49

b.  awarding Plaintiffs and Class members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

c.  awarding Plaintiffs and Class members restitution, disgorgement of profits, and forfeiture of compensation;

d.  awarding Plaintiffs and the Class reasonable attorneys' fees and costs of suit, including expert witness fees; and

e.  awarding such other and further relief as the Court deems proper.

**JURY TRIAL DEMAND**

Plaintiffs, on behalf of themselves and the Class (including the IRA Subclass), demand a trial by jury on all issues so triable.

DATED: March 28, 2025                    Respectfully submitted,

By: */s/ Michael Dell'Angelo*
Michael Dell'Angelo (admitted *pro hac vice*)
Alex B. Heller (admitted *pro hac vice*)
Radha Nagamani Raghavan (NY Bar No. 5753140)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net
aheller@bm.net
rraghavan@bm.net

*Court-Appointed Lead Counsel for Plaintiffs and the Proposed Class*

Salvatore J. Graziano
John Rizio-Hamilton
Avi Josefson
Adam H. Wierzbowski
Michael D. Blatchley
**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**
1251 Avenue of the Americas

50

New York, NY 10020
Telephone: (212) 554-1400
salvatore@blbglaw.com
johnr@blbglaw.com
avi@blbglaw.com
adam@blbglaw.com
michaelb@blbglaw.com

***Court-Appointed Local Counsel for Plaintiffs and
the Proposed Class***

51