**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re JP Morgan Chase Cash Sweep Program* | Case No. 1:24-cv-06404-LGS |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

**JONES DAY**
**250 Vesey Street**
**New York, New York 10281**
*Counsel for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 3

    A.  Plaintiffs Are Non-Discretionary Brokerage Customers of JPMS ................................ 3

    B.  Plaintiffs Instructed Defendants to Sweep Their Idle Cash ............................................ 5

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT ..................................................................................................................... 7

    I.  Plaintiffs' Contract Claims Should Be Dismissed. ........................................................ 7

        A.  JPMS Did Not Owe Plaintiffs a Contractual Duty to Procure a Higher Interest Rate for Their Uninvested Cash........................................................................................... 7

            1.  The disclosure that rates will "vary based on business and economic conditions" at Chase Bank's "discretion" imposed no enforceable obligation on JPMS. .................. 8

            2.  The reference to the Internal Revenue Code's "reasonable rate" disclosure requirement does not create an enforceable promise by JPMS. ............................... 10

        B.  Plaintiffs Failed to Perform Their Obligation to Promptly Raise Concerns About the Rates Paid on Sweep Program. ..................................................................................... 14

        C.  Plaintiffs Released JPMS and Its Affiliates from Liability Related to the Sweep Program........................................................................................................................ 15

        D.  *Valelly* Is Consistent with Defendants' Arguments. ............................................. 16

    II.  JPMS Did Not Owe Plaintiffs Broad Fiduciary Duties With Regard to the Cash Sweep Program........................................................................................................................ 17

        A.  The Fiduciary Duty Claim Impermissibly Duplicates the Contract Claims. .................. 18

        B.  The Agreements Do Not Create Any Fiduciary Duty Regarding the Interest Rate. ...... 19

            1.  JPMS owed Plaintiffs nothing more than sweeping their funds as authorized. ........ 19

            2.  Plaintiffs cannot leverage JPMS's limited role to support broad fiduciary duties. ... 21

    III.  The Two Remaining Claims Must Be Dismissed Since They Duplicate the Contract Claims. ......................................................................................................................... 25

    IV.  Plaintiffs Cannot Sustain Any Claims Against JPMorgan Chase & Co. Because Plaintiffs Have No Relationship With It......................................................................................... 26

CONCLUSION.................................................................................................................. 27

**TABLE OF AUTHORITIES**

**Page**

CASES

*Acevado v. Citibank, N.A.*,
2012 WL 996902 (S.D.N.Y. Mar. 23, 2012) ...........................................................................13

*Aetna Health Inc. v. Davila*,
542 U.S. 200 (2004)...................................................................................................................22

*Allen v. Fid. Brokerage Servs. LLC*,
711 F. Supp. 3d 219 (S.D.N.Y. 2024).......................................................................................24

*Apt v. Sengupta*,
981 N.Y.S.2d 680 (1st Dep't 2014) ..........................................................................................19

*Aramony v. United Way of Am.*,
254 F.3d 403 (2d Cir. 2001).................................................................................................13, 14

*Arroyo v. Cent. Islip UFSD*,
103 N.Y.S.3d 512 (2d Dep't 2019)...........................................................................................26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................................................6

*Axiom Inv. Advisors, LLC v. Deutsche Bank AG*,
234 F. Supp. 3d 526 (S.D.N.Y. 2017).........................................................................................7

*Baltia Air Lines, Inc. v. CIBC Oppenheimer Corp.*,
709 N.Y.S.2d 54 (1st Dep't 2000) ..............................................................................................8

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005)...................................................................................................................12

*Beal Sav. Bank v. Sommer*,
8 N.Y.3d 318 (2007) ....................................................................................................................8

*Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*,
448 F.3d 573 (2d Cir. 2006)......................................................................................................25

*Bissell v. Merrill Lynch & Co.*,
937 F. Supp. 237 (S.D.N.Y. 1996)............................................................................................20

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
866 F. Supp. 2d 257 (S.D.N.Y. 2012).......................................................................................19

i

*Booth v. 3669 Del.*,
　703 N.E.2d 757 (N.Y. 1998)......................................................................................................15

*Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*,
　631 F. Supp. 3d 125 (S.D.N.Y. 2022)........................................................................................22

*Celle v. Barclays Bank P.L.C.*,
　851 N.Y.S.2d 500 (1st Dep't 2008) ......................................................................................18, 19

*Churchill Real Est. Holdings LLC v. CBCS Washington St. LP*,
　95 N.Y.S.3d 526 (1st Dep't 2019) ............................................................................................25

*Consedine v. Portville Cent. Sch. Dist.*,
　12 N.Y.3d 286 (2009) ..............................................................................................................14

*Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*,
　544 F. Supp. 2d 178 (S.D.N.Y. 2008)........................................................................................15

*Cruz v. FXDirectDealer, LLC*,
　720 F.3d 115 (2d Cir. 2013).....................................................................................................25

*de Kwiatkowski v. Bear, Stearns & Co.*,
　306 F.3d 1293 (2d Cir. 2002).......................................................................................... *passim*

*DeBlasio v. Merrill Lynch & Co.*,
　2009 WL 2242605 (S.D.N.Y. July 27, 2009) ...........................................................................20

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
　631 F.3d 42 (2d Cir. 2011).......................................................................................................14

*Ellington v. EMI Music, Inc.*,
　24 N.Y.3d 239 (2014) ................................................................................................................8

*Fesseha v. TD Waterhouse Inv. Servs., Inc.*,
　761 N.Y.S.2d 22 (1st Dep't 2003) .............................................................................................19

*Grochowski v. Phoenix Constr.*,
　318 F.3d 80 (2d Cir. 2003)...................................................................................................12, 13

*Gurfein v. Ameritrade, Inc.*,
　312 F. App'x 410 (2d Cir. 2009) ...............................................................................................12

*Hauptman v. Interactive Brokers, LLC*,
　349 F. Supp. 3d 292 (S.D.N.Y. 2018)........................................................................................24

*Hughes v. Standard Chartered Bank, PLC*,
　2010 WL 1644949 (S.D.N.Y. Apr. 14, 2010)..............................................................................9

*Hunter v. Deutsche Bank AG*,
   866 N.Y.S.2d 670 (1st Dep't 2008) ....................................................................9

*In re Dean Witter Managed Futures Ltd. P'ship Litig.*,
   724 N.Y.S.2d 149 (1st Dep't 2001) ..................................................................21

*In re Mid-Island Hosp., Inc.*,
   276 F.3d 123 (2d Cir. 2002)..............................................................................17

*Indep. Ord. of Foresters v. Donald, Lufkin & Jenrette, Inc.*,
   157 F.3d 933 (2d Cir. 1998)........................................................................19, 20

*Int'l Bhd. of Elec. Workers, Loc. Union 43 v. Nat'l Lab. Rels. Bd.*,
   9 F.4th 63 (2d Cir. 2021) ..................................................................................14

*Johnson v. Priceline.com, Inc.*,
   711 F.3d 271 (2d Cir. 2013)..............................................................................24

*Joseph v. JetBlue Airways Corp.*,
   2012 WL 1204070 (N.D.N.Y. Apr. 11, 2012)...................................................13

*LeBouteiller v. Bank of New York Mellon*,
   2015 WL 5334269 (S.D.N.Y. Sept. 11, 2015)..................................................12

*MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*,
   268 F.3d 58 (2d Cir. 2001)................................................................................27

*Maki v. Travelers Cos.*,
   44 N.Y.S.3d 220 (3d Dep't 2016).................................................................26, 27

*Maniolos v. United States*,
   741 F. Supp. 2d 555 (S.D.N.Y. 2010)................................................................7

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
   500 F.3d 171 (2d Cir. 2007)..............................................................................12

*Mirkin v. Viridian Energy, Inc.*,
   2016 WL 3661106 (D. Conn. July 5, 2016) .......................................................9

*Mitchell v. Faulkner*,
   531 F. App'x 136 (2d Cir. 2013) .......................................................................25

