**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re JPMorgan Chase Cash Sweep Program* | Case No. 1:24-cv-06404-LGS <br><br> <u>CLASS ACTION</u> |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................................iii

TABLE OF ABBREVIATIONS .........................................................................................viii

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................... 1

        A.      JPMorgan's Cash Sweep Program-Related Agreements Gave Rise
                to Contractual and Fiduciary Obligations ................................................ 1

        B.      JPMorgan Failed to Pay Fair or Reasonable Interest Rates and Improperly
                Profited Thereby ........................................................................................ 2

III.    ARGUMENT ........................................................................................................ 3

        A.      Plaintiffs State a Claim for Breach of Contract ....................................... 3

                1.      JPMorgan's Contracts Establish Its Obligations ........................... 3

                        a.      Defendants have an obligation to vary their interest rates
                                based on business and economic conditions. .................... 3

                        b.      Defendants agreed to pay a reasonable rate of interest to IRA
                                accountholders. ................................................................. 7

                        c.      Defendants had additional contractual obligations. ........ 10

                2.      JPMorgan Breached the Contracts.............................................. 11

                3.      Plaintiffs' Ability to Invest Elsewhere Does Not Eliminate
                        Contractual Obligations .............................................................. 11

                4.      Plaintiffs Fully Performed Their Obligations ............................. 12

                5.      Plaintiffs Did Not Release Defendants from Liability............... 13

        B.      Plaintiffs State a Claim for Breach of the Implied Covenant ............... 15

        C.      Plaintiffs State a Claim for Breach of Fiduciary Duty.......................... 16

                1.      JPMS Agreed to Act as "Agent" with Respect to the CSP ....... 17

                2.      JPMorgan Exercised De Facto Control and Discretion Over the
                        CSP .............................................................................................. 19

        3.     JPMorgan Recommended Its CSP, Provided Investment Advice, and Owed Fiduciary Duties ........................................................................ 21

        4.     JPMorgan Cannot Disclaim Its Duties to Its Clients ................................ 23

        5.     Plaintiffs' Fiduciary Duty Claim Coexists with the Contract Claim ........ 23

    D.     Plaintiffs State a Claim for Unjust Enrichment ........................................................ 24

    E.     Plaintiffs State a Claim Against JPMorganChase .................................................... 25

IV.    CONCLUSION ............................................................................................................ 26

# TABLE OF AUTHORITIES

<u>Cases</u> <u>Page(s)</u>

*Acevado v. Citibank, N.A.*,
2012 WL 996902 (S.D.N.Y. Mar. 23, 2012) ................................................................. 9

*Ambac Assurance Corp. v. U.S. Bank N.A.*,
328 F. Supp. 3d 141 (S.D.N.Y. 2018) ....................................................................... 24

*Ambac Assurance Corp. v. U.S. Bank N.A.*,
2020 WL 7211217 (S.D.N.Y. Dec. 7, 2020) ........................................................... 5, 9

*Apt v. Sengupta*,
981 N.Y.S.2d 680 (1st Dep't 2014) .......................................................................... 20

*Aramony v. United Way of Am.*,
254 F.3d 403 (2d Cir. 2001) ....................................................................................... 9

*Axiom Inv. Advisors, LLC v. Deutsche Bank AG*,
234 F. Supp. 3d 526 (S.D.N.Y. 2017) ........................................................................ 5

*Baltia Air Lines, Inc. v. CIBC Oppenheimer Corp.*,
709 N.Y.S.2d 54 (1st Dep't 2000) .............................................................................. 4

*Benicorp Ins. Co. v. Nat'l Med. Health Card Sys, Inc.*,
447 F. Supp. 2d 329 (S.D.N.Y. 2006) ...................................................................... 14

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
448 F.3d 573 (2d Cir. 2006) ................................................................................. 24, 25

*Bissell v. Merrill Lynch & Co.*,
937 F. Supp. 237 (S.D.N.Y. 1996) .................................................................. 18, 20, 21

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
866 F. Supp. 2d 257 (S.D.N.Y. 2012) ...................................................................... 20

*Carlton Grp., Ltd. v. Mirabella SG SpA*,
2018 WL 3520494 (S.D.N.Y. July 19, 2018) ........................................................... 17

*Celle v. Barclays Bank P.L.C.*,
851 N.Y.S.2d 500 (1st Dep't 2008) ...................................................................... 20, 24

*Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.*,
462 F. Supp. 3d 317 (S.D.N.Y. 2020) ...................................................................... 19

*Churchill Real Estate Holdings, LLC v. CBCS Washington Street LP*,
95 N.Y.S.3d 526 (1st Dep't 2019) ............................................................................. 25

*Claridge v. N. Am. Power & Gas, LLC*,
   2015 WL 5155934 (S.D.N.Y. Sept. 2, 2015) ........................................................................ 3, 15

*Congregation Yetev Lev D'Satmar, Inc. v. Engie Power & Gas, LLC*,
   683 F. Supp. 3d 238 (E.D.N.Y. 2023) ...................................................................................... 15

*Consedine v. Portville Cent. Sch. Dist.*,
   12 N.Y.3d 286 (2009) ................................................................................................................... 9

*Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*,
   544 F. Supp. 2d 178 (S.D.N.Y. 2008) ....................................................................................... 14

*Cornfeld v. Bhuiyan*,
   120 N.Y.S.3d 708 (N.Y. Civ. Ct. 2020) .................................................................................... 19

*Cruz v. FXDirectDealer, LLC*,
   720 F.3d 115 (2d Cir. 2013) ....................................................................................................... 16

*Custom Hair Designs by Sandy, LLC v. Cent. Payment Co., LLC*,
   2020 WL 639613 (D. Neb. Feb. 11, 2020) ................................................................................ 13

*de Kwiatkowski v. Bear, Stearns & Co.*,
   306 F.3d 1293 (2d Cir. 2002) ..................................................................................................... 12

*De Vito v. Pokoik*,
   540 N.Y.S.2d 858 (2d Dep't 1989) .............................................................................................. 7

*DeBlasio v. Merrill Lynch & Co.*,
   2009 WL 2242605 (S.D.N.Y. July 27, 2009) ............................................................................ 20

*Dey v. Robinhood Markets Inc.*,
   2025 WL 1322716 (N.D. Cal. Apr. 28, 2025) ............................................................. 4, 6, 10, 15

*EBC I, Inc. v. Goldman, Sachs & Co.*,
   5 N.Y.3d 11 (2005) ............................................................................................................... 16, 17

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
   375 F.3d 168 (2d Cir. 2004) ......................................................................................................... 3

*Fesseha v. TD Waterhouse Inv. Servs., Inc.*,
   761 N.Y.S.2d 22 (1st Dep't 2003) .............................................................................................. 20

*Grochowski v. Phoenix Constr.*,
   318 F.3d 80 (2d Cir. 2003) ........................................................................................................... 9

*Gurfein v. Ameritrade, Inc. Gurfein v. Ameritrade, Inc.*,
   312 F. App'x 410 (2d Cir. 2009) .................................................................................................. 8

*Harte v. Ocwen Fin. Corp.*,
  2016 WL 1275045 (E.D.N.Y. Mar. 31, 2016) ................................................................. 25

*Higgins v. New York Stock Exch., Inc.*,
  806 N.Y.S.2d 339 (N.Y. Sup. 2005) ............................................................................... 23

*Hofmann v. Long Island Univ.*,
  2024 WL 3262819 (2d Cir. Jul. 2, 2024) ........................................................................ 24

*Hosp. Auth. of Rockdale Cnty. v. GS Cap. Partners V Fund, L.P.*,
  2011 WL 182066 (S.D.N.Y. Jan. 20, 2011) ................................................................... 15

*Hughes v. Standard Chartered Bank, PLC*,
  2010 WL 1644949 (S.D.N.Y. Apr. 14, 2010) ................................................................... 6

*Hunter v. Deutsche Bank AG*,
  866 N.Y.S.2d 670 (1st Dep't 2008) .................................................................................. 6

*In re Cablevision Consumer Litig.*,
  864 F. Supp. 2d 258 (E.D.N.Y. 2012) ............................................................................ 14

*In re Dean Witter Managed Futures Ltd. P'ship Litig.*,
  724 N.Y.S.2d 149 (1st Dep't 2001) ................................................................................ 20

*Indep. Ord. of Foresters v. Donald, Lufkin & Jenrette, Inc.*,
  157 F.3d 933 (2d Cir. 1998) ........................................................................................... 20