*N. Shipping Funds I, LLC v. Icon Cap. Corp.*,
   921 F. Supp. 2d 94 (S.D.N.Y. 2013)..................................................................18

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016)................................................................................3

iii

*O'Connor v. Henkel Corp.*,
   2015 WL 5922183 (E.D.N.Y. Sept. 22, 2015) ...................................................................11

*Oddo Asset Mgmt. v. Barclays Bank PLC*,
   19 N.Y.3d 584 (2012) .........................................................................................................17

*Orlander v. Staples, Inc.*,
   802 F.3d 289 (2d Cir. 2015)..........................................................................................14, 15

*PaineWebber Inc. v. Bybyk*,
   81 F.3d 1193 (2d Cir. 1996)...........................................................................................11, 24

*People ex rel. Cuomo v. Coventry First LLC*,
   13 N.Y.3d 108 (2009) .........................................................................................................17

*Perl v. Smith Barney Inc.*,
   646 N.Y.S.2d 678 (1st Dep't 1996) ....................................................................................19

*Press v. Chem. Inv. Servs. Corp.*,
   166 F.3d 529 (2d Cir. 1999)................................................................................................19

*Schuloff v. Queens Coll. Found., Inc.*,
   165 F.3d 183 (2d Cir. 1999)................................................................................................12

*Snyder v. Wells Fargo Bank, N.A.*,
   594 F. App'x 710 (2d Cir. 2014) ........................................................................................18

*Sokoloff v. Harriman Ests. Dev. Corp.*,
   96 N.Y.2d 409 (2001) .........................................................................................................21

*Subaru Distributors Corp. v. Subaru of Am., Inc.*,
   425 F.3d 119 (2d Cir. 2005)..................................................................................................7

*Tate & Lyle Ingredients Americas, Inc. v. Whitefox Techs. USA, Inc.*,
   949 N.Y.S.2d 375 (1st Dep't 2012) ....................................................................................26

*United States v. Bestfoods*,
   524 U.S. 51 (1998)..............................................................................................................26

*Valelly v. Merrill Lynch*,
   2021 WL 240737 (S.D.N.Y. Jan. 25, 2021) ..................................................................16, 17

*Valelly v. Merrill Lynch*,
   464 F. Supp. 3d 634 (S.D.N.Y. 2020)..............................................................................13, 24

*Welch v. TD Ameritrade Holding Corp.*,
   2009 WL 2356131 (S.D.N.Y. July 27, 2009) ......................................................................23

iv

*Welchert v. Am. Cyanamid, Inc.*,
    59 F.3d 69 (8th Cir. 1995) ........................................................................................................12

*XY Plan. Network, LLC v. United States Sec. & Exch. Comm'n*,
    963 F.3d 244 (2d Cir. 2020)......................................................................................................22

**REGULATIONS**

17 C.F.R. § 240.15*l*-1(a)(1) ...........................................................................................................23

26 C.F.R. § 54.4975-6(b)(3)(i)........................................................................................................11

**INTRODUCTION**

Plaintiffs have sued Defendants J.P. Morgan Securities LLC ("JPMS") and JPMorgan Chase & Co. for doing precisely what Plaintiffs agreed JPMS would do, in precisely the manner JPMS said it would.  Plaintiffs now seek to saddle JPMS with promises it never made and with fiduciary obligations that are foreclosed by the very contracts Plaintiffs cite and by long-settled law.  The complaint should be dismissed in its entirety.

Plaintiffs are non-advisory brokerage customers.  They specifically chose not to contract with JPMS to provide investment advice, but instead to serve only as a broker-dealer for their accounts.  Plaintiffs made their own decisions regarding these accounts, and JPMS's sole obligation was to execute their instructions.  Plaintiffs instructed JPMS to automatically sweep uninvested cash in their brokerage accounts to an interest-bearing bank account.  Now, dissatisfied with their own decision, and seeking a windfall for decisions they elected not to make, Plaintiffs improperly seek to recast their brokerage relationship to impose alleged contractual and fiduciary obligations on JPMS to have obtained a higher rate of interest on Plaintiffs' uninvested cash.

In their brokerage contracts, Plaintiffs instructed JPMS to automatically sweep transitory, uninvested cash in their accounts into an FDIC-insured bank account at non-party JPMorgan Chase Bank, N.A. ("Chase Bank") at a disclosed interest rate that was set in the discretion of Chase Bank.  The contracts advised Plaintiffs that the rate on swept deposits could be lower than what they could get elsewhere, that Chase Bank was a JPMS affiliate that would benefit from the cash, and how Chase Bank would so benefit.  Plaintiffs have identified no contractual obligation that required JPMS to do anything else with respect to Plaintiffs' uninvested cash.  Under New York law, Plaintiffs' failure to identify an unambiguous promise is fatal to their contract claims.

1

Unable to identify any promise by JPMS to obtain a higher interest rate than the one agreed upon and disclosed in the brokerage agreements, Plaintiffs search in the shadows of those documents, trying to manufacture obligations by excerpting phrases out of context. While Plaintiffs repeat those cherry-picked phrases to create the impression of sweeping obligations, reading those words in the context of the operative documents guts Plaintiffs' assertions. Plaintiffs' favorite phrases are plucked from contract provisions that are either inapplicable or are mere disclosures that impose no affirmative obligations on JPMS. Plaintiffs' allegations of what the contracts supposedly required cannot overcome the actual text of the agreements.

The contract claims fail for two additional reasons. First, Plaintiffs did not fulfill their own contractual obligations. JPMS swept the cash as instructed, ensured that Plaintiffs received the disclosed interest, and each month reported the interest payments on account statements. For their part, in their agreements with JPMS, Plaintiffs promised JPMS that they would promptly review their statements and complain if they had any concerns about the contents of their statements. Yet, until filing this action, neither Plaintiff ever complained about the interest rate disclosed on their statements. Second, because JPMS followed Plaintiffs' instructions in sweeping their uninvested cash, the broad releases in the agreements negate any contract claim Plaintiffs now attempt to pursue.

Plaintiffs' tag-on claims premised on snippets of the contracts – for breach of a fiduciary duty, breach of the implied covenant of good faith and fair dealing, and unjust enrichment – likewise fail because Plaintiffs misread the applicable agreements. Moreover, settled law forecloses Plaintiffs' attempt to pursue alleged contractual claims masquerading as tort causes of action.

Finally, the claims against JPMorgan Chase & Co., the bank holding company, must fail because Plaintiffs allege no relationship with it whatsoever.  Instead, Plaintiffs resort to sleight of hand by claiming that "JPMorgan" (defined to include JPMS and the holding company) is liable.

## BACKGROUND

### A.    Plaintiffs Are Non-Discretionary Brokerage Customers of JPMS

The named plaintiffs, Dan Bodea and Richard Quigley, maintained non-discretionary brokerage accounts at JPMS.[1]  Compl. ¶¶ 12-13.  They purport to bring this action on behalf of themselves and a class of non-discretionary brokerage customers "who had cash deposits or balances in JPMorgan's Cash Sweep Programs from August 24, 2018" going forward.  *Id.* ¶ 154.  They also purport to bring this action on behalf of a subclass of brokerage customers who held an Individual Retirement Account ("IRA") with JPMS.  *Id.* ¶ 155.

The relationship between JPMS and its non-discretionary clients (like Plaintiffs and the putative class) is governed by their detailed written agreements.  Specifically, the general terms and conditions, account agreements, and disclosures applicable to JPMS customers are found in the Investment Account Agreement and Disclosures Booklet ("Booklet").  Ex. A at 2.[2]  The Booklet is broken down into two main parts.  *Id.*  The first part of the Booklet is titled "Agreements" and includes (a) the General Terms and Conditions that apply to all accounts; (b) the Brokerage Account Agreement that applies to all brokerage accounts; and (c) other specific account agreements that apply to particular types of accounts, such as retirement

---

[1]  JPMS offers "both brokerage and investment advisory services."  Ex. H at 4-5.  Exhibits ("Ex.") are attached to the accompanying Declaration of Laura Washington Sawyer.  The Court may rely on these Exhibits in resolving this Motion because each Exhibit is the current, publicly available version of the documents and agreements that are quoted or cited in the complaint, and therefore incorporated by express reference.  *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016).