*Int'l Bhd. of Elec. Workers, Loc. Union 43 v. Nat'l Lab. Rels. Bd.*,
  9 F.4th 63 (2d Cir. 2021) .................................................................................................. 9

*JoAnn Homes at Bellmore, Inc. v. Dworetz*,
  25 N.Y.2d 112 (1969) ....................................................................................................... 4

*Johnson v. Priceline.com, Inc.*,
  711 F.3d 271 (2d Cir. 2013) ........................................................................................... 17

*Joseph v. JetBlue Airways Corp.*,
  2012 WL 1204070 (N.D.N.Y. Apr. 11, 2012) .................................................................. 9

*JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*,
  2009 WL 321222 (S.D.N.Y. Feb. 9, 2009) ......................................................... 16, 17, 24

*Keybank Nat'l Ass'n v. Franklin Advisers, Inc.*,
  616 B.R. 14 (Bankr. S.D.N.Y. 2020) .............................................................................. 16

*LeBouteiller v. Bank of New York Mellon*,
  2015 WL 5334269 (S.D.N.Y. Sept. 11, 2015) .................................................................. 9

*Madison Pictures, Inc. v. Pictorial Films, Inc.*,
    151 N.Y.S.2d 95 (Sup. Ct. 1956) ..................................................................... 6

*Mirkin v. Viridian Energy, Inc.*,
    2016 WL 3661106 (D. Conn. July 5, 2016)............................................... 3, 6

*Mirkin v. XOOM Energy, LLC*,
    931 F.3d 173 (2d Cir. 2019) ...........................................................................11

*Morris v. Walmart, Inc.*,
    2024 WL 3784113 (D. Mont. Aug. 13, 2024) ................................................. 8

*N. Shipping Funds I, LLC v. Icon Cap. Corp.*,
    921 F. Supp. 2d 94 (S.D.N.Y. 2013) ............................................................ 24

*Nunez v. A-T Fin. Info. Inc.*,
    957 F. Supp. 438 (S.D.N.Y. 1997) .................................................................. 7

*O'Connor v. Henkel Corp.*,
    2015 WL 5922183 (E.D.N.Y. Sept. 22, 2025) ............................................... 8

*Press v. Chem. Inv. Servs. Corp.*,
    166 F.3d 529 (2d Cir. 1999) ......................................................................... 20

*Press v. Chem. Inv. Servs. Corp.*,
    988 F. Supp. 375 (S.D.N.Y. 1997) ............................................................... 19

*Rsch. Found. for State Univ. of N.Y. v. Inpria Corp.*,
    2025 WL 472680 (N.D.N.Y. Feb. 12, 2025)................................................. 19

*S. D. Hicks & Son Co. v. J. T. Baker Chem. Co.*,
    307 F.2d 750 (2d Cir. 1962) ......................................................................... 12

*Samba Enters., LLC v. iMesh, Inc.*,
    2009 WL 705537 (S.D.N.Y. Mar. 19, 2009) ................................................ 17

*Schuloff v. Queens Coll. Found., Inc.*,
    165 F.3d 183 (2d Cir. 1999) ........................................................................... 9

*Skanga Energy & Marine Ltd. v. Arevenca S.A.*,
    875 F. Supp. 2d 264 (S.D.N.Y. 2012) .......................................................... 25

*Snyder v. Wells Fargo Bank, N.A.*,
    594 F. App'x 710 (2d Cir. 2014) .................................................................. 24

*Sokoloff v. Harriman Estates Dev. Corp.*,
    96 N.Y.2d 409 (2001)............................................................................. 17, 18

*Sommer v. Fed. Signal Corp.*,
 79 N.Y.2d 540 (1992) .................................................................................................... 24

*Spinelli v. Nat'l Football League*,
 903 F.3d 185 (2d Cir. 2018) ..................................................................................... 15, 16

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
 464 F. Supp. 3d 634 (S.D.N.Y. 2020) ............................................................................. 8

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
 2021 WL 240737 (S.D.N.Y. Jan. 25, 2021) ................................................... 7, 8, 9, 10

*Veleron Holding, B.V. v. Morgan Stanley*,
 117 F. Supp. 3d 404 (S.D.N.Y. 2015) ....................................................... 17, 19, 23

*Welchert v. Am. Cyanamid, Inc.*,
 59 F.3d 69 (8th Cir. 1995) ............................................................................................. 8

Statute

21 U.S.C. §379r ................................................................................................................. 8

Regulations

26 C.F.R. § 54.4975-6(b) & (b)(3)(i) ............................................................................... 8

Other Authority

14 Williston on Contracts § 40:1 (4th ed.) ...................................................................... 12

**TABLE OF ABBREVIATIONS**

| Short Form | Full Meaning |
|---|---|
| ¶___ or Complaint | "¶___" refers to paragraphs of Plaintiffs' Consolidated Class Action Complaint (ECF No. 69) |
| CSP | JPMorgan's Cash Sweep Programs, as provided in ¶52 |
| Defendants or JPMorgan | JPMorgan Chase & Co. and J.P. Morgan Securities LLC |
| D.Ex.___ | Exhibits to the Declaration of Laura Washington Sawyer in Support of Defendants' Motion to Dismiss (ECF No. 86) |
| IRA | Individual Retirement Account |
| JPMCB | JPMorgan Chase Bank N.A. |
| JPMorganChase | JPMorgan Chase & Co. |
| JPMS | J.P. Morgan Securities LLC |
| MTD | Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint (ECF No. 85) |
| Plaintiffs | Plaintiffs Dan G. Bodea and Richard W. Quigley Jr. |
| SEC | U.S. Securities and Exchange Commission |
| Reg BI | Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318 (July 12, 2019), 17 C.F.R. 240.151-1 |

## I.    INTRODUCTION

JPMorgan breached contractual, implied, and fiduciary duties to clients in its CSP and unjustly enriched itself at its clients' expense, by drastically under-paying interest on their CSP balances. JPMS promised to pay Plaintiffs and the members of the Class a "reasonable rate" of interest on their CSP balances, and that those interest rates "will vary based on business and economic conditions." Instead, JPMorgan paid *de minimis* unvarying interest rates to its clients during the Class Period while earning significant financial returns on their cash as interest rates soared. As the Federal Funds Rate and yield on short-term Treasury Bills climbed from nearly 0% to above 5%, JPMorgan paid CSP clients a stagnant, unchanging rate of just 0.01%—over ***500 times*** lower than the prevailing short-term Treasury Bill rate and the Federal Funds Rate.

The Court should reject JPMorgan's attempt to dismiss its obligations to its clients. ***First***, Plaintiffs sufficiently anchor their contract claims to specific provisions in the parties' written agreements and incorporated disclosures. JPMorgan's purported disclosures and attempts to obscure the Complaint's well-pleaded provisions, their implications, or the facts supporting their breach cannot sustain its MTD. ***Second***, Plaintiffs sufficiently plead JPMorgan's fiduciary duties as an agent of its clients with respect to the CSP, over which JPMorgan exercised complete discretion and control. ***Third***, in the alternative, Plaintiffs sufficiently plead that equity and good conscience prohibit JPMorgan from retaining astronomical profits generated by its clients' cash through its misuse of the CSP.

## II.    STATEMENT OF FACTS

### A.    JPMorgan's Cash Sweep Program-Related Agreements Gave Rise to Contractual and Fiduciary Obligations

JPMorgan's CSP was provided to non-retirement and retirement brokerage clients. ¶¶2, 52. For those non-advisory accounts, the CSP was the default and only cash sweep option. ¶¶25-26.

The CSP swept JPMorgan clients' cash to a "Deposit Account" with its affiliated bank, JPMCB. ¶52. JPMCB was the only option for the CSP. ¶53. JPMorgan kept CSP interest rates stagnant at 0.01% since June 2020 and 0.03% prior to June 2020 (¶52), while JPMorgan and its affiliates retained the difference between the interest it earned on the cash and the interest amounts paid to clients. ¶6.

For all its clients, JPMorgan promised that CSP interest rates "*will vary based on business and economic conditions*….The rate is reset periodically at the discretion of JPMCB." ¶¶32, 37, 99; D.Ex.G at 1. JPMorgan also promised its IRA clients that JPMS "may invest any uninvested cash held in the IRA in bank savings instruments or bank deposits *bearing a reasonable rate of interest in JPMCB's banks.*" ¶¶45, 111-12; D.Ex.E at 6; D.Ex.F at 5.[1] JPMorgan also explains that it has a "*special rule*" requiring JPMorgan to act in its IRA retirement clients' "*best interest and not put our interest ahead of yours*." ¶¶46, 48, 91; D.Ex.C at 5; D.Ex.H at 5.