[2] The Booklet consists of Exhibits A-G, as well as additional documents that are not appended as exhibits. The complete booklet can be found at https://www.chase.com/content/dam/chase-ux/documents/personal/investments/jpm-investment-account-agreements.pdf (accessed May 11, 2025).

accounts.[3]  The second part of the Booklet, titled "Disclosures," contains important disclosures relevant to the customers' accounts.  The General Terms and Conditions contained within the Booklet identify certain other disclosures, including the Client Relationship Summary and the Guide to Investment Services and Brokerage Products ("Guide").  Ex. B at 1.  These documents collectively "represent the entire agreement and understanding" between customers and JPMS.  *Id.* at 8.  By signing their account application, Plaintiffs agreed "to the Agreements" in the Booklet and "acknowledge[d] receipt of the disclosures."  Ex. A at 3.  The agreements were between only two parties:  (i) the customer and (ii) JPMS.  Ex. B at 1.

The agreements made clear that, for its brokerage customers like Plaintiffs, JPMS "act[ed] ***only*** as [a] broker-dealer and ***not as an investment advisor***."  Ex. C at 5 (emphasis added).  As a general matter, JPMS did not "make investment decisions" for its brokerage customers, "manage [their] investments," or "monitor [their] account[s]."  Ex. H at 5.  Indeed, JPMS explicitly ***disclaimed*** "any discretionary authority or obligation to review or to make recommendations for the investment of [customers'] cash."  Ex. C at 5.  If Plaintiffs wanted JPMS to provide "ongoing account management and monitoring" and act "as a fiduciary," they could have obtained those advisory services by paying additional fees and entering into a separate agreement.  Ex. H at 6; *see also* Ex. D at 2.  Yet, in their non-discretionary brokerage accounts, Plaintiffs maintained complete control over how, when, and where to direct their funds.  Plaintiffs gave instructions to JPMS, and JPMS's role was simply to execute customers' instructions to purchase or sell securities.  Ex. C at 5; *see also* Ex. I at 1.

---

[3]  Customers with self-directed accounts also entered into the "Self-Directed Agreement," which Plaintiffs acknowledge "incorporates" the Booklet and provides for "identical" obligations.  *See* Compl. ¶ 41.

4

The agreements contained two sets of releases.  In the General Terms and Conditions, Plaintiffs expressly "release[d] and forever discharge[d] JPMS [and] its affiliates" from all liabilities "caused directly or indirectly by ... [JPMS] following [their] instructions."  Ex. B at 7.[4] This general release applied to all brokerage customers, including those with IRA accounts.  In addition to the general release, the IRA agreements provided that JPMS "shall not be liable for any loss of any kind that may result from any action taken by it in accordance with the directions of the Depositor."  Ex. E at 7; Ex. F at 6.

### B.    Plaintiffs Instructed Defendants to Sweep Their Idle Cash

By its plain terms, the sweep program is a ***temporary*** holding place for cash in customers' accounts "until withdrawn or used to pay for transaction or account fees, changes or commissions."  Ex. C at 2.  The sweep program enabled Plaintiffs to "earn interest on [their] uninvested cash by 'sweeping' (i.e., automatically transferring) such cash into a bank deposit account."  Compl. ¶ 2.  When becoming brokerage customers, Plaintiffs expressly "authorize[d]" JPMS to sweep their idle cash "into an FDIC-insured account with [Chase Bank]" on a daily basis.  *Id.* ¶ 27.

JPMS directed Plaintiffs to the "'JPMorgan Chase Deposit Account Disclosure' contained in the Disclosure section of the Booklet" (the "Sweep Disclosure") for more information about the sweep program.  Ex. C at 2.  The Sweep Disclosure detailed how the sweep program works, how customers can access current interest rates, and what risks customers should consider when deciding to leave cash uninvested.  Ex. G at 1.

---

[4] As brokerage customers, Plaintiffs could solicit one-off investment recommendations for "the purchase or sale of securities."  Ex. H at 5.  In only those limited instances and "based on [Plaintiffs'] particular needs or circumstances," JPMS would make recommendations in their best interest.  Ex. C at 5.

The Sweep Disclosure explained that, acting as customers' agent, JPMS would move funds between customers' individual brokerage accounts and an interest-bearing deposit account at Chase Bank. *Id.* The Sweep Disclosure also explained how that interest would be credited to customers' accounts. And it noted that swept cash would benefit Chase Bank by providing it with a "stable, cost effective source of funding." *Id.* at 2.

As to rates, the Sweep Disclosure disclosed that the interest rate would "vary based on business and economic conditions" in the sole "discretion" of non-party Chase Bank. *Id.* at 1. It further warned that the interest rate may therefore be "lower than the rate available ... for comparable accounts" and encouraged Plaintiffs to "compare the terms, rate of return, required minimum amounts, charges and other features of the [sweep program] with those of other deposit accounts and alternative cash investments." *Id.* Additionally, in the Guide (which explains the difference between brokerage and advisory accounts), JPMS disclosed that the sweep rate paid to advisory customers "is typically higher, and could be substantially higher, than the rate paid" to brokerage customers. Ex. H at 11.

The sweep rate for brokerage customers was similar to rates paid on savings and checking deposits, and, as provided in the Sweep Disclosure, customers could track the rate in many ways: (i) reviewing their monthly account statements, (ii) calling an advisor, (iii) calling the client service phone number included in the agreement, or (iv) clicking a weblink, offset in blue font, that would take them to the "current rate." Ex. G at 1.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter" to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In determining the adequacy of the complaint, the court may consider any

6

written instrument … incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).  When a complaint is premised on a contract, "court[s] [are] not obliged to accept the allegations of the complaint as to how to construe [the] contract." *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010). Rather, "if the relevant contract provisions are unambiguous and plaintiff has no claim under them, then the claim should be dismissed." *Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 533 (S.D.N.Y. 2017) (Schofield, J.).[5]

## ARGUMENT

## I.   PLAINTIFFS' CONTRACT CLAIMS SHOULD BE DISMISSED.

Plaintiffs contend that JPMS was contractually obligated to procure a higher rate of interest on their uninvested cash than the disclosed interest rate they received.  Plaintiffs' contract arguments fail for several reasons.  *First*, Plaintiffs' asserted contractual obligations are not found in, and actually conflict with, the clear terms of their JPMS brokerage agreements. *Second*, Plaintiffs fail to allege, as they must, that they fully performed under the agreements. Plaintiffs agreed to promptly review their statements and raise any concerns with their contents. But, until this lawsuit, Plaintiffs have not raised any concerns about the interest paid on their swept funds.  *Third*, Plaintiffs' claims are released in the very agreements they rely upon.

### A.   JPMS Did Not Owe Plaintiffs a Contractual Duty to Procure a Higher Interest Rate for Their Uninvested Cash.

The relationship between Plaintiffs and the putative class – all non-discretionary brokerage customers – and JPMS is governed by the express terms of their brokerage

---

[5] Unless otherwise noted, internal quotation marks, citations, and subsequent case history are omitted from citations.

agreements.  Under New York law, a contract's "words and phrases" must "be given their plain meaning."  *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014).  A contract must be "read as a whole," construed "to give full meaning and effect to the material provisions."  *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324-25 (2007).  "Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract …."  *Ellington*, 24 N.Y.3d at 244.  The brokerage agreements are unambiguous and do not contain any of the obligations Plaintiffs assert.

As detailed above, JPMS did not have "any discretionary authority or obligation to review or to make recommendations for the investment of [customers'] cash."  Ex. C at 5.  With regard to that cash, Plaintiffs expressly "authorize[d] JPMS to automatically sweep uninvested cash in your Account to a bank deposit account with Chase Bank on a daily basis."  *Id.* at 2; *see also* Compl. ¶ 58.  JPMS executed that direction, swept Plaintiffs' uninvested funds to Chase Bank, and Plaintiffs received interest at the disclosed rate.  *See, e.g.*, Compl. ¶¶ 5, 7; Ex. I at 1.  That was all JPMS promised to do.  There is no allegation that JPMS breached these obligations.