JPMorgan agreed that for the CSP, "*JPMS acts as exclusive custodian and agent with respect to all transactions* relating to the Deposit Account feature of customers' JPMS accounts" and "[w]hen you select the Deposit Account for the automatic investment or 'sweep' of available cash held in your JPMS account, such balances are remitted for deposit by JPMS, *acting as your agent*, into a Demand Deposit Account maintained at JPMCB." ¶¶31, 37, 59, 92; D.Ex.G at 1.

> **B.    JPMorgan Failed to Pay Fair or Reasonable Interest Rates and Improperly Profited Thereby**

JPMorgan's sweep rates were unreasonably low and did not account for industry, market, or prevailing business or economic conditions, as promised. ¶¶137-40, 143-45, 151. CSP interest rates were also significantly lower than those JPMorgan paid its *advisory* accountholders, with

---

[1] Unless noted, all internal citations and quotations are omitted and emphasis is added. Any capitalized term not defined herein has the same meaning as defined in the Complaint.

advisory accountholders receiving over 4% interest at all times from December 2022 to-date. ¶¶74-75. JPMorgan derives improper windfall profits by capturing the majority of interest generated by the nearly cost-free cash entrusted to it by its CSP clients. ¶¶77-78. Specifically, from 2021 through 2024, as interest rates spiked and CSP rates remained stagnant at 0.01%, JPMorgan reported a significant increase in net interest income and the most profitable period in JPMorgan's history. ¶127.

## III.    ARGUMENT

### A.    Plaintiffs State a Claim for Breach of Contract

The plain language of JPMorgan's client agreements supports Plaintiffs' breach of contract claims. *E.g.*, ¶¶171-73, 179-81. To plead a breach of contract, a "complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).

#### 1.    JPMorgan's Contracts Establish Its Obligations

##### a.    Defendants have an obligation to vary their interest rates based on business and economic conditions.

JPMorgan promised its clients that the CSP rates "***will vary based on business and economic conditions….The rate is reset periodically at the discretion of JPMCB***." ¶¶32, 54, 99; D.Ex.G at 1. Therefore, JPMorgan has promised to (i) "vary" its CSP rates, (ii) "based on business and economic conditions," and (iii) "reset periodically" its CSP rates. Courts have upheld similar language as an enforceable and binding contractual promise. *See, e.g.*, *Mirkin v. Viridian Energy, Inc.*, 2016 WL 3661106, at *8 (D. Conn. July 5, 2016) (plaintiff's allegations that contract stated "rates will be 'based on…market conditions'" but defendant "did not actually base its rates on those conditions" stated breach of contract); *Claridge v. N. Am. Power & Gas, LLC*, 2015 WL

5155934, at *6 (S.D.N.Y. Sept. 2, 2015) (denying motion to dismiss where defendant promised to charge "variable market based rates").[2]

In *Dey v. Robinhood Markets Inc.*, 2025 WL 1322716 (N.D. Cal. Apr. 28, 2025), the court found that Robinhood's identical promise that "interest rates on the [cash sweep] Deposit Accounts will vary ***based upon prevailing economic and business conditions***" sufficiently alleged a misrepresentation because "***a reasonable customer would understand this statement to mean that interest rates will correlate to market conditions***—that is, when market conditions improve, interest rates will go up, and when market conditions falter, interest rates will go down." *Id*. at *4. But, as here, Robinhood's rates appeared "entirely divorced from prevailing economic conditions" because Robinhood's sweep rates "ranged from 0.01% to 1.5% from June 2022 to present" while comparators like the 1-Month U.S. Treasury Rate "exceeded 1.5% and reached over 5% during that same period." *Id*. Taken together, the court found that, contrary to the agreement's language, "the interest rates paid to customers are not, in fact, determined by external market conditions but, instead, are more directly affected by Robinhood's choice to increase the amount of fees it extracts for itself." *Id.* Plaintiffs make even stronger allegations about JPMorgan's breach regarding the CSP given the stagnant 0.01% interest rate since June 2020. *See* ¶¶7, 142-48.[3]

Defendants try to transform the contractual language evidencing JPMS's promise that the

---

[2] Defendants' authority for the proposition that a disclosure without "any clear and unambiguous promise" creates no contractual obligations starkly contrasts with their own unequivocal promise that rates would vary in the prescribed manner. *Baltia Air Lines, Inc. v. CIBC Oppenheimer Corp.*, 709 N.Y.S.2d 54, 56 (1st Dep't 2000) (underwriter's mere disclosure to issuer of relationship between underwriter and clearing agent did not create contract between issuer and clearing agent).

[3] The *Robinhood* plaintiffs did not allege breach of contract, *Robinhood*, 2025 WL 1322716, at *5-6, but the court's holding that the term providing that rates would vary based on "prevailing economic and business conditions" was an actionable misrepresentation demonstrates the same language here constitutes an enforceable contractual promise. *See JoAnn Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119-21 (1969) (inclusion in contract of language constituting an actionable misrepresentation meant the breach of contract claim "can hardly be disputed").

4

rates "*will* vary" (¶32) into a supposed unenforceable risk disclosure that the rates "*may* vary." MTD at 8. This is an improper misreading of the contract, and nothing suggests that this is a mere risk disclosure. *See Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 534 (S.D.N.Y. 2017) (Schofield, J.) (upholding contract claims and holding that "[a] court's primary objective in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement"). The language appears on the first page of the Deposit Account Agreement under a header titled "Interest." D.Ex.G at 1. Defendants further argue that the language that interest "***will vary based on business and economic conditions***" merely acknowledges that JPMCB "may vary the rates paid." MTD at 8. But this impermissibly reads the basis for the varying rates—i.e., that they be "based on business and economic conditions"—out of the contract. *See Ambac Assurance Corp. v. U.S. Bank N.A.*, 2020 WL 7211217, at *4 (S.D.N.Y. Dec. 7, 2020) (Schofield, J.) ("Courts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements.").

Further contractual provisions support the reading that CSP interest rates will vary and "may be higher or lower than the rate available to direct depositors of JPMCB for comparable accounts" (¶100) and that rates could be "higher or lower than the rate available to direct depositors of Chase Bank for comparable accounts (and the return on any other vehicles available to you as a sweep option)." ¶54. These statements further support the reasonable interpretation that rates would in fact vary "based on business and economic conditions."

That JPMS's affiliate JPMCB had rate-setting "discretion" does not render the promise to vary rates "based on business and economic conditions" illusory. MTD at 9. It demonstrates the opposite, and highlights Defendants' bad faith in improperly exercising this "discretion." *See*

*Mirkin*, 2016 WL 3661106, at *8-9 (sustaining breach of contractual provision providing defendant discretion to set variable rates because discretion was not "unfettered" but rates were to be "based on wholesale market conditions"). Indeed, the fact that the contract assigned rate-setting "discretion" to affiliate JPMCB only highlights the importance of the contractual limits on its exercise—and, in all events, would not excuse Defendants' misconduct because, among other reasons, under New York law, a "parent cannot escape liability for derelictions by its subsidiary." *Madison Pictures, Inc. v. Pictorial Films, Inc.*, 151 N.Y.S.2d 95, 105 (Sup. Ct. 1956).