1.  *The disclosure that rates will "vary based on business and economic conditions" at Chase Bank's "discretion" imposed no enforceable obligation on JPMS.*

JPMS was not obligated to pay or procure any specific (or higher) interest rate on funds in the sweep program.  Plaintiffs attempt to convert the risk disclosure that sweep rates "will vary based on business and economic conditions … at the discretion of [Chase Bank]" into a promise by JPMS to pay higher rates.  Compl. ¶ 32.  But, far from promising that JPMS will do anything, this language merely acknowledges that Chase Bank, a non-party to the brokerage agreements or this case, may vary the rates paid.  *See Baltia Air Lines, Inc. v. CIBC Oppenheimer Corp.*, 709 N.Y.S.2d 54, 56 (1st Dep't 2000) (disclosure without "any clear and unambiguous promise" did not support contract claim).

The First Department agreed when it considered a similar provision.  In *Hunter v. Deutsche Bank AG*, 866 N.Y.S.2d 670 (1st Dep't 2008), an employee brought a contract claim for bonus awards, but the "unambiguous" contract language left bonuses to the employer's sole "discretion."  *Id.* at 670-71.  The employee then relied on language that "bonuses would be contingent on criteria such as performance and profitability."  *Id.* at 671.  The First Department refused to interpret such language "as a limitation on defendant's discretion, since doing so would render the clear language of discretion meaningless."  *Id.*

Plaintiffs run the same failed play here.  They emphasize the language that the rate "will vary based on business and economic conditions," Compl. ¶ 32, just as the employee focused on supposed criteria for bonuses.  But here, as there, those words cannot limit "the clear language of discretion."  *Hunter*, 866 N.Y.S.2d at 671.  The disclosure of Chase Bank's discretion simply "does not constitute an enforceable contractual promise."  *Hughes v. Standard Chartered Bank, PLC,* 2010 WL 1644949, at *11 (S.D.N.Y. Apr. 14, 2010) (addressing discretionary bonuses).  In fact, JPMS's case is stronger than the employer's winning position in *Hunter*.  The discretion there belonged to the employer, plaintiff's counterparty, while the rate-setting discretion here is with non-party Chase Bank.  Ex. G at 1.  In any event, Plaintiffs cannot transmute the discretionary authority of the non-party into an enforceable promise by JPMS (a legally distinct entity) to ensure a higher rate.[6]

Undeterred, Plaintiffs blame JPMS because it "could choose to make a different vehicle available," thus indirectly affecting the rate.  Compl. ¶ 65.  But this assertion concedes that

---

[6] Plaintiffs' one citation to the Court on this point (*see* ECF No. 73 at 2), *Mirkin v. Viridian Energy, Inc.*, 2016 WL 3661106 (D. Conn. July 5, 2016), is not to the contrary.  There, the contract did not give the party the discretion to set rates, but instead required that rates be based on a single external factor: "wholesale market conditions."  *Id.* at *3, *9 (distinguishing case from one where the defendant had complete discretion over rates).  Additionally, it was a party setting the rate in *Mirkin*, not a non-party like here.

Plaintiffs have failed to state a breach of contract claim.  There are many things JPMS could "choose" to do; the question for a breach of contract claim hinges on what JPMS was obligated to do.  Nothing in the agreements or the law obligated JPMS to choose to make a different cash sweep vehicle available.

To the contrary, the choice of how to deploy Plaintiffs' cash belonged exclusively to Plaintiffs.  *See de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002) ("A nondiscretionary customer by definition keeps control over the account and has full responsibility for trading decisions.").  Plaintiffs say they could not have "invested elsewhere" because their non-managed accounts lack "alternative sweep programs."  ECF No. 73 at 1.  But that gets it exactly backwards.  Plaintiffs could, in fact, have invested elsewhere but ***chose*** to open their accounts at JPMS, knowing the sweep options available.  By opening their accounts, they expressly authorized JPMS to "sweep funds from [their] JPMS account into an FDIC insured account with JPMorgan Chase Bank, N.A."  Compl. ¶ 58; *see also id.* ¶¶ 25, 27.  Even after making that election, Plaintiffs always could have re-directed or withdrawn their funds rather than left uninvested cash in their JPMS accounts.  But, day after day, they chose not to.  Plaintiffs instead left their cash sitting idle in their brokerage accounts, thus confirming their choice to participate in the sweep program and accept Chase Bank's disclosed interest rate.  *See de Kwiatkowski*, 306 F.3d at 1302.

2.  <u>The reference to the Internal Revenue Code's "reasonable rate" disclosure requirement does not create an enforceable promise by JPMS.</u>

Seeking to smuggle an elephant into a mousehole, Plaintiffs seize a phrase in the brokerage IRA agreements that refers to deposits "bearing a reasonable rate of interest" and attempt to construe it as a promise by JPMS to pay more than the disclosed interest rate.  *See, e.g.*, Compl. ¶ 83.  Since this language is found only in the IRA agreements, Plaintiffs'

10

"reasonable rate" allegations could apply only to the subclass of brokerage customers who have IRA accounts. *Id.* ¶ 155. But even for this subclass, Plaintiffs' claim fails as a matter of law, many times over.

*First*, Plaintiffs' favorite phrase is found deep within a paragraph that did not obligate JPMS to do anything at all:

> Depositor authorizes the use of savings instruments offered by [Chase Bank]; ***and without limiting the generality of the foregoing***, unless otherwise directed by the Depositor, and agreed upon by [JPMS], [JPMS] may invest any uninvested cash held in the IRA [or Roth IRA] in bank savings instruments or bank deposits bearing a reasonable rate of interest in [Chase Bank] so long as (to the extent necessary) such investment is in compliance with section 4975(d)(4) of the Code [and] Treasury regulations section 54.4975-6(b)(1) ….

Ex. E at 6; Ex. F at 5 (emphasis added). By its plain terms, the "reasonable rate of interest" in no way "limit[ed] the generality" of Plaintiffs' authorization to sweep funds to Chase Bank. *Id.* In other words, that authorization was not premised on a promise to pay a reasonable rate. Indeed, the "reasonable rate" phrase provided no contractual "limit[]" at all. *Id.* And Plaintiffs' effort to squeeze a promise from the "reasonable rate" language would impermissibly rewrite that provision of the IRA agreements. *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (noting courts cannot "rewrite an unambiguous agreement").

Rather than a promise, the "reasonable rate" phrase is only a disclosure of how JPMS "may invest" Plaintiffs' cash in compliance with federal law. Ex. E at 6; Ex. F at 5. Plaintiffs themselves acknowledge that this language is required by federal law to the extent JPMS relies on a certain tax exemption applicable to retirement accounts. *See* Compl. ¶ 117 (citing 26 C.F.R. § 54.4975-6(b)(3)(i)); *see also* Ex. E at 6; Ex. F at 5 ("reasonable rate of interest … ***so long as (to the extent necessary)*** [a certain tax exemption is utilized]") (emphasis added). That makes it a "mandated disclosure, not a 'voluntarily undertaken' promise." *O'Connor v. Henkel Corp.*,

2015 WL 5922183, at *10 (E.D.N.Y. Sept. 22, 2015) (quoting *Welchert v. Am. Cyanamid, Inc.*, 59 F.3d 69, 72 (8th Cir. 1995) and rejecting express warranty claims that were based on violations of federally mandated labels).[7]  The mere inclusion of this language required to qualify for a particular federal tax law exemption was not a promise.  And if there is no promise, there is no contractual duty.  *See Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410, 413 (2d Cir. 2009) (holding that contractual language that "memorializes only [the plaintiff's] acknowledgement that her trades are subject to applicable rules and regulations" did "not impose any contractual obligations").