Again, *Robinhood* is instructive. There, the court upheld an implied covenant claim based on the underpayment of cash sweep rates at the amount third-party "Program Banks are willing to pay" based on "prevailing economic and business conditions" less Robinhood's fee—a promise that was breached by Robinhood "exercising its discretion to set its own fee in a manner that frustrated those provisions of the contract and ran contrary to customers' reasonable expectations." *Robinhood*, 2025 WL 1322716, at *5. Significantly, Robinhood specifically disclaimed it was "responsible for negotiating interest rates" with the third-party banks that participated in Robinhood's sweep program. *Robinhood*, 2025 WL 1322716, at *5-6. Here, any "discretion" over CSP rates is thus even more circumscribed because JPMorgan had complete control over its wholly-owned subsidiary bank that had the "discretion" to set rates (¶¶18, 29), acknowledged the financial benefits it received through the CSP (¶¶65-69), did not disclaim any duty to "negotiate" those rates, and exercised complete control over the CSP, including all interactions with JPMCB concerning the CSP. ¶¶56-59.[4]

---

[4] Defendants' "at-will" employment cases—*Hunter v. Deutsche Bank AG*, 866 N.Y.S.2d 670 (1st Dep't 2008), and *Hughes v. Standard Chartered Bank, PLC*, 2010 WL 1644949 (S.D.N.Y. Apr. 14, 2010)—involved at-will employees challenging discretionary bonus awards and are inapposite. New York law holds that a "promise to pay an employee a bonus which does not obligate the

### b. Defendants agreed to pay a reasonable rate of interest to IRA accountholders.

JPMorgan expressly agreed to "invest any uninvested cash held in [its accountholders] IRA in bank savings instruments or bank deposits ***bearing a reasonable rate of interest*** in JPMCB's banks." ¶¶45, 111-12; D.Ex.E at 6; D.Ex.F at 5. The promise is plain. *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2021 WL 240737, at *1-2 (S.D.N.Y. Jan. 25, 2021) (allowing a similar contractual promise to pay a "reasonable rate" to proceed in a cash sweep case where Merrill Lynch paid a 0.14% interest rate and comparators paid 0.19% to 0.38%).

Defendants' arguments that they have no contractual obligation to pay a "reasonable rate of interest" fail. ***First***, Defendants argue that JPMS's promise to pay a reasonable rate did not "obligate JPMS to do anything at all." MTD at 11. Defendants thereby mischaracterize the agreement, citing a clause immediately preceding the "reasonable rate" promise that states "without limit[] the generality of the foregoing." *Id.* (quoting D.Ex.E at 6; D.Ex.F at 5). But a plain reading makes clear the "foregoing" simply refers to the preceding clause "authoriz[ing] the use of savings instruments offered by [JPMCB]"—and does not limit JPMorgan's obligation to pay a "reasonable rate" in the CSP, which is not mentioned in any preceding part of the IRA agreement. *Id.* Any "authorization" of the use of JPMCB's savings instruments did not relieve JPMS of its independent obligation to invest class members' cash at a "reasonable rate of interest."[5]

---

employee to do or forego doing something that he was not otherwise obligated to do is a mere gratuity, and unenforceable," *De Vito v. Pokoik*, 540 N.Y.S.2d 858, 860 (2d Dep't 1989) and, unlike the agreements here, "no implied covenant of good faith and fair dealing attaches to at-will employment contracts." *Nunez v. A-T Fin. Info. Inc.*, 957 F. Supp. 438, 443 (S.D.N.Y. 1997) ("Every contract (***other than an agreement for employment at will***) under New York law" includes an implied covenant of good faith).

[5] Defendants curiously argue that JPMS's "reasonable rate" promise is "found deep within" the IRA agreement—in fact, it is found in the second sentence of a section titled "Brokerage

Instead, Defendants claim their promise to pay a reasonable rate was a "mandated disclosure" that is somehow unenforceable despite the contract's plain language—and even though Plaintiffs' "authorization" was conditioned upon the payment of a "reasonable rate." MTD at 11-12. Defendants are wrong. Whether the payment of "reasonable rates" is required to qualify for a certain tax treatment does nothing to limit or negate JPMorgan's contractual obligation, as Judge Caproni's decision concerning a breach of a "reasonable rate" promise based on the identical tax exemption in *Vallely* shows.[6]

Moreover, Plaintiffs do not "bootstrap" or "relabel[]" the tax exemption's reasonable rate obligation into a contract claim as Defendants argue, MTD at 12, but instead base their claims on the specific promise to pay a reasonable rate. Ironically, Defendants quote Judge Caproni's decision dismissing negligence claims in *Valelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 464 F. Supp. 3d 634, 645 (S.D.N.Y. 2020) to support their argument that the "reasonable rate" language improperly seeks to "bootstrap" an IRS obligation into a contract claim (MTD at 13, 14)—ignoring that Judge Caproni permitted contract claims based on substantially similar

---

Commissions; Use of JPMorgan Chase Bank, N.A. Products." D.Ex. E at 6; D.Ex. F at 5. In all events, as the drafter, any ambiguity must be construed against JPMorgan, particularly on a motion to dismiss.

[6] Defendants' "mandated disclosure" argument is belied by the fact that they have not received any regulatory approval to represent the reasonableness of their rates—and are only invoking the "reasonable rate" language because they are voluntarily seeking a particular tax treatment. 26 C.F.R. § 54.4975-6(b) & (b)(3)(i); *see Morris v. Walmart, Inc.*, 2024 WL 3784113, at *9-11 (D. Mont. Aug. 13, 2024) (disclosure required by federal law held enforceable contract because defendant was not required to offer the services that triggered the disclosure obligation or "get approval to use specific language"). In contending otherwise, Defendants miscite cases dealing with whether drug warranty claims are preempted under FDA law (e.g., 21 U.S.C. §379r)—a preemption analysis that has no bearing here. *See* MTD at 11-12 (citing *O'Connor v. Henkel Corp.*, 2015 WL 5922183, at *10 (E.D.N.Y. Sept. 22, 2025); *Welchert v. Am. Cyanamid, Inc.*, 59 F.3d 69, 72 (8th Cir. 1995)). And *Gurfein v. Ameritrade, Inc.* highlights the sufficiency of Plaintiffs' claims, as there, the exchange rules the plaintiff sought to enforce were not incorporated into the agreement, which did not impose any relevant contractual obligations on the defendant. 312 F. App'x 410, 413-14 (2d Cir. 2009).

"reasonable rate" language arising from the same IRC provisions to proceed. *Valelly*, 2021 WL 240737, at *1-2.[7]

*Third*, Defendants claim that the "reasonable rate" language contradicts other specific terms of the agreements—and specifically, JPMorgan's purported disclosure of the CSP rate on a separate website. MTD at 13. To start, the agreements did not contain any "agreed-to" CSP rate— only a URL that, if opened, would take the client to a page showing the current rate. *See* D.Ex.G at 1. But that purported disclosure (coupled with Defendants' promise that the rate "will vary") does not amount to an "agreement" to the specific variable rate paid. Indeed, in numerous cases like *Robinhood*, *Valelly*, and *Mirkin*, the "current rate" was disclosed, and the courts did not hesitate to sustain breach of contract claims. As in those cases, Defendants' interpretation here would impermissibly read the "reasonable rate" term out of the contract. *See Ambac*, 2020 WL 7211217, at *4 ("When parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.").[8]

Defendants then contend that the "reasonable rate" language in the IRA agreements actually contemplates two different sets of interest rates—one for advisory and another for non-advisory clients. MTD at 13. But the agreements nowhere make this distinction. Indeed, the fact

---

[7] In Defendants' "bootstrap" cases, the plaintiffs did not bring breach of contract claims or were not in contractual privity with defendants at all—*e.g.*, *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003)*; Schuloff v. Queens Coll. Found., Inc.*, 165 F.3d 183, 184 (2d Cir. 1999); *LeBouteiller v. Bank of New York Mellon*, 2015 WL 5334269 (S.D.N.Y. Sept. 11, 2015)—or are otherwise inapposite. *See Joseph v. JetBlue Airways Corp.*, 2012 WL 1204070, at *5-6 (N.D.N.Y. Apr. 11, 2012) (state law claims preempted by Airline Deregulation Act); *Acevado v. Citibank, N.A.*, 2012 WL 996902, at *14 (S.D.N.Y. Mar. 23, 2012) (plaintiffs' claim for unjust enrichment did "not allege any actionable wrongs independent of the requirements of the statute").

[8] In none of Defendants' cited cases were the limitation-imposing "specific terms" only accessible outside the four corners of the contracts at issue, as Defendants suggest the "weblink" disclosing the "current rate" functioned here. MTD at 13. *Cf. Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001); *Consedine v. Portville Cent. Sch. Dist.*, 12 N.Y.3d 286, 293 (2009); *Int'l Bhd. of Elec. Workers, Loc. Union 43 v. Nat'l Lab. Rels. Bd.*, 9 F.4th 63, 75 (2d Cir. 2021).

that advisory clients were paid rates far exceeding those that members of the Class received underscores the severity of Defendants' breach. *See* ¶¶74-76.