    *Second*, Plaintiffs cannot bootstrap the "reasonable rate" obligation imposed by an Internal Revenue Code ("IRC") tax exemption into a contract claim against JPMS because the IRC denies them any private cause of action.  *See Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003); *Schuloff v. Queens Coll. Found., Inc.*, 165 F.3d 183, 184 (2d Cir. 1999); *LeBouteiller v. Bank of New York Mellon*, 2015 WL 5334269, at *8 (S.D.N.Y. Sept. 11, 2015) (collecting examples from district courts in the Second Circuit).  Even Plaintiffs concede that they "do not assert claims under" the IRC.  ECF No. 73 at 2 n.3.  Nor can they bypass this limitation simply by relabeling their causes of action as state law breach of contract claims.  *See Grochowski*, 318 F.3d at 86.  In *Grochowski*, the plaintiffs sought to enforce a contractual provision that stated the contractor "shall pay … the [prevailing] wages" as determined "pursuant to the Davis–Bacon Act."  *Grochowski*, 318 F.3d at 83.  Notwithstanding the contract's "shall pay" language, the Second Circuit recognized these contract claims as "indirect attempts at

---

[7]  Plaintiffs wave off these cases as "irrelevant decision[s] about warranty law."  ECF No. 73 at 2.  Not so. "[T]here is no reason under New York law to treat a breach of warranty any differently than any other contractual breach."  *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 187 (2d Cir. 2007).  Both ask if a party made "good on the contractual commitment that it voluntarily undertook."  *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 444 (2005).  Here, JPMS cannot be held to a contractual term it was obligated by law to include.

privately enforcing the prevailing wage schedules contained in" the statute, which lacked any private right of action.  *Id.* at 85-86.  That meant the plaintiffs' action could not proceed:  "Since … no private right of action exists under the relevant statute, the plaintiffs['] efforts to bring their claims as state common-law claims are clearly an impermissible 'end run' around" that restriction.  *Id.* at 86; *cf. Valelly v. Merrill Lynch*, 464 F. Supp. 3d 634, 645 (S.D.N.Y. 2020) ("Plaintiff cannot circumvent the lack of a private right of action … merely by recasting her claim as a violation of a common law duty."); *Joseph v. JetBlue Airways Corp.*, 2012 WL 1204070, at *6 (N.D.N.Y. Apr. 11, 2012) (rejecting effort to use implied covenant of good faith and fair dealing "to recover via a private enforcement action for the airline's obligations otherwise enforceable only by the [Department of Transportation]"); *Acevado v. Citibank, N.A.*, 2012 WL 996902, at *14 (S.D.N.Y. Mar. 23, 2012) (similar for unjust enrichment).

*Third*, even if the "reasonable rate" language were a privately enforceable term, Plaintiffs cannot co-opt those words to contradict their agreements' specific terms.  *See Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001).  The general "reasonable rate" language in the IRA agreements contemplates two different sets of interest rates:  The rate applicable to advisory customers and the separate rate available to non-advisory customers like Plaintiffs.  For advisory customers, who pay a fee for JPMS to manage their account, the reasonable rate was significantly higher than what Plaintiffs could earn on their idle cash.  *See* Compl. ¶¶ 74-75.  And, to avoid any doubt on this score, Plaintiffs' Sweep Disclosure included a weblink with the agreed-to "current rate."  Ex. G at 1.

Plaintiffs invite the Court to read the broad "reasonable rate" term as superseding the specific and agreed-to rate in the agreements.  That is backwards.  Indeed, "it is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than

13

general language.'"  *Aramony*, 254 F.3d at 413; *Consedine v. Portville Cent. Sch. Dist.*, 12 N.Y.3d 286, 293 (2009) (similar).  If anything, the "specific words will limit the meaning of the general words."  *Aramony*, 254 F.3d at 414.  Not only does Plaintiffs' interpretation "elevate[] general language," but in doing so, it would impermissibly "nullify specific contractual terms." *Int'l Bhd. of Elec. Workers, Loc. Union 43 v. Nat'l Lab. Rels. Bd.*, 9 F.4th 63, 75 (2d Cir. 2021).

In addition to nullifying the agreed-to rate, Plaintiffs' interpretation would entirely restructure the parties' relationship by shredding other material contract provisions.  Although JPMS disclaimed "any discretionary authority or obligation to review … the investment of [customers'] cash," Ex. C at 5, Plaintiffs try to wield the "reasonable rate" language to obligate JPMS to review their cash investment to "secure and pay a higher interest rate."  ECF No. 73 at 2.  And while JPMS admonished its brokerage customers to "compare the terms" and "rate of return" available with other deposit accounts, Ex. G at 1, Plaintiffs flip that around so that JPMS must shop for "banks that will pay a higher rate."  ECF No. 73 at 2.  In short, Plaintiffs would foist on JPMS an active managerial role with respect to the interest rate – far beyond JPMS's agreed-to passive function of "automatically transferring" Plaintiffs' idle cash.  Compl. ¶ 2.  The IRA agreements' reference to a "reasonable rate" should not be twisted to be at war with the contracts' other provisions.  To the extent Plaintiffs contracted for a "reasonable rate," that term must be read to mean the variable, disclosed rate they agreed to earn.

**B.    Plaintiffs Failed to Perform Their Obligation to Promptly Raise Concerns About the Rates Paid on Sweep Program.**

Apart from their failure to allege any contractual duty to increase the rate, Plaintiffs also neglect to allege they performed their material obligations under the brokerage agreements.  To state a contract claim under New York law, "the complaint must allege … performance by the plaintiff."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015); *see also Diesel Props S.r.l.*

14

*v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).  Plaintiffs ignore the performance element of their claim altogether, entirely failing to allege performance or any facts suggesting it.

That is especially problematic given the terms of Plaintiffs' agreements.  Specifically, each of the Plaintiffs expressly took on the "responsibility to review … [their] periodic statements," which included their interest rate, "and to report errors to JPMS."  Ex. C at 1.  Such notice would allow JPMS to address and cure purported defects.  And the notice provision was, at minimum, a necessary pre-condition to any obligation for JPMS to alter the previously agreed-to rate.  Indeed, under the brokerage agreements, Plaintiffs' periodic statements "will be binding unless [they] report suspected errors within 10 business days."  *Id.*  But Plaintiffs do not allege that either of them ***ever*** gave pre-litigation notice to challenge the disclosed rate.  Plaintiffs cannot agree to the disclosed interest rate, promise to review and report any errors with it, and sit silently on the sidelines before springing a putative class action on JPMS.  Since Plaintiffs altogether failed to plead that they each performed their end of the bargain, their breach of contract claims must be dismissed.  *See Orlander*, 802 F.3d at 294.

### C.    Plaintiffs Released JPMS and Its Affiliates from Liability Related to the Sweep Program.

Even if Plaintiffs had pleaded a contract claim, they released Defendants under the specific agreements they cite in their complaint.  Under New York law, "a clear and unambiguous release …  should be enforced according to its terms."  *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 189 (S.D.N.Y. 2008) (quoting *Booth v. 3669 Del.*, 703 N.E.2d 757 (N.Y. 1998)).

Here, Plaintiffs' claims fall squarely within the language of their clear releases.  In the General Terms and Conditions applicable to all brokerage accounts, Plaintiffs "agree[d] to

release and forever discharge JPMS" and "its affiliates … from all responsibilities, liabilities, obligations, claims, damages, losses and expenses of any nature whatsoever incurred or sustained by a Released Party and caused directly or indirectly by one or more of the released parties following instructions by you." Ex. B at 7. Reinforcing this broad release, the IRA agreements further provided that JPMS "shall not be liable for any loss of any kind that may result from any action taken by it in accordance with the directions of the Depositor." Ex. E at 7; Ex. F at 6. Plaintiffs repeatedly instructed and directed JPMS to sweep their uninvested cash into an account at Chase Bank – and they gave these instructions after JPMS fully disclosed the interest rate. *See, e.g.*, Compl. ¶¶ 25, 27, 30-31, 36, 41, 58; Ex. C at 2. Accordingly, they cannot escape the language of their releases.