Nor does Defendants' promise to pay a "reasonable rate" contradict any of the other contractual terms—such as JPMorgan's supposed disclaimer of "any discretionary authority or obligation to review…the investment of [customers'] cash" or its mere "encourage[ment]" (MTD at 6) to brokerage customers to "'compare the terms' and 'rate of return' available with other deposit accounts.'" MTD at 14 (quoting D.Ex.G at 1; D.Ex.C at 5). Such statements do not eliminate or limit JPMorgan's independent promise to provide a reasonable rate of interest on that cash—as other courts in similar cases have held. *See, e.g.*, *Robinhood*, 2025 WL 1322716, at *5 (rejecting similar disclaimers).

### c. Defendants had additional contractual obligations.

JPMorgan promised its CSP clients that, when providing "a recommendation as your broker dealer," it would "***act in your best interest and not put our interest ahead of yours***." ¶38. Similarly, JPMorgan promises its clients that, "[w]hen acting in a brokerage capacity for certain clients, ***JPMS will make investment recommendations that are in your best interest***, based on the information that you shared with JPMS about you and your preferences." ¶¶38, 98. In addition, JPMorgan promises that "You'll receive investment recommendations, made in your best interest and based on information you share about your investing goals, needs and preferences." ¶33.

JPMorgan promises that for IRA clients it "***operate[s] under a special rule that requires us to act in your best interest and not put our interest ahead of yours***." ¶¶46, 48, 91. JPMorgan explains that its "special rule" requires that it "[n]ever put our financial interests ahead of yours when making investment recommendations" and "[c]harge no more than what is reasonable for our services." ¶¶46, 48, 91. Similarly, JPMorgan was contractually obligated, when acting as a broker-dealer for IRA accountholders, "to act in your best interest and not put our interest ahead

of yours." ¶98. As discussed below, each of these obligations reinforced clients' reasonable expectations that JPMorgan would, as it promised, pay "reasonable" CSP rates that "will vary" based on "business and economic conditions."

### 2.      JPMorgan Breached the Contracts

JPMorgan breached its contracts by failing to: (i) set, secure, and/or pay reasonable interest rates;  (ii) base its CSP interest rates on "business and economic conditions"; (iii) vary the interest rates on clients' cash balances in the CSP; (iv) reset the CSP interest rates; and (v) place its clients' interests before its own, instead creating and operating the CSP for its own benefit, and reaping exorbitant net interest income from clients' cash balances while underpaying interest to them. ¶173. Such breaches included JPMorgan using only its affiliated bank JPMCB for the CSP and paying clients 0.01% at all times since June 2020, even as market interest rates climbed dramatically during the Class Period. ¶¶64, 71; *see Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 177 (2d Cir. 2019) (plaintiff alleged breach of contract when defendant promised rates that would be based on "actual and estimated supply costs," but actual rates showed "significant upward deviations from the Market Supply Cost and continued to rise even when that cost fell").

### 3.   Plaintiffs' Ability to Invest Elsewhere Does Not Eliminate Contractual Obligations

JPMorgan argues that Plaintiffs could have invested elsewhere (MTD at 10)[9] but this argument fails. Class members opened and maintained their accounts subject to JPMorgan's promises as embodied in the parties' contract. That Plaintiffs could have invested elsewhere does not relieve JPMorgan of its contractual duties. Importantly, JPMorgan did not offer any alternative

---

[9] Contrary to Defendants' argument, Plaintiffs' reference to JPMS's ability to "choose to make a different vehicle available" simply outlines one of several mechanisms through which Defendants could have complied with their obligations, in addition to securing appropriate rates through JPMCB. MTD at 9-10.

sweep programs for accountholders in the CSP, making the CSP the default, and only, sweep option. ¶¶25-26. As such, the only way Plaintiffs could have invested elsewhere was to completely close their brokerage accounts and move their investments elsewhere. Defendants reference *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002) to argue that a non-discretionary client keeps control over its account and therefore Plaintiffs had the choice of how to deploy their cash. MTD at 10. But *de Kwiatkowski* addressed the obligations of a brokerage in executing trades and to monitor and give advice on a non-discretionary account—whereas here, Plaintiffs do not have a choice of how their cash was deployed in the CSP.

To the extent Defendants suggest Plaintiffs cannot enforce their rights because they continued to use their accounts, their position contradicts basic principles of contract law. A party may "allow[] the breaching party to continue performing and accept[] the defective performance" without "manifest[ing] an agreement that that performance is to be considered as full satisfaction of all obligations under the contract." 14 Williston on Contracts § 40:1 (4th ed.); *S. D. Hicks & Son Co. v. J. T. Baker Chem. Co.*, 307 F.2d 750, 752 (2d Cir. 1962) ("[T]here is no warrant for the position that a party to a contract waives his rights under the contract by failing to insist upon [agreed-upon] performance...and by urging and encouraging the other party to perform thereafter").

### 4.    Plaintiffs Fully Performed Their Obligations

The Complaint adequately alleges Plaintiffs' performance of the material terms of the agreements, i.e. signing the agreements and maintaining the accounts. *See, e.g.*, ¶¶24-25, 27-28. Nothing more is required. Having alleged Plaintiffs' agreement to the material terms of the agreements, the Complaint incorporates those allegations into the breach of contract claims and describes the binding agreements that were breached. *See* ¶¶169-70, 177-78.

But Defendants mischaracterize Plaintiffs' obligations under the agreements and cite an

12

irrelevant provision concerning "Communications Regarding Your Transactions" to contend Plaintiffs were obligated to "report errors to JPMS" in their periodic statements and that the failure to report the "suspected error" of the improper CSP rate meant that rates were "binding." MTD at 15. This is a red herring at worst and an affirmative defense, at best, that does not warrant dismissal. There is no basis to interpret the term "error" to apply to the Defendants' willful under-payment of CSP rates. *See, e.g.*, *Error*, Black's Law Dictionary (11th ed. 2019) ("a belief that what is false is true or that what is true is false; mistake"). Plaintiffs are not alleging any "mistake" in the calculations, but rather that JPMorgan intentionally paid unreasonably low CSP rates that did not "vary with economic and business conditions." At best, Defendants' strained contractual interpretation raises an issue of fact. *See Custom Hair Designs by Sandy, LLC v. Cent. Payment Co., LLC*, 2020 WL 639613, at *12 (D. Neb. Feb. 11, 2020), *aff'd sub nom. Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*, 984 F.3d 595 (8th Cir. 2020) (denying summary judgment based on defendant's "errors or discrepancies" notice provision because plaintiffs argued it covered "only mistaken charges" and not "willful efforts" by defendant).

### 5.   Plaintiffs Did Not Release Defendants from Liability

JPMorgan next incorrectly argues that it cannot be held liable because the brokerage agreement included a release from claims for damages "caused directly or indirectly by one or more of the released parties following instructions by [clients]." MTD at 16 (citing D.Ex.B at 7). But, as Plaintiffs allege, JPMS's sweeping cash to the CSP did not "follow" its clients' "instructions" to sweep cash to a vehicle that paid a reasonable interest rate that "will vary" based on "business and economic conditions." And on its face, this '*force majeure*' type clause relieves JPMorgan of liability in limited situations such as the "suspension of trading, unexpected market closures, war, natural disasters," and "any other conditions ***beyond the Released Parties' control***." D.Ex.B at 7. The provision is inapplicable because Plaintiffs' losses were not "caused directly or

13

indirectly" by any "suspension of trading," "war," or "natural disaster," or anything else "***beyond***" JPMorgan's control. To the contrary, the Complaint alleges that the CSP and the interest rates it paid was entirely within JPMorgan's control. ¶¶55-63.[10]

Separately, JPMorgan argues that IRA clients released sweep-related claims through an IRA agreement disclosure that JPMorgan "shall not be liable for any loss of any kind that may result from any action taken by it in accordance with the directions of the Depositor." MTD at 15-16 (quoting D.Ex.B at 7; D.Ex.E at 7; D.Ex.F at 6). This provision is also irrelevant. As Plaintiffs allege, Defendants did not act "in accordance" with Plaintiffs' directions because JPMS swept their cash into the CSP—which paid a non-changing, *de minimis* interest rate of 0.01%—instead of complying with the parties' agreement (and Plaintiffs' instruction) to pay a "reasonable rate" that "will vary" based on "economic and business conditions." The sweep of Plaintiffs' cash into the CSP is also the automatic and the default option—not the result of any "direction" by Plaintiffs. Undeterred, Defendants contend that Plaintiffs were "alone[] responsible for managing their cash and investments," and that JPMorgan "merely executed Plaintiffs' instructions." MTD at 16. Not so. JPMorgan, not its clients, had control over the CSP and the rates JPMorgan paid, and exercised that control to favor its own interests and prejudice its clients'—all without taking any instruction from its clients concerning the CSP's operations. *See supra* at §III.C.2.