Plaintiffs' contrary position rests on JPMS's alleged "discretionary control over the Cash Sweep Programs." ECF No. 73 at 3. But that is a red herring. Plaintiffs were non-discretionary customers who alone were responsible for managing their cash and investments. *See de Kwiatkowski*, 306 F.3d at 1302. JPMS merely executed Plaintiffs' instructions, transferring Plaintiffs' uninvested funds to the account they authorized, to earn the rate disclosed to them. Having instructed the automatic transfer of their uninvested cash to the deposit account to earn the disclosed interest rate, Plaintiffs cannot now assert these claims against Defendants.

### D. *Valelly* Is Consistent with Defendants' Arguments.

Plaintiffs cannot dodge these legal arguments by relying on *Valelly v. Merrill Lynch*. ECF No. 73 at 2-3 (citing 2021 WL 240737, at *1-2 (S.D.N.Y. Jan. 25, 2021)). The agreements in *Valelly* were materially different than the agreements here; the Merrill Lynch agreements included a materially different "reasonable rate" provision, lacked a hyperlink to the current rate, and contained different release language. In particular, the Merrill Lynch sweep agreement provided that "[t]he Interest paid on retirement account assets will be at no less than a reasonable

16

rate." *Valelly*, 19-cv-07998-VEC, ECF No. 18-1 at 5 (Merrill Lynch sweep agreement). That

provision did not cite the IRC, and it did not disclaim that this language constrained its sweep

program.

Given these material differences, Merrill Lynch did not press – and Judge Caproni did not

address – *any* of the arguments JPMS advances with respect to its reasonable-rate provision. *See*

*Valelly*, 19-cv-07998-VEC, ECF No. 17 (Merrill Lynch's memorandum in support of its motion

to dismiss); ECF No. 39 (Merrill Lynch's opposition to Plaintiff's motion for leave to amend her

complaint). Instead, as relevant here, Merrill Lynch argued that the plaintiff had relied on

"deeply flawed comparisons," such as by looking to data from rates from distinct institutions and

distinguishable products. *Valelly*, 19-cv-07998-VEC, ECF No. 39 at 13-17. Judge Caproni

(partially) rejected that argument based on what a finder of fact could determine from such

comparisons. *See Vallely*, 2021 WL 240737, at *1-2. While Merrill Lynch's fact-intensive

comparison could not (fully) be resolved at the pleading stage, JPMS's legal arguments can and

should be resolved against Plaintiffs now.

## II.    JPMS DID NOT OWE PLAINTIFFS BROAD FIDUCIARY DUTIES WITH REGARD TO THE CASH SWEEP PROGRAM.

Plaintiffs' broad and sweeping fiduciary duty claims likewise fail. A fiduciary

relationship "arises between two persons when one of them is under a duty to act for or to give

advice for the benefit of another upon matters within the scope of the relation." *Oddo Asset*

*Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 592-93 (2012). Such a relationship "exists only

when a person reposes a high level of confidence and reliance in another, who thereby exercises

control and dominance over him." *People ex rel. Cuomo v. Coventry First LLC*, 13 N.Y.3d 108,

115 (2009). Indeed, for parties dealing at arm's length, no fiduciary duties "will arise absent

extraordinary circumstances." *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002).

17

To clear this high bar, Plaintiffs must plead "fact-specific" allegations, as they themselves admit. ECF No. 73 at 1. But Plaintiffs allege no facts – other than stray words from the parties' agreements – that purportedly give rise to any fiduciary obligations. The language Plaintiffs cite does not create any fiduciary duty with regard to their interest rate. Additionally, since Plaintiffs' argument only repackages contract language, it must be dismissed as duplicative.

**A.    The Fiduciary Duty Claim Impermissibly Duplicates the Contract Claims.**

New York law forecloses Plaintiffs' effort to base their fiduciary claim on their agreements with JPMS. Where "a fiduciary duty is [allegedly] based upon a comprehensive written contract between the parties, a claim for breach of fiduciary duty is duplicative of a claim for breach of contract and must be dismissed." *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 105 (S.D.N.Y. 2013) (collecting cases); *see also Snyder v. Wells Fargo Bank, N.A.*, 594 F. App'x 710, 713 (2d Cir. 2014); *Celle v. Barclays Bank P.L.C.*, 851 N.Y.S.2d 500, 501 (1st Dep't 2008) ("The breach of fiduciary duty claim was properly dismissed as the agreement 'cover[s] the precise subject matter of the alleged fiduciary duty.'").

Here, the alleged fiduciary duty is "based" entirely "upon a comprehensive written contract." *N. Shipping Funds*, 921 F. Supp. 2d at 105. Indeed, Plaintiffs themselves root the alleged fiduciary duty in their contract. *E.g.*, Compl. ¶ 35 (alleging, that "[u]nder the terms of the relevant agreements," JPMorgan "undertook a fiduciary duty"); *see also* ECF No. 73 at 1 (citing Compl. ¶¶ 90-95). Each of these cited paragraphs quotes from or summarizes some part of Plaintiffs' agreements. Because the agreements cover "the precise subject matter of the alleged fiduciary duty," the fiduciary claim must be dismissed. *Celle*, 851 N.Y.S.2d at 501.

Plaintiffs next cite Regulation Best Interest ("Reg BI") and the IRC, insisting that these sources (both unenforceable through private action, *see supra* pp. 12-13 and *infra* p. 24) somehow "extend" the purported fiduciary duties "past the contract." ECF No. 73 at 3. But this

18

ignores the language of Plaintiffs' own complaint.  In alleging JPMS undertook "obligations under Regulation Best Interest," Plaintiffs look to and quote from "the account agreements." Compl. ¶ 90.  So too with the IRC's "reasonable rate" language, which Plaintiffs say JPMS "explicitly promises" to provide in its agreements.  Compl. ¶¶ 111-12.  Because all of this turns solely on purported contractual provisions, the duplicative fiduciary breach claim cannot stand.

**B.    The Agreements Do Not Create Any Fiduciary Duty Regarding the Interest Rate.**

Plaintiffs' fiduciary claim also fails on the merits, as a matter of well-established law. The law sets a high bar that Plaintiffs cannot meet.

*1.    JPMS owed Plaintiffs nothing more than sweeping their funds as authorized.*

Normally, "there is no general fiduciary duty inherent in an ordinary broker/customer relationship." *Indep. Ord. of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998) (citing *Perl v. Smith Barney Inc.*, 646 N.Y.S.2d 678, 680 (1st Dep't 1996)).  Rather, "[s]uch a duty can arise only where the customer has delegated discretionary trading authority to the broker." *Id.*  But where customers – like Plaintiffs here – maintain nondiscretionary accounts, "the broker's duties are quite limited." *Id.*  In fact, New York courts commonly reject fiduciary duty claims on the grounds that "brokers for non-discretionary accounts do not owe clients a fiduciary duty." *Celle*, 851 N.Y.S.2d at 501; *see also Apt v. Sengupta*, 981 N.Y.S.2d 680, 681 (1st Dep't 2014); *Fesseha v. TD Waterhouse Inv. Servs., Inc.*, 761 N.Y.S.2d 22, 24 (1st Dep't 2003).

When courts recognize a broker's duty to a non-discretionary client, the scope of the duty is typically limited "to the narrow task of consummating the transaction requested." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999); *see also BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 271 (S.D.N.Y. 2012) ("[W]here a broker does not have discretionary trading authority over an account, the broker's only duty is the proper execution of

19

transactions upon explicit customer instructions."). Put differently, the "broker's duties ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice, or warnings concerning the customers' investments." *de Kwiatkowski*, 306 F.3d at 1302.

These same principles all but eliminate fiduciary duties in the context of sweep programs for nondiscretionary brokerage accounts, as courts in this circuit have made clear. "Federal regulation of ... broker utilization of customer funds is extensive." *DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605, at *31 (S.D.N.Y. July 27, 2009). Yet federal regulators and courts alike have "recognized that the relationship of brokers to customers with respect to credit and debit balances in their accounts is that of debtor and creditor." *Id.* Swept funds, after all, always belong to the customer rather than the broker. *See id.* So, when those funds are "swept from *nondiscretionary* brokerage accounts," brokers "act[] as *debtors*, not fiduciaries." *Id.* n.16; *see also Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237, 246 (S.D.N.Y. 1996).