---

[10] Even if the release did apply, which it does not, courts "***construe[] narrowly***" such provisions because they are "***aimed narrowly*** at events that neither party could foresee or guard against in the agreement." *See, e.g.*, *In re Cablevision Consumer Litig.*, 864 F. Supp. 2d 258, 264 (E.D.N.Y. 2012) (similar clause releasing liability caused by circumstances "beyond [defendant's] reasonable control" did not preclude breach of contract claim). *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 189 (S.D.N.Y. 2008) is thus inapposite because the purported "release" here is inapplicable. In all events, any covenant not to sue "must be clear and unequivocal" (it is not) and "strictly construed against the party asserting it." *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys, Inc.*, 447 F. Supp. 2d 329, 339 (S.D.N.Y. 2006).

### B.    Plaintiffs State a Claim for Breach of the Implied Covenant

Plaintiffs also state a breach of the implied covenant. "[I]mplicit in every contract is a covenant of good faith and fair dealing...which encompasses any promises that a reasonable promisee would understand to be included." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018).  To state a claim, the plaintiff must allege that the contract's "purpose was subverted, depriving him of his reasonable expectations." *Hosp. Auth. of Rockdale Cnty. v. GS Cap. Partners V Fund, L.P.*, 2011 WL 182066, at *4 (S.D.N.Y. Jan. 20, 2011).

Plaintiffs reasonably expected JPMorgan would ***not*** use its discretion and control over the CSP to pay minuscule interest rates and appropriate essentially all returns for itself. Moreover, Plaintiffs reasonably expected that JPMorgan would consider prevailing business and economic conditions in good faith, paying its clients a fair and reasonable rate of interest on their CSP balances—something JPMorgan did not do. ¶¶32, 37, 43, 54, 120-22. *Claridge*, 2015 WL 5155934, at *6 (finding allegations sufficient that defendant "exercise[d] its discretion in bad faith and in a manner inconsistent with customers' reasonable expectations").

On similar facts, the *Robinhood* court explained:

[The Sweep Program Agreement] states that Robinhood pays its customers an interest rate based on the "amount the Program Banks are willing to pay" and the "prevailing economic and business conditions," less the fee Robinhood extracts for itself…. [T]he natural reading of these statements is that the interest rates paid to customers are determined based on the rates set by the Program Banks and prevailing market conditions. Thus, Robinhood ***plausibly breached the implied covenant by exercising its discretion to set its own fee in a manner that frustrated those provisions of the contract and ran contrary to customers' reasonable expectations***.

2025 WL 1322716, at *5. Similarly, in *Congregation Yetev Lev D'Satmar, Inc. v. Engie Power & Gas, LLC*, the court upheld a claim that plaintiffs alleged an energy company's rate increases breached the implied covenant of good faith, finding the defendant charged customers high rates "detached from market conditions." 683 F. Supp. 3d 238, 247-49 (E.D.N.Y. 2023).

Defendants' sole argument as to this count is that Plaintiffs' implied covenant claim is duplicative of the contract claim. MTD at 25. Not so. Where, like here, "there is a dispute over the meaning of the contract's express terms, there is no reason to bar a plaintiff from pursuing both types of claims in the alternative." *Spinelli*, 903 F.3d at 206.[11] And here, Defendants contend they disclaimed a duty to obtain a reasonable rate of interest (MTD at 8) and dispute what the "reasonable rate" and "will vary based on business and economic conditions" provisions require. MTD at 8, 13-14.

Plaintiffs' breach of implied covenant claim is also not duplicative because it "would require proof of matters that are distinct from the breach of contract claim." *Keybank Nat'l Ass'n v. Franklin Advisers, Inc.*, 616 B.R. 14, 41 (Bankr. S.D.N.Y. 2020); *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009) ("a plaintiff adequately states an implied covenant claim by alleging conduct that subverts the contract's purpose without violating its express terms"). Here, the express "reasonable rate" promise was made to IRA accountholders, but all CSP clients expected reasonable rates. ¶¶120-22, 188.

### C. Plaintiffs State a Claim for Breach of Fiduciary Duty

Plaintiffs' fiduciary breach claims are not based on simply the broker-client relationship, but on a separate, fiduciary duty arising out of JPMorgan's agency relationship with clients vis-à-vis the CSP, as well as its control and discretion over the CSP, and other duties it undertook when enrolling clients into the CSP. "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice ***for the benefit*** of another upon matters within the scope of the relation." *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19 (2005). Only if "the

---

[11] Defendants' authority is in accord. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (vacating dismissal of breach of contract claim and concluding that breach of covenant claim rested on the same facts and was thus redundant).

facts are insufficient to support a finding of agency or the facts are not in dispute, [can] the question of agency [] be resolved as a matter of law." *Samba Enters., LLC v. iMesh, Inc.*, 2009 WL 705537, at *7 (S.D.N.Y. Mar. 19, 2009); *see also IDW*, 2009 WL 321222, at *5 (noting in case where JPMorgan alleged fiduciary duty claim as plaintiff, "[o]nly discovery will reveal whether JPMorgan can prove these allegations, but they must be accepted as true").[12] "Generally, where parties have entered into a contract, courts look to that agreement to discover...the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency." *EBC I*, 5 N.Y.3d at 19-20.

Here, as explained below, JPMorgan's operation of the CSP is ***not*** a traditional brokerage relationship in which JPMorgan merely "executed" customer trades.  Rather, JPMorgan's fiduciary duties arise from unique features of the CSP, the language of JPMorgan's contracts, the extensive agency responsibilities JPMorgan assumed, and the fiduciary character inherent in Class members entrusting JPMS to safeguard and generate a return on their cash. *See, e.g.*, ¶¶6, 27, 58-59, 93-94.

### 1.    JPMS Agreed to Act as "Agent" with Respect to the CSP

Under New York law, an agent is a fiduciary. *Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d 409, 416 (2001); *Carlton Grp., Ltd. v. Mirabella SG SpA*, 2018 WL 3520494, at *9 (S.D.N.Y. July 19, 2018) (Schofield, J.) ("An exclusive agency relationship gives rise to a fiduciary duty between principal and agent under New York law"); *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 453 (S.D.N.Y. 2015) ("the agency relationship is fiduciary

---

[12] This case is distinct from *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 273 (2d Cir. 2013), where the court could determine as a matter of law that Priceline.com was not a fiduciary to its customers, emphasizing that "the relevant facts [there were] uncontroverted."

in nature and imposes on an agent, among others, a duty of utmost good faith").[13] Where, as here, a broker acts in a capacity other than that of an ordinary broker in executing trades, "[t]he issue posed…is whether [Defendant] owes plaintiff a fiduciary or agency duty **with respect to the specific practices…in dispute in this action**." *Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237, 246 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998).

Thus, the rule that a broker's fiduciary duty is limited to the execution of specific transactions is unrelated to the fiduciary duties of a broker—or any other entity—that expressly agrees to act as its client's "agent" for an account over which it assumes *de facto* control and discretion—like the CSP deposit accounts. The Deposit Account Agreement describes JPMorgan's fiduciary relationship with its clients in unambiguous terms: JPMorgan "acts as **exclusive custodian and agent with respect to all transactions relating to the Deposit Account feature**." ¶¶31, 59, 92; D.Ex.G at 1. Likewise, "balances are remitted for deposit by JPMS, **acting as your agent**, into a Demand Deposit Account maintained at JPMCB." *Id*.; *Sokoloff*, 96 N.Y.2d at 416 ("On [a] motion to dismiss, we of course accept as true plaintiffs' allegation that [defendant] was acting as plaintiffs' agent").