There is no dispute here that Plaintiffs and the putative class members are non-discretionary brokerage customers. That means that JPMS did not act as Plaintiffs' investment advisor, Ex. C at 2, and did "not have discretion to act on [Plaintiffs'] behalf in [their] brokerage account," Ex. H at 5. Although JPMS could provide one-off recommendations for "the purchase or sale of securities," it disclosed to brokerage customers that it would "not make investment decisions" for Plaintiffs, "manage [their] investments," nor "monitor [their] account."[8] *Id.* For these textbook non-discretionary accounts, JPMS's only obligation was to follow Plaintiffs' instructions. *See Indep. Ord. of Foresters*, 157 F.3d at 940. Since Plaintiffs have not alleged

---

[8] In contrast, only for those customers that had enrolled in JPMS's "investment advisory programs" and agreed to the fees associated with such programs, JPMS would conduct "an ongoing" review of a client's "activity and investment results." Ex. D at 2. To the extent customers wanted such services, they needed to enter into a separate agreement with JPMS. *Id.* None of the Plaintiffs (or putative class members) here is an advisory customer.

facts showing "they had anything more than ordinary broker-client relationships" that would extend the duties any further, their fiduciary claim must be dismissed.  *In re Dean Witter Managed Futures Ltd. P'ship Litig.*, 724 N.Y.S.2d 149, 151 (1st Dep't 2001).

>    2.    *Plaintiffs cannot leverage JPMS's limited role to support broad fiduciary duties.*

Plaintiffs cannot contort JPMS's narrow agency into a broad fiduciary relationship. *Contra* Compl. ¶¶ 3, 35, 82, 92, 95.  Although Plaintiffs assert that JPMS acted as their "agent" with respect to "the rates paid" under their agreements, *id.* at ¶ 95, the agreement said nothing of the sort.  Nor did the agreement otherwise commit JPMS to a broad fiduciary relationship. Instead, JPMS agreed only to act as Plaintiffs' "agent" for purposes of moving their swept funds to and from Chase Bank.  Ex. G at 1.  Such limited agency is nothing more than the ordinary duty to complete a brokerage client's requested transfers, *see de Kwiatkowski*, 306 F.3d at 1302 – a duty JPMS fulfilled by sweeping Plaintiffs' uninvested funds to the deposit accounts they authorized.

The case Plaintiffs have cited, *Sokoloff v. Harriman Ests. Dev. Corp.*, 96 N.Y.2d 409 (2001); (ECF No. 73 at 1-2), actually cuts against them.  That case involved a company's "promise to furnish" the plaintiffs with architectural plans and drawings for their new home.  96 N.Y.2d 409, 415-17.  Acting on the plaintiffs' behalf, the company obtained and then "with[e]ld the architectural plans."  *Id.* at 416.  Such gamesmanship, the New York Court of Appeals held, breaches of the duty of loyalty by trying to "prevent[]" the principals "from using the architectural plans [the company] procured for them."  *Id.* at 417.  Nothing in *Sokoloff* broadens the minimal fiduciary duty a broker owes a customer with a nondiscretionary account.  Instead, the case underscores that JPMS has ***fulfilled*** any duty it owed because, unlike the plaintiffs in *Sokoloff*, Plaintiffs received the interest promised after JPMS executed their authorized sweep. *See* Compl. ¶¶ 6-7.

21

Retreating, Plaintiffs point to language in the agreements that they claim established broad fiduciary duties, such as the statement that JPMS would "act as a fiduciary within the meaning of ERISA and/or the Code, as applicable, when a specific recommendation is provided to you." *E.g.*, Compl. ¶ 47; *see also, e.g.*, *id.* ¶ 38 ("When we provide you with a recommendation … , we must act in your best interest and not put our interest ahead of yours."). But these provisions – by their own terms – only apply if JPMS made a "***specific*** recommendation" to Plaintiffs. Ex. C at 5 (emphasis added). And, as the agreements specify, the fiduciary duty arises when JPMS "make[s] ***investment*** recommendations." *Id.* (emphasis added). Such "transaction-specific recommendations" are ordinary "characteristics of the broker-dealer business model." *XY Plan. Network, LLC v. United States Sec. & Exch. Comm'n*, 963 F.3d 244, 255 (2d Cir. 2020); *cf. Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*, 631 F. Supp. 3d 125, 141 (S.D.N.Y. 2022) (recognizing fiduciary claim based on recommendations requires a plaintiff to plead "the defendant provided individualized investment advice"). Apart from specific investment advice, however, JPMS expressly disclosed that it does not act as "a fiduciary under any federal law, federal rule or federal regulation" for its brokerage customers like Plaintiffs. Ex. H at 6.[9]

Critically, Plaintiffs do not – and cannot – allege any facts that would trigger the cabined fiduciary duties related to specific investment advice. Indeed, they do not identify ***any*** specific recommendations JPMS offered to ***them*** concerning their uninvested cash. Compl. ¶ 61. To the contrary, JPMS disclaimed "any discretionary authority or obligation … to make

---

[9] In quoting from their agreements, Plaintiffs repeatedly mention a "fiduciary within the meaning of … the Employment Retirement Income Security Act (ERISA) and/or the [IRC], as applicable." Compl. ¶ 46-49, 61. Plaintiffs do not allege that ERISA is applicable. In any event, their state-law claims cannot piggy-back on ERISA; indeed, its comprehensive remedies preempt any such claims. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

recommendations for the investment of [customers'] cash." Ex. C at 5. Scrambling to plug this hole, Plaintiffs insist that the "automatic enrollment of clients" in the sweep program somehow "constituted a [qualifying] recommendation." Compl. ¶ 129. Not so. Rather than "*automatic*," each customer's participation in the sweep program resulted from their *own choice* to enter a broker-client relationship with JPMS. Rather than saying anything "*specific*," JMPS offered the sweep program to *all*. Ex. C at 5. Rather than part of an "*investment*," the sweep program – by definition – pertains only to "*uninvested* cash." *Id.* at 2, 5. And rather than make a "*recommendation*," Compl. ¶ 129, JPMS *warned* Plaintiffs that the rate might be "lower than the rate available" on other "comparable accounts," Ex. G at 1. Plaintiffs have it backwards, as their agreements make clear.

Not satisfied with the plain language, Plaintiffs resort to a non-binding SEC Staff Bulletin addressing Reg BI. Compl. ¶ 89 (citing Ex. J). But the Staff Bulletin disclaims any "legal force or effect," and its stray remark about sweep programs has no bearing here. Ex. J n.1.[10] Fundamentally, Reg BI itself does not apply to JPMS's sweep program. Instead, it applies only when the broker-dealer makes "recommendation[s] of any *securities* transaction or investment strategy involving *securities*." 17 C.F.R. § 240.15*l*-1(a)(1) (emphasis added). But the sweep program is simply a service to transfer *uninvested cash* – not a recommendation about *securities*. *Cf. Welch v. TD Ameritrade Holding Corp.*, 2009 WL 2356131, at *1 (S.D.N.Y. July 27, 2009) (describing a cash sweep "service"). Accordingly, Reg BI is expressly inapplicable to the claims in this case.

---

[10] In fact, the Staff Bulletin barely mentions sweep programs and only as one of several "potential costs" broker-dealers should consider when they ultimately make recommendations. Ex. J at 5.

Even if Reg BI were applicable, Plaintiffs' arguments would still fail because Reg BI offers no private right of action.[11]  *Allen v. Fid. Brokerage Servs. LLC*, 711 F. Supp. 3d 219, 224 n.5 (S.D.N.Y. 2024) (quoting the SEC's Adopting Release for Reg BI to conclude that Reg BI "specifically disclaimed that it 'creates any new private right of action'"); *see also Hauptman v. Interactive Brokers, LLC*, 349 F. Supp. 3d 292, 295-96 (S.D.N.Y. 2018).  As noted above, Judge Caproni in *Valelly* rejected efforts to use unenforceable regulatory standards in this very way, finding that a plaintiff "cannot circumvent the lack of a private right of action … merely by recasting her claim as a violation of a common law duty."  464 F. Supp. 3d at 645.