Defendants seek to minimize their agency role by claiming it is "limited" to transferring funds to and from JPMCB. MTD at 21. But Defendants impermissibly shrink the scope of their agency and misstate JPMS's agreement to act as "exclusive custodian and agent to **all transactions**"—and not just moving funds—with respect to CSP accounts. ¶¶31, 59, 92; D.Ex.G at 1. JPMS's contention that its agency role was limited to moving funds—stated nowhere in its

---

[13] Defendants mischaracterize Plaintiffs' use of *Sokoloff*. MTD at 21. *Sokoloff* supports that an agent is a fiduciary, and contrary to Defendants' argument, does not support in any way that JPMS fulfilled its duties—because, like the defendants in *Sokoloff*, JPMorgan enriched itself and underpaying class members an unfair and unreasonable return on their cash. 96 N.Y.2d at 416.

agreements—should be rejected, as it impermissibly reads out the "all transactions" language. *Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.*, 462 F. Supp. 3d 317, 329 (S.D.N.Y. 2020) (courts are "required to give each word and phrase in a contract its plain meaning and avoid rendering the terms or provisions of a contract superfluous").

### 2.    JPMorgan Exercised *De Facto* Control and Discretion Over the CSP

Plaintiffs also allege that JPMorgan exercised *de facto* control and discretion over the establishment and operation of the CSP. *See Cornfeld v. Bhuiyan*, 120 N.Y.S.3d 708 (N.Y. Civ. Ct. 2020) ("the hallmark of a fiduciary relationship is '*de facto* control and dominance'"); *Veleron*, 117 F. Supp. 3d at 453 ("New York law is clear that a fiduciary relationship exists from the assumption of control and responsibility ... and is founded upon trust reposed by one party in the integrity and fidelity of another"); *Press v. Chem. Inv. Servs. Corp.*, 988 F. Supp. 375, 386 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 529 (2d Cir. 1999) (a fiduciary obligation attaches to matters over which "the broker exercises discretion").

That includes JPMorgan's control over: (i) automatically selecting and placing client funds into the CSP of JPMorgan's choice, (ii) setting the interest rates paid to its CSP clients, (iii) only using its affiliated bank JPMCB for the CSP, and (iv) determining client eligibility for the CSP. ¶¶55-62. The Deposit Account Agreement further states that "JPMCB will not accept any instructions concerning these bank deposits unless the instructions are transmitted by JPMS," effectively depriving its clients of any control. ¶¶27, 58-59; D.Ex.G at 1. These establish JPMorgan's "*de facto* control and dominance," the hallmarks of a fiduciary relationship. *Bhuiyan*, 120 N.Y.S.3d at 708. Plaintiffs also allege the imbalance of negotiating power between the parties to further support the existence of a fiduciary relationship. ¶128; *Rsch. Found. for State Univ. of N.Y. v. Inpria Corp.*, 2025 WL 472680, at *15 (N.D.N.Y. Feb. 12, 2025). Bolstering further JPMorgan's discretion over the CSP is, in the agreements, JPMorgan's "discretion" to terminate

use of the CSP, to offer alternative cash sweep options, to modify the terms of the CSP, and for JPMCB to set the rates. ¶¶93-94.

Defendants also argue that JPMorgan and its clients were in an "ordinary broker/customer relationship" like that of a debtor and creditor, and thus JPMorgan owed no fiduciary duties. MTD at 19-20. This is wrong. As laid out in JPMorgan's disclosures, the relationship between JPMorgan and its CSP clients was that of "agent" acting "on your behalf" in dealing with JPMCB—and not a debtor-creditor relationship. ¶¶27, 35, 58, 92. Defendants' cited authority is thus inapplicable to its duties as an agent with respect to cash sweep accounts over which it has discretion and control. For example, in *DeBlasio v. Merrill Lynch & Co.*, 2009 WL 2242605 (S.D.N.Y. July 27, 2009), the plaintiffs did not allege an agency relationship as to the cash sweep programs, and there were no other facts that would support the existence of a fiduciary relationship, as pled here. Indeed, the plaintiffs conceded "that 'in fact, they had nothing more than an "[arms]-length" relationship—the same as with any commercial vendor.'" *Id.* at *29. Likewise, in *Bissell*, the parties' relationship was unquestionably that of debtor and creditor in a dispute involving a margin agreement. 937 F. Supp. at 246.[14]

---

[14] Defendants' remaining cases—involving the limited duties owed by brokers to clients with respect to individual securities transactions—are inapposite: the brokers in those cases did not enter into an agency relationship with their clients with regard to any specific activities. *Cf. Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999) (alleging fiduciary relationship "limited" to a "single transaction of purchasing the T-Bill"); *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 866 F. Supp. 2d 257, 266 (S.D.N.Y. 2012) (alleging "duties…may be gleaned from industry standards and practice, third-party contractual undertakings, and the existence of an affiliate relationship"); *In re Dean Witter Managed Futures Ltd. P'ship Litig.*, 724 N.Y.S.2d 149, 151 (1st Dep't 2001) (nothing more than "ordinary broker-client relationships"). JPMorgan cites some loose language or dicta, inapplicable here, that "New York courts commonly reject fiduciary duty claims" for non-discretionary accounts. MTD at 19 (citing *Celle v. Barclays Bank P.L.C.*, 851 N.Y.S.2d 500 (1st Dep't 2008); *Apt v. Sengupta*, 981 N.Y.S.2d 680 (1st Dep't 2014); *Fesseha v. TD Waterhouse Inv. Servs., Inc.*, 761 N.Y.S.2d 22 (1st Dep't 2003); *Indep. Ord. of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933 (2d Cir. 1998)). By contrast, JPMorgan's fiduciary duty here arises out of the specific agency relationship it undertook as to the CSP.

### 3. JPMorgan Recommended Its CSP, Provided Investment Advice, and Owed Fiduciary Duties

JPMorgan recommended clients utilize the CSP by automatically enrolling them in the CSP by default upon opening their JPMorgan brokerage account. ¶¶25-26, 129. JPMorgan denies that this automatic enrollment was a recommendation because clients made the choice to enter a broker-client relationship with JPMS. MTD at 23. Rather than grapple with ramifications of this automatic enrollment, JPMorgan essentially argues that clients should never have opened a brokerage account if they did not want to be automatically enrolled in the CSP.

As Defendants concede, the CSP agreements provide that JPMorgan will act as a fiduciary, in the clients' best interest, and not put its interest ahead of its clients'. MTD at 22 (referencing ¶¶38, 47). In addition, JPMorgan takes on similar duties with other promises, including to "make investment recommendations that are in your best interest, based on the information you have shared with JPMS about you and your preferences." *See* ¶¶33, 38, 46, 48, 91, 98. However, JPMorgan incorrectly contends that Plaintiffs do not allege facts that "trigger the cabined fiduciary duties related to specific investment advice" and that Plaintiffs do not identify any recommendations JPMS offered to them concerning the uninvested cash. MTD at 22. First, the automatic enrollment feature establishes that the CSP is a recommendation.[15] Further, Plaintiffs' additional allegations support that the CSP is an investment recommendation. For example, non-advisory brokerage clients receive "personalized recommendations" and receive a welcome letter from the CEO of Chase Wealth Management, while simultaneously being placed in the CSP as

---

[15] *See* FINRA Regulatory Notice 11-02 at 2-3, 2011 FINRA LEXIS 11, at *5 (Jan. 2011) ("important factor" in determining whether a communication is a "recommendation" is whether it would "reasonably would be viewed as a suggestion that the customer take action or refrain from taking action regarding a security or investment strategy") *available at* https://www.finra.org/sites/default/files/NoticeDocument/p122778.pdf.

21

part of this account opening package. ¶50; *see also* ¶62. In other words, JPMorgan explicitly tells its clients that they are receiving recommendations for their investment account, and then enrolls them into the CSP. *See id.* JPMorgan Chase's Code of Conduct also lays out obligations to treat all clients fairly and in good faith. ¶¶102-07.

While Defendants argue they disclaimed any obligation to make recommendations on their client's cash (MTD at 22-23), Defendants selectively quote this part of the agreement, which states in full: "Unless otherwise agreed to in writing, JPMS does not have any discretionary authority or obligation to review or to make recommendations for the investment of cash or securities in your Brokerage Account(s)." *See* D.Ex. C at 5. As described herein, Plaintiffs provide other agreements that govern the CSP and JPMorgan's related obligations. Defendants similarly selectively quote disclosures to claim that JPMS warned that the CSP rate "might be lower than the rate available" on other "comparable accounts" (MTD at 23), which ignores that the same disclosure states that that the interest rate "***may be higher*** or lower." ¶¶54, 100; D.Ex.G at 1.