Without any legal grounds to assert their fiduciary claims, Plaintiffs plead that the fiduciary question is too "fact-specific" to be decided at the pleading stage.  ECF No. 73 at 1. While the existence of an agency or fiduciary relationship "often turns on questions of fact," it is "properly resolved" at the dismissal stage where, as here, the allegations fail to state a claim. *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013).  Indeed, Plaintiffs have not pleaded any facts to support this claim; instead, they base their fiduciary claim exclusively on the terms of the contract, Compl. ¶¶ 90-95, as supposedly "informed by Regulation Best Interest and the Internal Revenue Code," ECF No. 73 at 3.  Fundamentally, these are legal questions through and through and should be decided against Plaintiffs now.  *See, e.g.*, *PaineWebber*, 81 F.3d at 1199 (contractual language can be decided at dismissal).

---

[11]  The same is true of Plaintiffs' reliance on FINRA Rule 2122.  *See Allen v. Fid. Brokerage Servs. LLC*, 711 F. Supp. 3d 219, 224 n.5 (S.D.N.Y. 2024).  In addition to not offering a private right of action, FINRA Rule 2122 has no relevance here because it expressly relates to "charges" for "services performed."  Plaintiffs do not challenge any charges, but instead seek a higher interest rate.

24

### III. THE TWO REMAINING CLAIMS MUST BE DISMISSED SINCE THEY DUPLICATE THE CONTRACT CLAIMS.

As with the fiduciary duty claim, Plaintiffs' residual claims of unjust enrichment and breach of the covenant of good faith and fair dealing are nothing more than dressed-up contract claims, which must be rejected as impermissibly duplicative of the unsustainable contract claims.

Plaintiffs claim that Defendants were unjustly enriched because they received "significantly greater net interest income" than they were entitled to under the contracts. Compl. ¶¶ 198-99. The allegedly wrongful conduct thus arises from the same agreements underlying the breach of contract claims. But claims for unjust enrichment cannot stand alongside claims for breach of contract. *Churchill Real Est. Holdings LLC v. CBCS Washington St. LP*, 95 N.Y.S.3d 526 (1st Dep't 2019) ("The claim for unjust enrichment is barred by the existence of an express agreement governing the subject matter."); *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 586-87 (2d Cir. 2006) (similar). Although Plaintiffs cite to a case allowing unjust enrichment as an "alternative" pleading, (ECF No. 73 at 3 (quoting *Mitchell v. Faulkner*, 531 F. App'x 136, 137 (2d Cir. 2013))), that case did not involve a written, express agreement. Here, by contrast, "the existence of an express agreement governing the subject matter" precludes the claim for unjust enrichment. *Churchill Real Est.*, 95 N.Y.S.3d at 526.

Similarly, Plaintiffs predicate the alleged breach of the implied covenant of good faith and fair dealing on Defendants' purported failure "to fulfill … obligations under the contract" between Plaintiffs and JPMS. *See* Compl. ¶¶ 120-22. That too is duplicative and cannot proceed along with Plaintiffs' breach of contract claim. *See, e.g.*, *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("New York law ... does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.").

25

In every meaningful respect, the non-contract claims are carbon copies of the contract claims. All claims involve the same core facts and seek damages based on the same alleged wrongdoing. *E.g.*, Compl. ¶¶ 1, 4, 6-7, 10, 64-65, 70-78, 83-86, 95, 99-101, 108, 120, 123-26. These tag-on claims, therefore, must be dismissed as duplicative.

## IV.  PLAINTIFFS CANNOT SUSTAIN ANY CLAIMS AGAINST JPMORGAN CHASE & CO. BECAUSE PLAINTIFFS HAVE NO RELATIONSHIP WITH IT.

Plaintiffs' claims against JPMorgan Chase & Co should be dismissed because Plaintiffs have not alleged that they have any relationship with JPMorgan Chase & Co., much less any relationship that would give rise to any contractual or fiduciary duties. While Plaintiffs attempt to cloud the relationships with Defendants by generally referring to both Defendants as "JPMorgan," the only relationship Plaintiffs allege arises from their agreements with JPMS and alleged obligations growing out of that relationship. Plaintiffs' relationship with JPMS in no way implicates JPMorgan Chase & Co.

Black-letter contract and corporate law makes clear that Plaintiffs have no basis on which to bring any claims against JPMorgan Chase & Co. As a matter of contract law, "[o]ne cannot be held liable under a contract to which he or she is not a party." *Arroyo v. Cent. Islip UFSD*, 103 N.Y.S.3d 512, 514 (2d Dep't 2019). Contract liability thus requires "proof of a contractual relationship or privity between the parties." *Arroyo*, 103 N.Y.S.3d at 514. Moreover, as a matter of corporate law, "a parent corporation" generally "is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). Under New York law, this principle applies with full force to contracts, as courts have long held that a "parent corporation may not be held liable for the contracts … of its subsidiary solely because of stock ownership." *Maki v. Travelers Cos.*, 44 N.Y.S.3d 220, 223 (3d Dep't 2016); *see also Tate & Lyle Ingredients Americas, Inc. v. Whitefox Techs. USA, Inc.*, 949 N.Y.S.2d 375, 376 (1st Dep't 2012) (similar).

26

These basic precepts negate Plaintiffs' claims against JPMorgan Chase & Co.  Plaintiffs entered a contract only with JPMS, not the holding company.  Ex. B at 1.  Although they allege that JPMorgan Chase & Co. has control of JPMS, Compl. ¶¶ 15, 18, 29, that bare assertion is insufficient as a matter of law.  *See, e.g.*, *Maki*, 44 N.Y.S.3d at 223 (claims against parent company dismissed because "Plaintiff failed to make any specific allegations" "of control in [subsidiary's] everyday operations").  Plaintiffs do not (because they cannot) allege any facts suggesting that JPMorgan Chase & Co. exercised "complete domination over [JPMS] with respect to the transaction," nor do they allege anything else that could transform Plaintiffs' association with JPMS into a contractual or fiduciary relationship owed by the holding company. *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (listing several factors).  Because Plaintiffs lack any relationship with JPMorgan Chase & Co., their contract and fiduciary duty claims must be dismissed.  Just as those claims fail, so too do the remaining claims, which are premised upon Plaintiffs' contractual relationship with JPMS.

## CONCLUSION

Plaintiffs' consolidated complaint should be dismissed in its entirety.

Dated: May 13, 2025

/s/ Jayant W. Tambe

Jayant W. Tambe
Laura Washington Sawyer
Céalagh P. Fitzpatrick
Meredith Christian
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
jtambe@jonesday.com
lwsawyer@jonesday.com
cfitzpatrick@jonesday.com
mchristian@jonesday.com

*Counsel for Defendants J.P. Morgan Securities LLC and JPMorgan Chase & Co.*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(c)

This Motion complies with the word limits of Local Civil Rule 7.1(c) because, excluding the parts of the Motion exempted by Local Civil Rule 7.1(c), it contains 8,727 words, as determined by the word-count function of Microsoft Word.

Dated: May 13, 2025

*/s/ Jayant W. Tambe*

Jayant W. Tambe
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
jtambe@jonesday.com

*Counsel for Defendants*
*J.P. Morgan Securities LLC and*
*JPMorgan Chase & Co.*

**CERTIFICATE OF SERVICE**

I certify that on May 13, 2025 I caused the foregoing Memorandum of Law in Support of

Defendants' Motion to Dismiss the Consolidated Complaint to be served upon all counsel of record

via electronic service pursuant to Federal Rule of Civil Procedure Rule 5(b)(2)(E).

Dated: May 13, 2025                                        /s/ Jayant W. Tambe

                                                           Jayant W. Tambe
                                                           JONES DAY
                                                           250 Vesey Street
                                                           New York, NY 10281
                                                           (212) 326-3939
                                                           jtambe@jonesday.com

                                                           *Counsel for Defendants*
                                                           *J.P. Morgan Securities LLC and*
                                                           *JPMorgan Chase & Co.*