JPMorgan's duties under federal law are relevant to the existence of a fiduciary relationship under state law. JPMorgan points out that there is no private right of action under Reg BI and the Internal Revenue Code, and argues that, as a result, Plaintiffs cannot premise claims based on those authorities. MTD at 22-24. But Plaintiffs do not assert claims under those authorities. Instead, they cite them because they are relevant to show the fiduciary character of the relationship between Plaintiffs and JPMorgan with respect to the CSP. *See, e.g.*, ¶¶88-91, 108-19. In response to Plaintiffs' reference to the SEC Staff Bulletin addressing Reg BI (¶89; citing D.Ex.J), Defendants claim that Reg BI itself does not apply to the CSP. However, as described above, JPMorgan acknowledges its duties as a broker-dealer, and thus its obligations under Reg BI. ¶90. In an effort to distance the CSP from Reg BI, Defendants cite the statute's reference to "securities" when

referencing that Reg BI applies to an "investment strategy." MTD at 23. This distinction is not relevant to Plaintiffs' claims. Fundamentally, the cited SEC Staff Bulletin and Reg BI describe the obligations of firms like JPMorgan to act in a "retail investor's best interest and not to place their own interests ahead of the investor's interest." ¶89; D.Ex.J.

### 4.        JPMorgan Cannot Disclaim Its Duties to Its Clients

JPMorgan's disclosures—including that it does not act as a fiduciary under any federal laws, rules, or regulations, for its brokerage customers except in limited circumstances (*see* MTD at 22)—do not abrogate its duties to its clients. Agents generally cannot disclaim the fiduciary duties owed to their principals. *See, e.g.*, *Veleron*, 117 F. Supp. 3d at 451-52 ("where a writing erects the essential structure of an agency relationship, even an explicit disclaimer cannot undo it" and holding that whether there was an "agent-principal arrangement—an inherently fiduciary arrangement" was for trial). There is no authority that the mere disclosure of a conflict precludes a fiduciary relationship; courts hold the opposite. *Higgins v. New York Stock Exch., Inc.*, 806 N.Y.S.2d 339 (N.Y. Sup. 2005) (fiduciary's "attempt to insulate itself from appearances of impropriety...by simply disclosing potential conflicts…does not necessarily absolve it of potential liability").  In fact, JPMorgan concedes it owed fiduciary duties when it "make[s] investment recommendations" (D.Ex.C at 5)—which JPMS did when automatically enrolling class members in the CSP.[16]

### 5.        Plaintiffs' Fiduciary Duty Claim Coexists with the Contract Claim

Plaintiffs' breach of contract and breach of fiduciary duty claims are based on distinct legal

---

[16] JPMorgan's disclaimer that it had no duty "to make recommendations for the investment of cash" disregards that JPMorgan ***did*** make a recommendation by enrolling clients in the CSP. D.Ex.C at 5. Indeed, given JPMorgan's agency obligations, to the extent this disclaimer is effective (it is not), the better reading is that it only exempts JPMorgan from an ongoing obligation to make ***future*** recommendations concerning the investment of clients' cash.

theories and facts. *Compare* ¶¶171, 173 (contract claim based on failure to pay rates that will vary based on business and economic conditions) *with* ¶¶192-93 (breach of fiduciary duties of care and loyalty in failing to secure fair or reasonable rates, failure to act in the clients' best interests, and recommending use of CSP).  Plaintiffs' remedies for breach of fiduciary duty include restitution, disgorgement of profits, and forfeiture of compensation, which are generally unavailable for breach of contract. New York law also allows fiduciary duty claims to be "connected with and dependent upon the contract." *Ambac Assurance Corp. v. U.S. Bank N.A.*, 328 F. Supp. 3d 141, 156 (S.D.N.Y. 2018); *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551 (1992) (possible to allege tort liability from breach of duty in addition to breach of contract); *see also IDW*, 2009 WL 321222, at *12 (upholding both breach of fiduciary and contract under Rule 8 because "breach of fiduciary duty is based, at least in part, [on facts suggesting] the existence of a broader, ongoing fiduciary relationship…beyond the four corners of the Agreements.").[17]

### D.    Plaintiffs State a Claim for Unjust Enrichment

Defendants do not challenge the substance of Plaintiffs' unjust enrichment claim, but only Plaintiffs' ability to plead unjust enrichment in the alternative. MTD at 25. Defendants are wrong.

A party may plead unjust enrichment in the alternative to a breach of contract claim where, as here, "there is a dispute over the ***existence, scope, or enforceability*** of the putative contract." *Hofmann v. Long Island Univ.*, 2024 WL 3262819, at *1 (2d Cir. Jul. 2, 2024); *see also Beth Israel*

---

[17] Defendants' cases are inapposite or help Plaintiffs. In *Snyder v. Wells Fargo Bank, N.A.*, 594 F. App'x 710, 713 (2d Cir. 2014), the fiduciary duty claim was held not duplicative at the pleading stage, both claims were tried together, and the fiduciary claim was held duplicative after trial. In *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, the court held the plaintiff failed to allege a fiduciary relationship, but observed in dicta that the claim was duplicative because both were "premised upon the same facts and seek the same damages." 921 F. Supp. 2d 94, 106 (S.D.N.Y. 2013). Here, the substance of the two claims is not identical and the remedies are not the same. In *Celle*, 851 N.Y.S.2d 501, the court held that a fiduciary duty claim based on the same facts could not be sustained because it was not adequately alleged and, in dicta, observed it was duplicative.

*Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (cited by Defendants) (restriction on dual claims applies only "inasmuch as the valid and enforceable written [contract] governed the particular subject matter"). *Churchill Real Estate Holdings, LLC v. CBCS Washington Street LP*, on which Defendants rely, favors Plaintiffs' position. There, the court held that an express agreement governed the subject matter and, in any event, that "defendants were allegedly enriched not by plaintiff but by a third party." 95 N.Y.S.3d 526 (1st Dep't 2019). Here, the parties dispute the existence, scope, and enforceability of any agreement that imposes an obligation of reasonable rates and fees. *Compare* ¶¶108-19 (alleging obligation to pay reasonable rate), *with* MTD at 7-14, 26-27 (disputing (i) that contract imposes or covers such obligation and (ii) that any contractual relationship exists between Plaintiffs and JPMorganChase).

### E.    Plaintiffs State a Claim Against JPMorganChase

JPMorganChase, a holding company that conducts business through its subsidiaries JPMS and JPMCB (¶14), is liable as JPMS's corporate parent. *See Harte v. Ocwen Fin. Corp.*, 2016 WL 1275045, at *4 (E.D.N.Y. Mar. 31, 2016) (corporate parent may be held liable for wrongs of subsidiary). JPMorganChase knowingly encouraged, directed, and participated in JPMS's breaches of contracts and knowingly received the benefits thereof. ¶175. JPMorganChase controls what interest rates its clients receive. ¶65. The account agreements make clear that JPMS and JPMCB are "affiliated companies under the ***common control*** of JPMorgan Chase & Co." ¶18, 29. *See Skanga Energy & Marine Ltd. v. Arevenca S.A.*, 875 F. Supp. 2d 264, 269 (S.D.N.Y. 2012) (logo on bill of lading supported liability at motion to dismiss stage). Additionally, JPMorganChase is liable under the doctrine of *respondeat superior* because JPMS, a wholly owned subsidiary and agent of JPMorganChase, was acting within the scope of its corporate principal-agent relationship. ¶176.

25

## IV.    CONCLUSION

For the foregoing reasons, Defendants' MTD should be denied.

Dated: June 11, 2025

Respectfully submitted,

/s/ Michael Dell'Angelo
Michael Dell'Angelo (*pro hac vice*)
Joel M. Sweet (*pro hac vice*)
Alex B. Heller (*pro hac vice*)
Radha Nagamani Raghavan (NY Bar No. 5753140)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bm.net
jsweet@bm.net
aheller@bm.net
rraghavan@bm.net

*Lead Counsel for Plaintiffs and the Proposed Class*

Salvatore J. Graziano
John Rizio-Hamilton
Adam H. Wierzbowski
Michael D. Blatchley
**BERNSTEIN LITOWITZ BERGER
     & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
salvatore@blbglaw.com
johnr@blbglaw.com
adam@blbglaw.com
michaelb@blbglaw.com

*Local Counsel for Plaintiffs and the Proposed Class*

26

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing Memorandum complies with the word limit prescribed in Rule III.B.1 of this Court's Individual Practices and Procedures for Civil Cases and Local Civil Rule 7.1(c) because this document contains 8,729 words.


*/s/ Michael Dell'Angelo*
Michael Dell'Angelo